IN THE UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____
                                       )
UNITED STATES OF AMERICA and           )
THE STATE OF MICHIGAN                  )
                                       )
            Plaintiffs,                )
                                       )
      v.                               )   Civil Action No. 1:19-cv-1041
                                       )
NCR CORPORATION,                       )
                                       )
            Defendant.                 )
_____)

**COMPLAINT**

The United States of America, by authority of the Attorney General of the United States, acting at the request and on behalf of the United States Environmental Protection Agency ("EPA"), and the State of Michigan (the "State"), through the Michigan Department of Environment, Great Lakes, and Energy ("EGLE"), through the undersigned attorneys, file this complaint and allege as follows:

NATURE OF THE ACTION

1.      This is a civil action brought by the United States and the State (collectively, the "Plaintiffs") against Defendant NCR Corporation (the "Defendant" or "NCR") pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9606 and 9607.  The Plaintiffs seek to recover unreimbursed costs incurred for response activities undertaken in response to the release and threatened release of hazardous substances from facilities at and near the Allied Paper/Portage Creek/Kalamazoo River Superfund Site in Michigan (the "Site").  The Plaintiffs

also seek a declaratory judgment that the Defendant is liable for future response costs that the United States or the State may incur in connection with response actions that may be performed at the Site pursuant to CERCLA § 113(g)(2), 42 U.S.C. § 9613(g)(2).  Finally, the United States seeks injunctive relief requiring the Defendant to implement response actions that are determined to be necessary to protect public health and welfare and the environment pursuant to CERCLA § 106(a), 42 U.S.C. § 9606(a).

## JURISDICTION AND VENUE

2.	This Court has jurisdiction over the subject matter of this action pursuant to CERCLA § 113(b) and (e), 42 U.S.C. §§ 9613(b) and (e), and 28 U.S.C. §§ 1331 and 1345. The Court also has personal jurisdiction over the Defendant.

3.	Venue is proper in this district pursuant to CERCLA § 113(b), 42 U.S.C. § 9613(b), and 28 U.S.C. § 1391(b) and (c) because the claims arose and the threatened and actual releases of hazardous substances occurred in this district.

## BACKGROUND ON THE SITE AND THE STATUTE

4.	The Site includes soil and sediment contamination in disposal areas, paper mill properties, about 80 miles of the Kalamazoo River, adjacent riverbanks and contiguous floodplains, as well as a three-mile stretch of Portage Creek that is contaminated primarily with polychlorinated biphenyls ("PCBs").  Facilities along the River discharged large amounts of PCBs in connection with past re-processing of a particular type of PCB-coated "carbonless" copy paper, known as "No Carbon Required" paper or "NCR Paper."  PCBs do not break down readily by natural processes, and the compounds bioaccumulate in the fatty tissue of animals. The PCBs at the Site have caused adverse health effects in wild mink residing in the Kalamazoo River basin, and fish in the area are subject to human health-based consumption advisories.

PCBs are probable human carcinogens and can cause non-cancer human health effects, such as reduced ability to fight infections, low birth weights, and learning problems.

Response Activities by Plaintiffs

5. Pursuant to CERCLA, EPA and states may take "response" actions in response to the release and threatened release of hazardous substances at and from facilities, including contaminated sites. Such response actions may include "removal" actions, including site investigations, studies to plan and direct cleanup efforts, and various activities to prevent, minimize, or mitigate damage to public health, welfare, or the environment, as well as longer-term "remedial" actions consistent with permanent remedies that prevent or minimize releases of hazardous substances to protect present and future public health, welfare, and the environment.

6. As a result of PCB contamination at the Site, EPA and EGLE have taken and required various response activities in accordance with CERCLA, including removal activities and remedial activities.

Response Costs

7. CERCLA § 107, 42 U.S.C. § 9607, authorizes the United States and states to recover costs that they incur in response to the release and threatened release of hazardous substances, to the extent such costs are not inconsistent with the National Contingency Plan (the "NCP"). The statute imposes liability for such costs on certain classes of potentially responsible parties ("PRPs"), including current owners and operators of a facility from which there has been a release of a hazardous substance, parties that owned or operated a facility at the time of disposal of a hazardous substance, and parties that arranged for disposal or treatment of a hazardous substance at a facility owned by another party or entity.

8. EPA and EGLE have each incurred unreimbursed costs in connection with response actions at the Site, including the actions described above. Those unreimbursed costs include, but are not limited to: (i) costs of actions to monitor, assess, and evaluate the release or threatened release of hazardous substances at the Site; (ii) costs of performing and overseeing response activities at the Site; and (iii) costs of enforcement activities relating to the Site.

9. The above-referenced response costs incurred by Plaintiffs qualify as costs of "response" and "costs of removal or remedial action incurred by the United States Government or a State" under CERCLA §§ 101(25) and 107(a)(4)(A), 42 U.S.C. §§ 9601(25) and 9607(a)(4)(A).

10. The United States and the State incurred the above-referenced response costs in a manner not inconsistent with the NCP.

11. The United States and the State will continue to incur response costs associated with the Site.

Cleanup Requirements

12. Pursuant to CERCLA § 106, 42 U.S.C. § 9606, when EPA determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of hazardous substances from a facility, EPA may issue such orders as may be necessary to protect public health and welfare and the environment. CERCLA § 106 also authorizes the United States to maintain civil actions to secure such relief as may be necessary to abate such danger or threat, and provides that district courts may grant such relief as the public interest and the equities of the case may require.

13. EPA has determined that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of actual and threatened releases of

converted the NCR Paper into consumer end products by printing on the paper and trimming it to produce multi-part business forms.

20. NCR had a close and often controlling relationship with the companies that coated paper with NCR's PCB-containing emulsion to produce bulk NCR Paper. In the United States, those companies included Appleton Coated Paper Company, Combined Paper Mills, and Mead Corporation. Two of those coaters – Appleton Coated Paper Company and Combined Paper Mills – were eventually acquired by and merged into NCR. Among other things:

    a. NCR established and enforced detailed process specifications for the manufacture of NCR Paper. Those specifications required the paper coater to test samples of the NCR Paper and to scrap any NCR Paper that failed to meet a set of minimum quality requirements. Off-specification NCR Paper needed to be disposed of and could not be shipped to NCR Paper customers.

    b. NCR tracked coaters' generation of PCB-coated scrap paper that was incidental to the production of bulk NCR Paper. This scrap paper – which was commonly called NCR Paper "broke" – included partially-coated paper roll ends and trimmings, as well as coated paper that did not meet NCR Paper specifications. Internal memoranda and external communications by NCR and its coaters referred to NCR Paper broke as a "waste" material. NCR assisted the coaters in minimizing their generation of NCR Paper broke and also assisted them in ridding themselves of the NCR Paper broke that they generated.

21. NCR also involved itself in the conversion of bulk NCR Paper into end products that were sold to consumers. NCR's Systemedia Division operated multiple conversion facilities

throughout the country (the "NCR Systemedia Facilities"), including facilities in Washington Court House, Ohio, Dayton, Ohio, and Viroqua, Wisconsin.

22. PCB-containing waste paper was generated at no less than three separate stages in the production, conversion, and consumption of NCR Paper. First, as noted above, NCR Paper "broke" was generated during the production of bulk NCR Paper. Second, "converter trim" was generated during the conversion of bulk NCR paper into multi-part business forms. Third, "post-consumer" wastepaper was generated when business form users and other users discarded NCR Paper.

23. The owners of certain paper mills along the Kalamazoo River and in other areas purchased and reprocessed waste paper that included PCB-coated NCR Paper – including broke, converter trim, and post-consumer waste paper – as feedstock for the production of their own paper products.

24. The sale of NCR Paper waste was influenced by the fact that many reprocessing mills needed a special "deinking" or washing process to separate, remove, and discard the coatings, reactive dyes, and inks applied to the NCR Paper before they could make beneficial use of the re-pulped paper fiber for the production of their own paper products. This treatment and disposal step for the unwanted coatings and inks required added equipment, effort, and expense. As a result, the market price for NCR Paper waste invariably was discounted as compared to the price charged for comparable waste paper without unwanted coatings or inks.

25. When NCR Paper waste was reprocessed, most of the PCBs in the coating were removed from the paper production process in the reprocessing mill's waste water effluent.

    a. PCBs would often adhere to solids that were filtered or settled out of the reprocessing mills' waste water effluent by waste water handling systems. In many

instances, the sludge formed from these solids was accumulated in lagoons and/or collected and placed in fill areas at or near the paper mills.

        b.      The paper reprocessing mills' waste water treatment systems would not remove all PCBs from the waste water effluent, and PCB-contaminated waste water was often discharged to a nearby waterbody. In a natural aquatic environment like a river, a substantial portion of the PCBs in waste water effluent would normally partition and adhere to solids and sediment in the river and in floodplain areas.

      26.      In the Kalamazoo River watershed, PCB-containing paper mill sludge was disposed of in multiple fill areas and impoundments, including areas known as the Allied Landfill, the Willow Boulevard/A-Site Landfill areas, the King Highway Landfill, the 12th Street Landfill, and former settling ponds and lagoons for several area mills.

      27.      PCB-containing effluent from multiple paper reprocessing mills was discharged to the Kalamazoo River and some of its tributaries, including Portage Creek. The PCB dischargers included the facilities known as the Kalamazoo Paper Company Mill, the King Mill, the Bryant Mill, and the Plainwell Mill. These mills reprocessed various categories of NCR Paper waste from various sources, including but not limited to NCR Paper broke generated by Appleton Coated Paper Company and NCR Paper converter trim generated by NCR Systemedia Facilities.

      28.      NCR understood, facilitated, and participated in the sale of PCB-coated NCR Paper waste to reprocessing mills, including facilities along the Kalamazoo River identified in the preceding Paragraph. Based in part on its own experiments and experience, NCR understood that these mills' re-pulping processes would release the PCBs and reactive dyes applied to NCR Paper. NCR knew that the dyes would discolor the pulp and that the discoloration typically

would need to be reduced by deinking or washing processes. NCR knew that mills that reprocessed NCR Paper waste – including facilities along the Kalamazoo River identified in the preceding Paragraph – actually employed such processes to remove unwanted coatings from NCR Paper waste. NCR viewed the mills' reprocessing of NCR Paper waste as a convenient arrangement for the treatment and disposal of NCR Paper waste, and especially for the unwanted PCB-containing coating on NCR Paper waste.

29. NCR gained increasing knowledge of the environmental risks posed by its use of PCBs in its proprietary NCR Paper emulsion coating during the late 1960s and early 1970s. Rather than sharing its knowledge of those risks with NCR Paper customers, reprocessors, and regulators – and ceasing its use of PCBs entirely – NCR ramped up its PCB use in the late 1960s and did not discontinue PCB use in NCR Paper until April 1971. Throughout this time period, NCR also continued to promote and engage in the sale of PCB-containing NCR Paper waste that was being reprocessed by paper mills for the production of their own products.

30. NCR arranged for disposal or treatment of hazardous substances that it owned or possessed, at facilities owned or operated by other parties, through the production and disposition of PCB-coated NCR Paper, including but not limited to the disposition of NCR Paper broke and converter trim.

31. This Court has already determined that NCR is liable under CERCLA for response costs incurred in addressing PCB contamination at the Site as a party that arranged for disposal or treatment of PCBs released at the Site under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3). *See Georgia-Pacific Consumer Products LP v. NCR Corp.*, 980 F. Supp. 2d 821 (W.D. Mich. 2013), *appeal docketed*, No. 18-1805 (6th Cir. July 17, 2017).

32.     In light of the foregoing, NCR is liable to Plaintiffs in this action under CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3).

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Cost Recovery by the United States Under CERCLA § 107, 42 U.S.C. § 9607)

33.     Paragraphs 1-32 are realleged and incorporated herein by reference.

34.     The Defendant is jointly and severally liable to the United States for all unreimbursed response costs incurred by the United States in connection with the Site pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a).

### SECOND CLAIM FOR RELIEF
(Declaratory Judgment for Recovery of Further Response Costs by the United States)

35.     Paragraphs 1-32 are realleged and incorporated herein by reference.

36.     The Defendant is liable to the United States for any unreimbursed further response costs that the United States incurs in connection with PCB contamination at the Site, not inconsistent with the NCP, pursuant to CERCLA §§ 107(a) and 113(g)(2), 42 U.S.C. §§ 9607(a) and 9613(g)(2).

### THIRD CLAIM FOR RELIEF
(Cost Recovery by the State Under CERCLA § 107, 42 U.S.C. § 9607)

37.     Paragraphs 1-32 are realleged and incorporated herein by reference.

38.     The Defendant is jointly and severally liable to the State for all unreimbursed response costs incurred by the State in connection with the Site pursuant to CERCLA § 107(a), 42 U.S.C. § 9607(a).

### FOURTH CLAIM FOR RELIEF
(Declaratory Judgment for Recovery of Further Response Costs by the State)

39.     Paragraphs 1-32 are realleged and incorporated herein by reference.

40. The Defendant is liable to the State for any unreimbursed further response costs that the State incurs in connection with PCB contamination at the Site, not inconsistent with the NCP, pursuant to CERCLA §§ 107(a) and 113(g)(2), 42 U.S.C. §§ 9607(a) and 9613(g)(2).

### FIFTH CLAIM FOR RELIEF
(United States' Claim for Relief Under CERCLA § 106, 42 U.S.C. § 9606)

41. Paragraphs 1-32 are realleged and incorporated herein by reference.

42. The United States Environmental Protection Agency has determined that there is or may be an imminent and substantial endangerment to the public health or welfare or the environment because of actual and threatened releases of hazardous substances into the environment at and from the Site.

43. Pursuant to CERCLA § 106(a), 42 U.S.C. § 9606(a), the Defendant is subject to injunctive relief to abate the danger or threat presented by releases or threatened releases of hazardous substances into the environment at and from the Site.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, the United States of America and the State of Michigan, respectfully request that this Court:

1. Enter judgment in favor of the United States and against the above-named Defendant, jointly and severally, for all response costs incurred by the United States, as well as prejudgment interest, for response actions in connection with the Site;

2. Enter a declaratory judgment in favor of the United States and against the above-named Defendant for any unreimbursed further response costs that the United States incurs in connection with the Site, not inconsistent with the NCP;

      3.      Enter judgment in favor of the State and against the above-named Defendant, jointly and severally, for all response costs incurred by the State, as well as prejudgment interest, for response actions in connection with the Site;

      4.      Enter a declaratory judgment in favor of the State and against the above-named Defendant for any unreimbursed further response costs that the State incurs in connection with the Site, not inconsistent with the NCP;

      5.      Order the above-named Defendant to abate the conditions at the Site that may present an imminent and substantial endangerment to the public health or welfare or the environment;

      7.      Award the United States and the State their costs of this action; and

      8.      Grant such other and further relief as the Court deems just and proper.

Signature Page for Complaint in
*United States and the State of Michigan v. NCR Corp.* (W.D. Mich.)

FOR THE UNITED STATES OF AMERICA:

12/4/19
Dated

Jeffrey Bossert Clark
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
Washington, D.C. 20530

Kristin M. Furrie
Senior Counsel
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, D.C. 20044-7611

ANDREW BYERLY BIRGE
United States Attorney
Western District of Michigan

Adam B. Townshend
Assistant United States Attorney
Western District of Michigan
330 Ionia Ave. N.W., Suite 501
Grand Rapids, MI 49503

OF COUNSEL:

Nichole Wood-Chi, Associate Regional Counsel
Charles Mikalian, Associate Regional Counsel
U.S. Environmental Protection Agency, Region 5
77 West Jackson Blvd.
Chicago, IL 60604

13

Signature Page for Complaint in
*United States and the State of Michigan v. NCR Corp.* (W.D. Mich.)

                      FOR THE STATE OF MICHIGAN

                      DANA NESSEL
                      Attorney General of Michigan

12/6/19
Dated
                      _____
                      Megen Miller (P78901)
                      Assistant Attorney General
                      Environment, Natural Resources, and
                      Agriculture Division
                      Michigan Department of Attorney General
                      P.O. Box 30755
                      Lansing, MI 48909
                      (517) 335-7664