IN THE UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | |
|---|---|
| UNITED STATES OF AMERICA and<br>THE STATE OF MICHIGAN | )<br>) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| NCR CORPORATION, | ) |
| | ) |
| Defendant. | ) |

Civil Action No. 1:19-cv-1041

_____)

**CONSENT DECREE WITH NCR CORPORATION**

# TABLE OF CONTENTS

I.      BACKGROUND ........................................................................................................ 1
II.     JURISDICTION ....................................................................................................... 4
III.    PARTIES BOUND .................................................................................................... 4
IV.     DEFINITIONS ......................................................................................................... 5
V.      GENERAL PROVISIONS ...................................................................................... 10
VI.     PERFORMANCE OF THE AREA 4 REMOVALWORK ...................................... 13
VII.    PERFORMANCE OF THE AREA 2 WORK .......................................................... 14
VIII.   PERFORMANCE OF THE AREA 3 WORK .......................................................... 15
IX.     REMEDY REVIEW ............................................................................................... 15
X.      PROPERTY REQUIREMENTS ............................................................................ 16
XI.     FINANCIAL ASSURANCE .................................................................................... 17
XII.    PAYMENTS ............................................................................................................ 22
XIII.   INDEMNIFICATION AND INSURANCE ............................................................ 26
XIV.    FORCE MAJEURE ................................................................................................. 27
XV.     DISPUTE RESOLUTION ...................................................................................... 28
XVI.    STIPULATED PENALTIES ................................................................................... 30
XVII.   COVENANTS BY PLAINTIFFS .......................................................................... 33
XVIII.  COVENANTS BY SD ............................................................................................. 36
XIX.    EFFECT OF SETTLEMENT; CONTRIBUTION .................................................. 37
XX.     ACCESS TO INFORMATION ............................................................................... 38
XXI.    RETENTION OF RECORDS .................................................................................. 39
XXII.   NOTICES AND SUBMISSIONS ........................................................................... 40
XXIII.  RETENTION OF JURISDICTION .......................................................................... 42
XXIV.   APPENDICES .......................................................................................................... 42
XXV.    MODIFICATION .................................................................................................... 43
XXVI.   LODGING AND OPPORTUNITY FOR PUBLIC COMMENT ............................ 43
XXVII.  EFFECTIVE DATE ................................................................................................ 43
XXVIII. SIGNATORIES/SERVICE ..................................................................................... 43
XXIX.   FINAL JUDGMENT ............................................................................................... 44

# I.   BACKGROUND

A.      Plaintiffs filed a complaint in this matter against NCR Corporation (the "Settling Defendant" or "SD") pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606 and 9607 at the Allied Paper/Portage Creek/Kalamazoo River Superfund Site, EPA ID# MID006007306 (the "Site").  The responsible Natural Resource trustees also contend that they have claims for recovery of Natural Resource Damages (including for recovery of Natural Resources Damages assessment costs) against the Settling Defendant.

B.      The United States of America ("United States"), on behalf of the Administrator of the United States Environmental Protection Agency ("EPA") and the State of Michigan ("State"), through the Michigan Department of Environment, Great Lakes, and Energy ("EGLE"),[1] in their complaint seek, *inter alia*: (1) reimbursement of a portion of the costs incurred by EPA, the Department of Justice ("DOJ"), and the State for response actions at the Site in Kalamazoo County, Michigan, together with accrued interest; and (2) performance of response actions by the defendants at the Site consistent with the National Contingency Plan, 40 C.F.R. Part 300 ("NCP").

C.      The responsible Natural Resources trustees include the State of Michigan, acting through its co-trustees designated by the Governor of Michigan: EGLE, the Michigan Department of Natural Resources ("MDNR"), and the Michigan Department of the Attorney General ("MDAG"); the United States Department of Interior ("DOI"), acting through the Fish and Wildlife Service ("FWS"); and, the Department of Commerce ("DOC"), acting through the National Oceanic and Atmospheric Administration ("NOAA") (collectively, the "Kalamazoo River Natural Resource Trustee Council" or "Trustees")). In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the State of negotiations with potentially responsible parties ("PRPs") regarding the implementation of response actions at the Site, and the State has participated in such negotiations and agreed to be a party to this Consent Decree ("CD").

D.      In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA notified the Trustees, as represented by the Kalamazoo River Natural Resource Trustee Council, of negotiations with PRPs regarding the release of hazardous substances that may have resulted in injury to the Natural Resources under federal and state trusteeship.  The Trustees have participated in the negotiation of this Consent Decree and support this Consent Decree.

E.      The United States initiated this suit on behalf of EPA and is entering into this Consent Decree on behalf of EPA, DOI, and DOC.

F.      The State initiated this action at the request of EGLE, and is entering into this Consent Decree on behalf of EGLE, MDNR, and MDAG (collectively, the "State Trustees").

G.      The Settling Defendant does not admit any liability to Plaintiffs arising out of the transactions or occurrences alleged in the complaint, nor do they acknowledge that the release or

---

[1] Pursuant to Executive Order 2019-06, effective April 22, 2019, the Michigan Department of Environmental Quality was renamed the Department of Environment, Great Lakes, and Energy. https://www.michigan.gov/documents/whitmer/EO_2019-06_Creating_EGLE_646953_7.pdf

threatened release of hazardous substance(s) at or from the Site constitutes an imminent and substantial endangerment to the public health or welfare or the environment.

H.      Pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, EPA placed the Site on the National Priorities List, set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on August 30, 1990, 55 Fed. Reg. 35502.

I.      The Site is located in and along the Kalamazoo River and Portage Creek, which is a tributary of the river, and includes sediments in the river and creek, river and creek banks and flood plains, and former paper mill property and papermaking waste disposal areas located near the river and creek.

J.      The Site has been divided into geographically-defined Operable Units ("OUs") as depicted in Appendix A to this CD: OU1 – Allied Paper, Inc./Bryant Mill Pond; OU2 – Willow Boulevard/A-Site Landfill; OU 3 – King Highway Landfill; OU4 – 12th Street Landfill; OU5 – 80 miles of the Kalamazoo River and 3 miles of Portage Creek; and OU7 – Former Plainwell Paper Mill Property.

K.      Georgia Pacific, LLC ("GP") has completed the remedial actions ("RAs") implementing records of decisions ("RODs") for OU 2 and OU 3. An Environmental Custodial Trust Trustee established in *In re: Lyondell Chemical Company, et al*., is currently performing a Remedial Design at OU1.  The Weyerhaeuser Company ("Weyerhaeuser") has completed the RA for OU4 and is performing the RA for OU7.

L.      Pursuant to 40 C.F.R. § 300.430 and a February 21, 2007 Administrative Order on Consent, GP is conducting a Supplemental Remedial Investigation and Feasibility Study ("SRI/FS") for OU5 of the Site. The 2007 SRI/FS AOC divided OU5 into seven areas ("Areas 1, 2, 3, 4, 5, 6, and 7").  That AOC requires separate SRI/FS reports for each of the seven OU5 areas. GP has completed the SRI/FS reports for Areas 1 and 2.  GP has completed the SRI for Area 3 and has submitted an FS report for EPA's approval in January 2018.  GP has also begun the SRI for Areas 4 and 5.  The primary contaminant of concern at OU5 is polychlorinated biphenyls ("PCBs").

M.      Between 2007 and 2011, EPA selected three separate time-critical removal actions ("TCRAs") to address conditions presenting imminent and substantial endangerment at Area 1 of OU5.  GP implemented two of the three TCRA response actions; EPA implemented the third.  In 2015, EPA issued a ROD for Area 1.  GP and International Paper Company ("IP") are implementing the remedy set forth in the Area 1 ROD pursuant to a Unilateral Administrative Order issued by EPA to GP, IP, and Weyerhaeuser.

N.      In 2010, GP commenced a lawsuit concerning the Site against IP, NCR and Weyerhaeuser in the United States District Court for the Western District of Michigan captioned *Georgia Pacific Consumer Products, LP, et al. v. NCR Corporation, et al,* Case No. 1:11-CV-483. The litigation in this case has yielded a decision on liability finding, among other things, that by at least 1969, NCR arranged for the disposal of PCB-contaminated carbonless copy paper broke and that NCR is a liable party at the Site. On June 19, 2018, the district court entered final judgment, in relevant part finding NCR liable for 40% of a portion of the past response costs incurred by GP (NCR's 40% share is $19,826,752.67) and entering a declaratory judgment that NCR is liable for

2

future costs at the Site.[2]  The district court did not allocate GP's response costs after September 2014.  The district court decisions are on appeal.  After judicial approval of this Consent Decree, NCR will withdraw its appeal within 30 days and satisfy the $19,826,752.67 judgment in favor of GP within 60 days.

O.    Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, EPA published notice of the completion of the FS for Area 2 and of the proposed plan for the Area 2 RA on June 30, 2017, in a major local newspaper of general circulation. EPA provided an opportunity for written and oral comments from the public on the proposed plan for the Area 2 RA. A copy of the transcript of the public meeting is available to the public as part of the administrative record upon which the Director of the EPA Region 5 Superfund Division based the selection of the response action.

P.    The decision by EPA on the remedial action to be implemented at Area 2 is embodied in a final ROD, executed on September 28, 2017.  The ROD includes a responsiveness summary to the public comments.  The State of Michigan, after a reasonable opportunity to review and comment, concurred with EPA's decision in the ROD.  Notice of the final plan was published in accordance with Section 117(b) of CERCLA, 42 U.S.C. § 9617(b).

Q.    Upon approval of the Area 3 FS, EPA plans to publish notice of the completion of the FS, issue a proposed plan for Area 3, and provide an opportunity for written and oral comments from the public on the proposed plan. Thereafter, EPA plans to issue a final Area 3 ROD that will include a response to public comment. EPA will provide the State an opportunity to review and concur on the final Area 3 ROD.

R.    Based on information provided to EPA by GP as part of the supplemental remedial investigation of Area 4, EPA may require a removal response action to address actual or threatened releases of pollutants or contaminants from Area 4 that may present an imminent and substantial endangerment to public health or welfare or the environment and will likely need to be addressed through a removal response action prior to the issuance of a ROD for Area 4.

S.    If the Director of EPA Region 5 Superfund Division selects a removal response action for Area 4, EPA believes that the removal response action will be properly and promptly conducted by SD if conducted in accordance with this CD and its appendices.

T.    Based on the information presently available to EPA, EPA believes that SD will properly and promptly implement the remedy for Area 2 as set forth in the Area 2 ROD if conducted in accordance with this CD and its appendices. If the Director of EPA Region 5 Superfund Division selects a removal response action for Area 4 and a ROD for Area 3, EPA believes those response actions will be properly and promptly conducted by SD if conducted in accordance with this CD and its appendices.

U.    Solely for the purposes of Section 113(j) of CERCLA, 42 U.S.C. § 9613(j), the remedies set forth in the Area 2 ROD, the Area 3 ROD, any removal response action in Area 4, and

---

[2] The District Court also found International Paper, Weyerhaeuser Company and the Georgia-Pacific Defendants liable for GP's past and future costs.

the Work to be performed by SD under this CD shall constitute response actions taken or ordered by the President for which judicial review shall be limited to the administrative record.

V.    The State Trustees, DOI, and DOC have been involved in various Natural Resource Damages assessment activities relating to the Site.  The Trustees have incurred and will continue to incur assessment costs associated with Natural Resource Damage assessment activities related to the Site.

W.    The Parties recognize, and the Court by entering this CD finds, that this CD has been negotiated in good faith and implementation of this CD will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this CD is fair, reasonable, and in the public interest.

X.    The Parties to this Consent Decree agree, and the Court by entering this Consent Decree finds, that restoration actions and other compensatory activities and damages payments to be provided under this Consent Decree constitute appropriate actions necessary to protect and restore the Natural Resources allegedly injured by releases or threatened releases of hazardous substances by the SD.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II.    JURISDICTION

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b). This Court also has personal jurisdiction over SD. Solely for the purposes of this CD and the underlying complaint, SD waives all objections and defenses that it may have to jurisdiction of the Court or to venue in this District. SD shall not challenge the terms of this CD or this Court's jurisdiction to enter and enforce this CD.

## III.    PARTIES BOUND

2.    This CD is binding upon the United States and the State and upon SD and its successors and assigns. Any change in ownership or corporate or other legal status of SD including, but not limited to, any transfer of assets or real or personal property, shall in no way alter SD's responsibilities under this CD.

3.    SD shall provide a copy of this CD to each contractor hired to perform the Work and to each person representing SD with respect to the Site or the Work, and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this CD. SD or its contractors shall provide written notice of the CD to all subcontractors hired to perform any portion of the Work. SD shall nonetheless be responsible for ensuring that its contractors and subcontractors perform the Work in accordance with the terms of this CD. With regard to the activities undertaken pursuant to this CD, each contractor and subcontractor shall be deemed to be in a contractual relationship with SD within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

## IV.    DEFINITIONS

4.    Unless otherwise expressly provided in this CD, terms used in this CD that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned

to them in CERCLA or in such regulations. Whenever terms listed below are used in this CD or its appendices, the following definitions shall apply solely for purposes of this CD:

"Affected Property" shall mean all real property at Area 2, Area 3 and Area 4 of Operable Unit 5 of the Site and any other real property to which EPA determines, at any time, that access, land, water, or other resource use restrictions, and/or Institutional Controls are needed to implement the Area 2 ROD, the Area 3 ROD (as applicable) or the Area 4 Removal Response Action.

"Area 2 of Operable Unit 5" or "Area 2" shall mean that portion of OU 5 from Plainwell Dam to Otsego City Dam, including approximately 1.9 miles of the Kalamazoo River and any nearby areas where hazardous substances, pollutants or contaminants from the Site have been, or may come to be, located (see Appendix A).

"Area 3 of Operable Unit 5" or "Area 3" shall mean that portion of OU 5 from Otsego City Dam to Otsego Dam, including approximately 3.4 miles of the Kalamazoo River and any nearby areas where hazardous substances, pollutants or contaminants from the Site have been, or may come to be, located (see Appendix A).

"Area 4 of Operable Unit 5" or "Area 4" shall mean that portion of OU 5 from Otsego Dam to Trowbridge Dam, including approximately 4.7 miles of the Kalamazoo River and any nearby areas where hazardous substances, pollutants or contaminants from the Site have been, or may come to be, located (see Appendix A).

"Area 4 Action Memorandum" or "Area 4 AM" shall mean the primary decision document selecting a removal response action at Area 4 of Operable Unit 5 that documents EPA's determination that a CERCLA removal action is needed, authorizes the removal action, identifies the action and cleanup levels and explains the rationale for the removal response action. A draft of the Area 4 AM is attached as Appendix D.

"Area 4 Removal Response Action" shall mean the response action for Area 4 of Operable Unit 5 to be selected by EPA in the Area 4 Action Memorandum, pursuant to CERCLA section 104(a), 42 U.S.C. § 9604, and EPA's regulations set forth at 40 C.F.R. § 300.415 and prior to EPA's issuance of a ROD for Area 4.

"Area 4 Removal Work Plan" shall mean the document describing the actions required by the CD related to implementation of the Area 4 Action Memorandum and shall include an expeditious schedule for completion of the activities set forth therein.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

"CD" shall mean this CD and all appendices attached hereto (listed in Section XXIV). In the event of conflict between this CD and any appendix, this CD shall control. The term "CD" includes any CD(s) modified pursuant to Paragraph(s) 13 and/or 14.

"Day" or "day" shall mean a calendar day. In computing any period of time under this CD, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of the next working day.

"DOC" shall mean the United States Department of Commerce and any successor departments, agencies, or instrumentalities.

5

"DOI" shall mean the United States Department of the Interior and any successor departments, agencies, or instrumentalities.

"DOJ" shall mean the United States Department of Justice and any successor departments, agencies, or instrumentalities.

"Effective Date" shall mean the date upon which the approval of this CD is recorded on the Court's docket.

"EGLE" shall mean the Michigan Department of Environment, Great Lakes, and Energy and any successor departments or agencies of the State.

"EPA" shall mean the United States Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

"EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

"Final Certification of Remedial Action Completion" or "Final Certification of RA Completion" shall mean the certification of remedial action completion that is last in time for the Site, regardless of which operable unit or Area of an Operable Unit it pertains to, and shall constitute the Final Certification of Remedial Action Completion for purposes of Section XVII (Covenants by Plaintiffs).

"Future Specified Response Costs" shall mean all costs incurred under this CD, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing deliverables submitted pursuant to this CD, in overseeing implementation of the Work, or otherwise implementing, overseeing, or enforcing this CD, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to ¶ 10 (Emergencies and Releases), ¶ 11 (Community Involvement) (including the costs of any technical assistance grant under Section 117(e) of CERCLA, 42 U.S.C. § 9617(e)), ¶ 39 (Access to Financial Assurance), Section IX (Remedy Review), Section X (Property Requirements) (including the cost of attorney time and any monies paid to secure or enforce access or land, water, or other resource use restrictions and/or to secure, implement, monitor, maintain, or enforce Institutional Controls including the amount of just compensation), and Section XV (Dispute Resolution), and all litigation costs.

"Installment Payments" shall mean the payment made by SD to the Trustees or EPA made on the anniversary of the Effective Date in accordance with Paragraphs 44 and 49 and does not include the Initial Payment as required by Paragraph 42, the initial payment to the Trustees as required by Paragraph 44, or the annual payment to the State for its oversight costs as required by Paragraph 50.

"Institutional Controls" or "ICs" shall mean Proprietary Controls and state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices that: (a) limit land, water, or other resource use to minimize the potential for human exposure to Waste Material at or in connection with Area 2, Area 3, and Area 4; (b) limit land, water, or other resource use to implement, ensure non-interference with, or ensure the protectiveness of the Area 2 RA, Area 3 RA, and Area 4 Removal Response Action; and/or (c) provide information intended to modify or guide human behavior at or in connection with Area 2, Area 3, and Area 4.

6

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at https://www.epa.gov/superfund/superfund-interest-rates.

"Natural Resource" or "Natural Resources" shall mean land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the fishery conservation zone established by the Magnuson-Stevens Fishery Conservation and Management Act [16 U.S.C. 1801 et seq.]), any State or local government, any foreign government, any Indian tribe, or, if such resources are subject to a trust restriction on alienation, any member of an Indian tribe.

"Natural Resource Damages" shall mean any damages recoverable by the United States or the State on behalf of the public for injury to, destruction of, or loss of use of, or impairment of Natural Resources at the Site as a result of a release of hazardous substances, including but not limited to: (i) the costs of assessing injury to, destruction of, loss of, or impairment of Natural Resources; (ii) the costs of restoration, rehabilitation, or replacement of injured or lost Natural Resources or of acquisition of equivalent resources and/or their services; (iii) compensation for injury, destruction, loss, loss of use, diminution in value, or impairment of Natural Resources; (iv) the costs of planning, implementing, and monitoring restoration activities; and (v) each of the categories of recoverable damages described in 43 C.F.R. § 11.15 and applicable state law.

"NRDAR Fund" means DOI's Natural Resource Damage Assessment and Restoration Fund.

"MDAG" shall mean the Michigan Department of Attorney General and any successor departments or agencies of the State.

"MDNR" shall mean the Michigan Department of Natural Resources and any successor departments or agencies of the State.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Non-Settling Owner" shall mean any person, other than SD, that owns or controls any Affected Property. The clause "Non-Settling Owner's Affected Property" means Affected Property owned or controlled by Non-Settling Owner.

"Operable Unit 5" or "OU 5" shall mean the area of the Site which includes contaminated instream sediments, banks and floodplains along 80 miles of the Kalamazoo River from Morrow Dam east of Kalamazoo to the river mouth at Lake Michigan, plus a three-mile stretch of Portage Creek in the City of Kalamazoo.

"Operation and Maintenance for Area 2" or "Area 2 O&M" shall mean all activities required to operate, maintain, and monitor the effectiveness of the Area 2 RA as specified in the SOW or any EPA-approved O&M Plan.

7

"Operation and Maintenance for Area 3" or "Area 3 O&M" shall mean all activities required to operate, maintain, and monitor the effectiveness of the Area 3 RA as specified in the SOW or any EPA-approved O&M Plan.

"Paragraph" or "¶" shall mean a portion of this CD identified by an Arabic numeral or an upper or lower case letter.

"Parties" shall mean the United States, the State, and SD.

"Performance Standards" shall mean, collectively, the Area 2 PS and Area 3 PS.

"Performance Standards for Area 2" or "Area 2 PS" shall mean the cleanup levels and other measures of achievement of the remedial action objectives set forth in the Area 2 ROD.

"Performance Standards for Area 3" or "Area 3 PS" shall mean the cleanup levels and other measures of achievement of the remedial action objectives set forth in the Area 3 ROD.

"Plaintiffs" shall mean the United States and the State.

"Prior Encumbrances" shall mean all record matters that affect title to the Affected Property, including all prior liens, claims, rights (such as easements), mortgages, and other encumbrances.

"Proprietary Controls" shall mean easements or covenants running with the land that (a) limit land, water, or other resource use and/or provide access rights and (b) are created pursuant to common law or statutory law by an instrument that is recorded in the appropriate land records office.

"RCRA" shall mean the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992 (also known as the Resource Conservation and Recovery Act).

"Record of Decision for Area 2" or "Area 2 ROD" shall mean the EPA Record of Decision relating to Area 2 of Operable Unit 5 of the Site signed on September 28, 2017, by the Regional Administrator, EPA Region 5, or his/her delegate, and all attachments thereto. The ROD is attached as Appendix C.

"Record of Decision for Area 3" or "Area 3 ROD" shall mean the Record of Decision relating to Area 3 of Operable Unit 5 of the Site to be issued after entry of the CD by EPA Region 5 and all attachments thereto.  The Area 3 ROD shall become Appendix E.

"Remedial Action for Area 2" or "Area 2 RA" shall mean the remedial action selected in the Area 2 ROD.

"Remedial Action for Area 3" or "Area 3 RA" shall mean the remedial action selected in the Area 3 ROD.

"Remedial Design for Area 2" or "Area 2 RD" shall mean those activities to be undertaken by SD to develop final plans and specifications for the Area 2 RA as stated in the SOW.

"Remedial Design for Area 3" or "Area 3 RD" shall mean those activities to be undertaken by SD to develop final plans and specifications for the Area 3 RA as stated in the SOW.

"Response Cost Payments" shall mean payments made pursuant to Paragraph 44 that will be deposited into the Site-wide Special Account for use by EPA to conduct or finance response actions at or in connection with the Site.

8

"Section" shall mean a portion of this CD identified by a Roman numeral.

"Settling Defendant" or "SD" shall mean NCR Corporation.

"Site" shall mean the Allied Paper, Inc./Portage Creek/Kalamazoo River Superfund Site, encompassing approximately 80 miles of the Kalamazoo River (from Morrow Lake Dam to Lake Michigan), including the river banks and formerly impounded adjacent floodplains and wetlands, as well as a 3-mile stretch of Portage Creek and four paper residual disposal areas, located in Kalamazoo and Allegan Counties, Michigan, and depicted generally on the map attached as Appendix A.  The "Site" also includes any areas where hazardous substances, pollutants or contaminants from the Site have been, or may come to be, located.

"Site-wide Special Account" shall mean the special account, within the EPA Hazardous Substance Superfund, established for the Site by EPA prior to the Effective Date pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3), and designated as account 059B00.

"State" shall mean the State of Michigan.

"State Future Response Costs" shall mean all costs, including direct and indirect costs, including but not limited to State employee salary and benefit costs, and travel expenses, that State employees incur in reviewing plans, reports, or other items pursuant to this CD, verifying Work, consulting with and providing comments to EPA and SD in connection with the Work, or otherwise implementing, overseeing, or enforcing this CD; and any costs spent on removal of one or more portions of the Trowbridge Dam structure done prior to SD's Area 4 Removal Work.

"State Past Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the State paid at or in connection with the Site through the Date of Lodging, plus Interest on all such costs that has accrued pursuant to 42 U.S.C. § 9607(a) through such date.

"Statement of Work" or "SOW" shall mean the document describing the activities SD must perform to implement the Area 2 RD, the Area 2 RA, the Area 2 O&M, the Area 3 RD, the Area 3 RA, the Area 3 O&M, the Area 4 Removal Response Action and each modification to the SOW.

"Supervising Contractor" shall mean the principal contractor retained by SD to supervise and direct the implementation of the Work under this CD.

"Transfer" shall mean to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

"Trustees" shall mean DOI, DOC, EGLE, MDNR, and MDAG.

"United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA, the National Oceanic and Atmospheric Administration, and the United States Department of Commerce.

"Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); and (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C.§ 6903(27).

"Work" shall mean all activities and obligations SD is required to perform under this CD, except the activities required under Section XXI (Retention of Records).

## V.   GENERAL PROVISIONS

5.      **Objectives of the Parties**. The objectives of the Parties in entering into this CD are to protect public health or welfare or the environment by the design and implementation of response actions at the Site by SD, to pay response costs of Plaintiffs, and to resolve the claims of Plaintiffs against SD, including to resolve claims for Natural Resource Damages, as provided in this CD.

6.      **Commitments by SD**.  SD shall finance and perform the Work in accordance with this CD and all deliverables developed by SD and approved or modified by EPA pursuant to this CD. SD shall pay the United States for its response costs and the State for its response costs as provided in this CD. SD shall also pay the Trustees to resolve Plaintiffs' Natural Resource Damages claim, as provided in this CD.

7.      **Compliance with Applicable Law**. Nothing in this CD limits SD's obligations to comply with the requirements of all applicable federal and state laws and regulations. SD must also comply with all applicable or relevant and appropriate requirements of all federal and state environmental laws as set forth in the ROD and the SOW. The activities conducted pursuant to this CD, if approved by EPA, shall be deemed to be consistent with the NCP as provided in Section 300.700(c)(3)(ii) of the NCP.

8.      **Permits**

a.      As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, SD shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

b.      SD may seek relief under the provisions of Section XIV (Force Majeure) for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval referenced in ¶ 8.a and required for the Work, provided that it has submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals.

c.      This CD is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

10

9.    **Coordination and Supervision**

    a.    **Project Coordinators**

        (1)    SD's Project Coordinator must have sufficient technical expertise to coordinate the Work. SD's Project Coordinator may not be an attorney representing SD in this matter and may not act as the Supervising Contractor. SD's Project Coordinator may assign other representatives, including other contractors, to assist in coordinating the Work.

        (2)    EPA shall designate and notify the SD of EPA's Project Coordinator[s] and Alternate Project Coordinators. EPA may designate other representatives, which may include its employees, contractors and/or consultants, to oversee the Work. EPA's Project Coordinator/Alternate Project Coordinator will have the same authority as a remedial project manager and/or an on-scene coordinator, as described in the NCP. This includes the authority to halt the Work and/or to conduct or direct any necessary response action when he or she determines that conditions at the Site constitute an emergency or may present an immediate threat to public health or welfare or the environment due to a release or threatened release of Waste Material.

        (3)    The State shall designate and notify EPA and the SD of its Project Coordinator[s] and Alternate Project Coordinators. The State may designate other representatives, including its employees, contractors and/or consultants to oversee the Work. For any meetings and inspections in which EPA's Project Coordinator participates, the State's Project Coordinator also may participate. SD shall notify the State reasonably in advance of any such meetings or inspections.

        (4)    SD's Project Coordinators shall meet (whether face-to-face or telephonically) with EPA's and the State's Project Coordinators at least monthly.

    b.    **Supervising Contractor**. SD's proposed Supervising Contractor must have sufficient technical expertise to supervise the Work and a quality assurance system that complies with ANSI/ASQC E4-2004, Quality Systems for Environmental Data and Technology Programs: Requirements with Guidance for Use (American National Standard).

    c.    **Procedures for Disapproval/Notice to Proceed**

        (1)    SD shall designate, and notify EPA, within 15 days after the Effective Date, of the name[s], title[s], contact information, and qualifications of the SD's proposed Project Coordinator and, within 60 days, notify EPA of the same regarding SD's proposed Supervising Contractor, whose qualifications shall be subject to EPA's review for verification based on objective assessment criteria (e.g., experience, capacity, technical expertise) and do not have a conflict of interest with respect to the project.

        (2)    EPA, after a reasonable opportunity for review and comment by the State, shall issue notices of disapproval and/or authorizations to proceed regarding the proposed Project Coordinator and Supervising Contractor, as applicable. If EPA issues a notice of disapproval, SD shall, within 60 days, submit to EPA a list of supplemental proposed Project Coordinators and/or Supervising Contractors, as

11

applicable, including a description of the qualifications of each. EPA shall issue a notice of disapproval or authorization to proceed regarding each supplemental proposed coordinator and/or contractor. SD may select any coordinator/contractor covered by an authorization to proceed and shall, within 21 days, notify EPA of SD's selection.

(3)　　SD may change its Project Coordinator and/or Supervising Contractor, as applicable, by following the procedures of ¶¶ 9.c(1) and 9.c(2).

10.　　**Emergencies and Releases**. SD shall comply with the emergency and release response and reporting requirements under ¶ 7.1 (Emergency Response and Reporting) of the SOW. Subject to Section XVII (Covenants by Plaintiffs), nothing in this CD or SOW limits any authority of Plaintiffs: (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, or (b) to direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site. If, due to SD's failure to take appropriate response action under ¶ 7.1 of the SOW, EPA or, as appropriate, the State take such action instead, SD shall reimburse EPA and/or the State under Section XII (Paymentss) for all costs of the response action. Payment to the State under this Paragraph is not subject to the process for payments in ¶ 50 (State Future Response Costs). Any costs incurred by the State under this Paragraph will be itemized and documented, and timely provided to SD, and payments shall be made within 60 days of SD's receipt of the itemized documentation and shall be made in accordance with ¶ 51 (State Payment Instructions).

11.　　**Community Involvement**. If requested by EPA, SD shall conduct community involvement activities under EPA's oversight as provided for in, and in accordance with, Section **2** (Community Involvement) of the SOW. Such activities may include, but are not limited to, designation of a Community Involvement Coordinator. Costs incurred by the United States under this Section constitute Future Specified Response Costs to be reimbursed under Section XII (Payments for Response Costs).

12.　　**Schedule for Implementation of the Work.**  Within 30 days of the Effective Date of the Consent Decree, SD shall submit to EPA for review and approval a schedule that is consistent with the attached SOW for the response actions for Areas 2, 3, and 4 that shows when design, pre-design sampling, construction, and construction completion is expected to occur. The first work on the schedule shall be the Removal Response Action in Area 4. The Parties agree to minimize the overlap of significant removal or remedial action work in more than one Area of OU5.

13.　　**CD and SOW Modification to Incorporate the Area 3 ROD**

a.　　After issuance of the Area 3 ROD, EPA, after consultation with the State, will provide SD with a Proposed CD and SOW Modification (e.g., "Proposed CD and SOW Modification for Area 3 RD/RA"), which describes the activities SD must perform to implement the Area 3 RD and Area 3 RA, including land or other resource use restrictions.

b.　　SD shall have 30 days from receipt of Proposed CD and SOW Modification for Area 3 RD/RA to opt-out of performance of the Area 3 ROD.  The Parties agree that the SOW modification shall follow the model "RD/RA CD Statement of Work" available at

https://cfpub.epa.gov/compliance/models/view.cfm?model_ID=543 to the extent that its language applies to the applicable ROD.

c.      If the SD does not opt-out of performance of the Area 3 ROD, the Parties will execute a CD modification in the form attached as Appendix F. The Proposed CD and SOW Modification for Area 3 RD/RA shall be lodged with the Court for at least 30 days for public notice and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the modified CD disclose facts or considerations that indicate that the modification is inappropriate, improper, or inadequate.

d.      In the event that the Court does not approve the CD and SOW Modification for Area 3 RD/RA, this CD remains in full force and effect.

14.     **SOW Modification and Related Deliverables**

a.      If EPA determines that it is necessary to modify the work specified in the SOW and/or in deliverables developed under the SOW in order to achieve and/or maintain the Area 2 PS, the Area 3 PS, or to carry out and maintain the effectiveness of the Area 2 RA or the Area 3 RA and such modification is consistent with the Scope of the Remedy for each Area as set forth in the SOW, then EPA may notify SD of such modification. If SD objects to the modification they may, within 30 days after EPA's notification, seek dispute resolution under Section XV.  However, SD may not seek dispute resolution for SOW Modifications for Area 3 that are part of the CD and SOW modifications to incorporate a ROD as described in ¶ 13.

b.      If EPA determines that it is necessary to modify the work specified in the Area 4 Action Memorandum or the Area 4 Removal Work Plan and/or in deliverables developed under the Area 4 Removal Work Plan in order to achieve and/or maintain the Cleanup Standards of the Action Memorandum or Area 4 PS, then EPA may notify SD of such modification. If SD objects to the modification it may, within 30 days after EPA's notification, seek dispute resolution under Section XV.

c.      The SOW and/or related work plans shall be modified: (1) in accordance with the modification issued by EPA; or (2) if SD invokes dispute resolution, in accordance with the final resolution of the dispute. The modification shall be incorporated into and enforceable under this CD, and SD shall implement all work required by such modification. SD shall incorporate the modification into the deliverable required under the SOW, as appropriate.

d.      Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this CD.

15.     Nothing in this CD, the SOW, or any deliverable required under the SOW constitutes a warranty or representation of any kind by Plaintiffs that compliance with the work requirements set forth in the SOW or related deliverable will achieve the Performance Standards.

## VI.      PERFORMANCE OF THE AREA 4 REMOVAL WORK

16.     **Selection of a Removal Response Action.**  Prior to or following entry of the CD, EPA may issue an Area 4 Action Memorandum to select an Area 4 Removal Response Action. Consistent with EPA's "Superfund Removal Guidance for Preparing Action Memoranda"

(September 2009), the Area 4 Action Memorandum will substantially comport with the draft action memorandum attached hereto as Appendix D.

17.    At a minimum, SD shall perform all actions necessary to implement the Area 4 Action Memorandum. The actions to be implemented, if an Area 4 Action Memorandum is issued, will generally include, but are not limited to, the following:

a.    dredging and/or excavation of PCB-contaminated in-stream sediments and riverbank/floodplain soils in the Trowbridge Dam Area, at locations specified in the Area 4 Action Memorandum;

b.    removal of one or more portions of the Trowbridge Dam structure or any water control structure within the Trowbridge Dam Area as needed to reduce the risk of PCB mobilization from floodplains and banks due to failure of the Trowbridge Dam or water control structure;

c.    cut-back and stabilization of riverbanks to mitigate exposures to PCB-contaminated riverbank/floodplain soils and future erosion;

d.    dewatering, as necessary, and disposal of all excavated or dredged Waste Material;

e.    backfilling and re-vegetation of excavated riverbanks and floodplain areas;

f.    monitoring and maintenance during and after the implementation of the removal response action; and

g.    post-removal control activities, including restoration.  For the avoidance of doubt, SD will not be required to perform restoration work that will be undone by later remedial action in the Area.

18.    **Performance of Area 4 Removal Response Action pursuant to an Area 4 Workplan**. SD shall submit an Area 4 Removal Work Plan in accordance with the schedule set forth in the SOW. The approved Area 4 Removal Work Plan shall be incorporated into the CD and SOW and enforceable under this CD without further modification by the Court, and SD shall implement all Work set forth in the Area 4 Removal Work Plan, including any modification made pursuant to ¶ 14.

19.    All deliverables required to be submitted for approval under the CD or Area 4 Removal Work Plan shall be subject to approval by EPA, after consultation with the State, in accordance with ¶ ¶ 3.2 and 10.6 of the SOW.

## VII.    PERFORMANCE OF THE AREA 2 WORK

20.    **Performance of Work in Area 2 in Accordance with the SOW**. SD shall: (a) develop the Area 2 RD; (b) perform the Area 2 RA; and (c) operate, maintain, and monitor the effectiveness of the Area 2 RA; all in accordance with the SOW and all EPA-approved, conditionally-approved, or modified deliverables as required by the SOW. All deliverables required to be submitted for approval under the CD or SOW shall be subject to approval by EPA in accordance with ¶ **10.6** (Approval of Deliverables) of the SOW.

## VIII.   PERFORMANCE OF THE AREA 3 WORK

21.      **Selection of Area 3 Remedy.**  As provided in Section 121 of CERCLA, 42 U.S.C. § 9621, and the NCP, and in a manner consistent with Section 117 of CERCLA, 42 U.S.C. § 9617, EPA intends to select the remedy for Area 3 and intends to issue the Area 3 ROD setting forth the selected remedy for Area 3.

22.      **Proposed Plan for Area 3.**

a.      Consistent with Section 117 of CERCLA, 42 U.S.C. § 9617, prior to issuing the Area 3 ROD, EPA intends to issue a proposed plan for the Area 3 remedy (Area 3 Proposed Plan).

b.      EPA intends to submit the Area 3 Proposed Plan for public comment in accordance with Section 117(a) of CERCLA, 42 U.S.C. § 9617(a). NCR shall submit any objections to the Area 3 Proposed Plan during the public comment period.

c.      The dispute resolution provisions of this CD are not applicable to the Area 3 Proposed Plan or the Area 3 ROD.

23.      **SD Opt-Out.** If SD opts-out of the performance of the Area 3 ROD, SD shall pay $52.5 million to EPA pursuant to Paragraph 46 within 60 Days of notifying EPA that it intends to opt-out.  If SD opts-out of the performance of the Area 3 ROD, SD shall not need to comply with any requirement in the Statement of Work ("SOW") that is applicable to Area 3, and Area 3 will not be included in the definition of Work.

24.      **No Modified CD and SOW for Area 3.** If any of the following events occur: (a) EPA fails to issue the Area 3 ROD within 6 years of entry of the Consent Decree; (b) the United States withdraws its consent from the CD and SOW Modification for Area 3 RD/RA; or (c) the Court denies entry of the modified CD; SD shall pay $35 million pursuant to Paragraph 46 within 30 Days after the relevant triggering event.

25.      **Performance of Work in Area 3 in Accordance with the SOW**. Unless SD opts-out of performance of the Area 3 ROD pursuant to ¶ 23 or there is no modified CD or SOW for Area 3: SD shall (a) develop the Area 3 RD; (b) perform the Area 3 RA; and (c) operate, maintain, and monitor the effectiveness of the Area 3 RA; all in accordance with the SOW and all EPA-approved, conditionally-approved, or modified deliverables as required by the SOW. All deliverables required to be submitted for approval under the CD or SOW shall be subject to approval by EPA in accordance with ¶ **10.6** (Approval of Deliverables) of the SOW.

## IX.   REMEDY REVIEW

26.      **Periodic Review**. SD shall conduct, in accordance with ¶ **6.5** (Periodic Review Support Plan) of the SOW and corresponding provisions of the SOW, studies and investigations to support EPA's reviews under Section 121(c) of CERCLA, 42 U.S.C. § 9621(c), and applicable regulations, of whether the Area 2 RA and Area 3 RA are protective of human health and the environment.

27.      **EPA Selection of Further Response Actions**. If EPA determines, at any time, that any of the RAs are not protective of human health and the environment, EPA may select further response actions for the Site in accordance with the requirements of CERCLA and the NCP.

15

28.    **Opportunity to Comment**. SD and, if required by Sections 113(k)(2) or 117 of CERCLA, 42 U.S.C. § 9613(k)(2) or 9617, the public, will be provided with an opportunity to comment on any further response actions proposed by EPA as a result of the reviews conducted pursuant to Section 121(c) of CERCLA and to submit written comments for the record during the comment period(s).

29.    **SD's Obligation to Perform Further Response Actions**. If EPA selects further response actions relating to the Site, EPA may require SD to perform such further response actions, but only to the extent that the reopener conditions in ¶¶ 81-83 (United States' Pre- and Post-Certification Reservations) are satisfied. SD may invoke the procedures set forth in Section XV (Dispute Resolution) to dispute (a) EPA's determination that the reopener conditions of ¶¶ 81-83 are satisfied, (b) EPA's determination that the Area 2 RA or Area 3 RA is not protective of human health and the environment, or (c) EPA's selection of the further response actions. Disputes regarding EPA's determination that the RA is not protective or EPA's selection of further response actions shall be resolved pursuant to ¶ 64 (Record Review).

30.    **Submission of Plans**. If SD is required to perform further response actions pursuant to ¶ 29, SD shall submit a plan for such response action to EPA for approval in accordance with the procedures of Section VI (Performance of the Work by SD). SD shall implement the approved plan in accordance with this CD.

## X.    PROPERTY REQUIREMENTS

31.    **Agreements Regarding Access and Non-Interference.** SD shall, with respect to any Non-Settling Owner's Affected Property, use best efforts to secure from such Non-Settling Owner an agreement, enforceable by SD and by Plaintiffs, providing that such Non-Settling Owner (i) provide Plaintiffs, and its representatives, contractors, and subcontractors with access at all reasonable times to such Affected Property to conduct any activity regarding the CD, including those listed in ¶ 20.a (Access Requirements); and (ii) refrain from using such Affected Property in any manner that EPA determines will pose an unacceptable risk to human health or to the environment due to exposure to Waste Material, or interfere with or adversely affect the implementation, integrity, or protectiveness of the Area 2 RA, Area 3 RA or the Removal Action. SD shall provide a copy of such access and use restriction agreement(s) to EPA and the State.

a.    **Access Requirements**. The following is a list of activities for which access is required regarding the Affected Property:

(1)    Monitoring the Work;

(2)    Verifying any data or information submitted to the United States or the State;

(3)    Conducting investigations regarding contamination at or near the Site;

(4)    Obtaining samples;

(5)    Assessing the need for, planning, or implementing additional response actions at or near the Site;

16

(6)     Assessing implementation of quality assurance and quality control practices as defined in the approved construction quality assurance quality control plan as provided in the SOW;

(7)     Implementing the Work pursuant to the conditions set forth in ¶ 86 (Work Takeover);

(8)     Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by SD or their agents, consistent with Section XX (Access to Information);

(9)     Assessing SD's compliance with the CD;

(10)     Determining whether the Affected Property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the CD; and

(11)     Implementing, monitoring, maintaining, reporting on, and enforcing any land, water, or other resource use restrictions and Institutional Controls.

32.     **Best Efforts**. As used in this Section, "best efforts" means the efforts that a reasonable person in the position of SD would use so as to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to secure access and/or use restriction agreements, Proprietary Controls, releases, subordinations, modifications, or relocations of Prior Encumbrances that affect the title to the Affected Property, as applicable. If SD is unable to accomplish what is required through "best efforts" in a timely manner, it shall notify EPA, and include a description of the steps taken to comply with the requirements. If EPA deems it appropriate, it may assist SD, or take independent action, in obtaining such access and/or use restrictions, Proprietary Controls, releases, subordinations, modifications, or relocations of Prior Encumbrances that affect the title to the Affected Property, as applicable. All costs incurred by the United States in providing such assistance or taking such action, including the cost of attorney time and the amount of monetary consideration or just compensation paid, constitute Future Specified Response Costs to be reimbursed under Section X (Payments).

33.     If EPA determines in a decision document prepared in accordance with the NCP that Institutional Controls in the form of state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices are needed, SD shall cooperate with EPA's and the State's efforts to secure and ensure compliance with such Institutional Controls.

## XI.     FINANCIAL ASSURANCE

34.     In order to ensure completion of the Work, SD shall secure financial assurance, initially in the amount of $226 million ("Estimated Cost of the Work"), for the benefit of EPA and the Trustees. The financial assurance must be one or more of the mechanisms listed below, in a form substantially identical to the relevant sample documents available from EPA or under the "Financial Assurance - Settlements" category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/, and satisfactory to EPA. SD may use multiple mechanisms if it is limited to surety bonds guaranteeing payment, letters of credit, trust funds, and/or insurance policies.

a.      A surety bond guaranteeing payment and/or performance of the Work that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

b.      An irrevocable letter of credit, payable to or at the direction of EPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency;

c.      A trust fund established for the benefit of EPA and the Trustees that is administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency;

d.      A policy of insurance that provides EPA and the Trustees with acceptable rights as a beneficiary thereof and that is issued by an insurance carrier that has the authority to issue insurance policies in the applicable jurisdiction(s) and whose insurance operations are regulated and examined by a federal or state agency;

e.      A demonstration by a SD that it meets the relevant test criteria of ¶36, accompanied by a standby funding commitment, which obligates the SD to pay funds to or at the direction of EPA, up to the amount financially assured through the use of this demonstration in the event of a Work Takeover; or

f.      A guarantee to fund or perform the Work executed in favor of EPA and the Trustees by a company: (1) that is a direct or indirect parent company of SD or has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with a SD; and (2) can demonstrate to EPA's satisfaction that it meets the financial test criteria of ¶36.

35.      SD shall, within 30 days of the Effective Date, obtain EPA's approval of the form of SD financial assurance. Within 30 days of such approval, SD shall secure all executed and/or otherwise finalized mechanisms or other documents consistent with the EPA-approved form of financial assurance and shall submit such mechanisms and documents to the Regional Financial Management Officer, to the United States, EPA, and the State as specified in Section XXII (Notices and Submissions).

36.      SD seeking to provide financial assurance by means of a demonstration or guarantee under ¶ 34.e or 34.f, must, within 30 days of the Effective Date:

a.      Demonstrate that:

(1)      SD or guarantor has:

i.      Two of the following three ratios: a ratio of total liabilities to net worth less than 2.0; a ratio of the sum of net income plus depreciation, depletion, and amortization to total liabilities greater than 0.1; and a ratio of current assets to current liabilities greater than 1.5; and

ii.      Net working capital and tangible net worth each at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental

18

obligations financially assured through the use of a financial test or guarantee; and

iii.    Tangible net worth of at least $10 million; and

iv.    Assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; or

(2)    The SD or guarantor has:

i.    A current rating for its senior unsecured debt of AAA, AA, A, or BBB as issued by Standard and Poor's or Aaa, Aa, A or Baa as issued by Moody's; and

ii.    Tangible net worth at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

iii.    Tangible net worth of at least $10 million; and

iv.    Assets located in the United States amounting to at least 90 percent of total assets or at least six times the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; and

b.    Submit to EPA for SD or guarantor: (1) a copy of an independent certified public accountant's report of the entity's financial statements for the latest completed fiscal year, which must not express an adverse opinion or disclaimer of opinion; and (2) a letter from its chief financial officer and a report from an independent certified public accountant substantially identical to the sample letter and reports available from EPA or under the "Financial Assurance - Settlements" subject list category on the Cleanup Enforcement Model Language and Sample Documents Database at https://cfpub.epa.gov/compliance/models/.

37.    SD providing financial assurance by means of a demonstration or guarantee under ¶ 34.e or 34.f  must also:

a.    Annually resubmit the documents described in ¶ 36.b within 90 days after the close of the SD's or guarantor's fiscal year;

b.    Notify EPA within 30 days after the SD or guarantor determines that it no longer satisfies the relevant financial test criteria and requirements set forth in this Section; and

c.    Provide to EPA, within 30 days of EPA's request, reports of the financial condition of the SD or guarantor in addition to those specified in ¶ 36.b; EPA may make such a request at any time based on a belief that the SD or guarantor may no longer meet the financial test requirements of this Section.

38.    SD shall diligently monitor the adequacy of the financial assurance. If SD becomes aware of any information indicating that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, SD shall notify EPA, the State, and the Trustees of such information within seven days. If EPA determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, EPA will notify SD, the State, and the Trustees of such determination. SD shall, within 30 days after notifying EPA or receiving notice from EPA under this Paragraph, secure and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the requirements of this Section. EPA may extend this deadline for such time as is reasonably necessary for SD, in the exercise of due diligence, to secure and submit to EPA a proposal for a revised or alternative financial assurance mechanism, not to exceed 60 days. SD shall follow the procedures of ¶ 40 (Modification of Financial Assurance) in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. SD's inability to secure financial assurance in accordance with this Section does not excuse performance of any other obligation under this Settlement.

39.    **Access to Financial Assurance**

a.    If EPA issues a notice of implementation of a Work Takeover under ¶ 86.b, then, in accordance with any applicable financial assurance mechanism and/or related standby funding commitment, EPA and the Trustees are entitled to: (1) the performance of the Work including the payment of Installment Payments; and/or (2) require that any funds guaranteed be paid in accordance with ¶ 39.d. EPA will not draw on a financial assurance mechanism for payment of Installment Payments unless the SD has failed to make Installment Payments.

b.    If EPA is notified by the issuer of a financial assurance mechanism that it intends to cancel the mechanism, and the affected SD fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with ¶ 39.d.

c.    If, upon issuance of a notice of implementation of a Work Takeover under ¶ 86.b, either: (1) EPA is unable for any reason to promptly secure the resources guaranteed under any applicable financial assurance mechanism, whether in cash or in kind, to continue and complete the Work including the payment of Installment Payments; or (2) the financial assurance is a demonstration or guarantee under ¶ 34.e or 34.f, then EPA is entitled to demand an amount, as determined by EPA, sufficient to cover the cost of the remaining Work to be performed including the payment of the Installment Payments. SD shall, within 30 days of such demand, pay the amount demanded as directed by EPA. EPA will not draw on a financial assurance mechanism for payment of Installment Payments unless the SD has failed to make Installment Payments.

d.    Any amounts required to be paid under this ¶ 39 shall be, as directed by EPA deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the FDIC, in order to facilitate the completion of the Work by EPA or another person and the payment of the Installment Payments. EPA shall direct that the amount of Installment Payments owed to the Trustees but not yet paid in accordance with Paragraph 49 be paid to the Trustees. If payment is made to EPA, EPA may deposit the payment into the EPA Hazardous Substance Superfund or into the Site-wide Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA

Hazardous Substance Superfund. If payment is made to the Trustees, it shall be paid into a Site-specific sub-account within the NRDAR Fund, to be managed by DOI for the joint benefit and use of the Trustees to pay for Natural Resource Damages restoration projects jointly selected by the Trustees and for costs associated with such projects, including but not limited to planning, designing, overseeing, monitoring, and maintaining such projects.

      e.     All EPA Work Takeover costs not paid under this ¶ 39 must be reimbursed as Future Specified Response Costs under Section XII (Payments for Response Costs).

      40.     **Modification of Amount, Form, or Terms of Financial Assurance**.

      a.     SD may submit, on any anniversary of the Effective Date or at any other time agreed to by the Parties, a request to reduce the amount, or change the form or terms, of the financial assurance mechanism. Any such request must be submitted to EPA in accordance with ¶ 35, and must include an estimate of the cost of the remaining Work including the amount of any remaining Installment Payments, an explanation of the bases for the cost calculation, and a description of the proposed changes, if any, to the form or terms of the financial assurance. SD shall also notify the Trustees of such a request. EPA will notify SD and the Trustees of its decision to approve or disapprove a requested reduction or change pursuant to this Paragraph. SD may reduce the amount of the financial assurance mechanism only in accordance with: (a) EPA's approval; or (b) if there is a dispute, the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XV (Dispute Resolution). SD may change the form or terms of the financial assurance mechanism only in accordance with EPA's approval. Any decision made by EPA on a request submitted under this Paragraph to change the form or terms of a financial assurance mechanism shall not be subject to challenge by SD pursuant to the dispute resolution provisions of this CD or in any other forum. Within 30 days after receipt of EPA's approval of, or the agreement or decision resolving a dispute relating to, the requested modifications pursuant to this Paragraph, SD shall submit to EPA and the Trustees documentation of the reduced, revised, or alternative financial assurance mechanism in accordance with ¶ 35.

      b.     During the first seven years following the Effective Date, SD may reduce the amount of its financial assurance mechanism by the amount of Installment Payment once the SD has made the Installment Payment.

      c.     After SD has paid all the Installment Payments to the Trustees under Paragraph 49, the SD may change the terms of the Financial Assurance to benefit only EPA. SD will also no longer need to provide notice to the Trustees under this Section.

      41.     **Release, Cancellation, or Discontinuation of Financial Assurance**. SD may release, cancel, or discontinue any financial assurance provided under this Section only: (a) if EPA issues a Certification of Work Completion under ¶ **8** (Certification of Work Completion) of the SOW; (b) in accordance with EPA's approval of such release, cancellation, or discontinuation; or (c) if there is a dispute regarding the release, cancellation or discontinuance of any financial assurance, in accordance with the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XV (Dispute Resolution).

## XII.   PAYMENTS

      42.     **Initial Payment by SD**.

a.      Within 14 Days after the Court enters an order in this action authorizing payment by SD into the Court Registry Account or 30 Days after the Effective Date, whichever is later, SD shall pay a total of $6,500,000 into the interest-bearing Court Registry Account of the United States District Court for the Western District of Michigan. Payment shall be made to the Clerk of the Court by an electronic funds transfer ("EFT") to the account designated by the Clerk of the Court, in accordance with payment instructions to be provided.

43.      **Disbursements from Court Registry Account.**  After entry of this Consent Decree by the District Court and either affirmation on appellate review of such entry or the expiration of time to appeal such entry, the funds deposited into the Court Registry Account under this Consent Decree (and all accrued interest) shall be disbursed pursuant to a separate Withdrawal Order of the Court, as follows:

a.      $3 million plus all accrued interest on that amount from the Court Registry Account shall be paid to the State for the State Past Response Costs, to be deposited into the State's Environmental Response Fund, settlement ID RRD50118;

b.      $2 million plus all accrued interest on that amount from the Court Registry Account shall be deposited in the NRDAR Fund to be applied towards Natural Resource Damage assessment costs incurred by the Trustees; and

c.      $1.5 million plus all accrued interest on that amount from the Court Registry Account shall be deposited in the Site-wide Special Account for the United States' response costs to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

44.      **Response Cost Payments.**  SD shall pay to EPA a total of $75 million to be paid as follows:

$10,700,000, plus Interest from the Date of Lodging, to be paid each year for six years on or before the anniversary of the Effective Date; and

$10,800,000, plus Interest from the Date of Lodging, to be paid no later than seven years after the Effective Date.

EPA shall deposit the Response Cost Payments in the Site-wide Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

45.      **Payments by SD for Future Specified Response Costs**. SD shall pay to EPA all Future Specified Response Costs not inconsistent with the NCP.

a.      **Periodic Bills**. On a periodic basis, EPA will send SD a bill requiring payment that includes an itemized cost summary, which includes direct and indirect costs incurred by EPA, its contractors, subcontractors, and DOJ. SD shall make all payments within 60 days after SD's receipt of each bill requiring payment, except as otherwise provided in ¶ 47, in accordance with ¶ 46.a (instructions for Future Specified Response Cost payments).

b.      **Deposit of Future Specified Response Costs Payments.** The total amount to be paid by SD pursuant to ¶ 45.a (Periodic Bills) shall be deposited by EPA in the Site-wide Special Account to be retained and used to conduct or finance response actions at or in connection with the

22

Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund, provided, however, that EPA may deposit a Future Specified Response Costs payment directly into the EPA Hazardous Substance Superfund if, at the time the payment is received, EPA estimates that the Site-wide Special Account balance is sufficient to address currently anticipated future response actions to be conducted or financed by EPA at or in connection with the Site. Any decision by EPA to deposit a Future Specified Response Costs payment directly into the EPA Hazardous Substance Superfund for this reason shall not be subject to challenge by SD pursuant to the dispute resolution provisions of this CD or in any other forum.

46.    **EPA Payment Instructions for SD**

a.    **Future Specified Response Costs Payments,  Payments pursuant to ¶ 23, Response Cost Payments, and Stipulated Penalties**

i.    For all payments subject to this ¶ 46.a, SD shall make such payment by Fedwire EFT, referencing the Site/Spill ID and DJ numbers. The Fedwire EFT payment must be sent as follows:

> Federal Reserve Bank of New York
> ABA = 021030004
> Account = 68010727
> SWIFT address = FRNYUS33
> 33 Liberty Street
> New York NY 10045
> Field Tag 4200 of the Fedwire message should read
>   "D 68010727 Environmental Protection Agency"

ii.    For all payments made under this ¶ 46.a, SD must include references to the Site/Spill ID and DJ numbers. At the time of any payment required to be made in accordance with ¶ 46.a, SD shall send notices that payment has been made to the United States, EPA, and the EPA Cincinnati Finance Center, all in accordance with ¶ 107. All notices must include references to the Site/Spill ID and DJ numbers.

47.    **Contesting Future Specified Response Costs**. SD may submit a Notice of Dispute, initiating the procedures of Section XV (Dispute Resolution), regarding any Future Specified Response Costs billed under ¶ 42 (Payments by SD for Future Specified Response Costs) if it determines that EPA has made a mathematical error or included a cost item that is not within the definition of Future Specified Response Costs, or if it believes EPA incurred excess costs as a direct result of an EPA action that was inconsistent with a specific provision or provisions of the NCP. Such Notice of Dispute shall be submitted in writing within 60 days after receipt of the bill and must be sent to the United States pursuant to Section XXII (Notices and Submissions). Such Notice of Dispute shall specifically identify the contested Future Specified Response Costs and the basis for objection. If SD submits a Notice of Dispute, SD shall within the 60-day period, also as a requirement for initiating the dispute, (a) pay all uncontested Future Specified Response Costs to the United States, and (b) establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the Federal Deposit Insurance Corporation ("FDIC"), and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs. SD shall send to the United States, as provided in Section XXII (Notices and Submissions), a copy of the transmittal letter and check paying the uncontested Future Specified Response Costs, and a copy of

23

the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. If the United States prevails in the dispute, SD shall pay the sums due (with accrued interest) to the United States within seven days after the resolution of the dispute. If SD prevails concerning any aspect of the contested costs, SD shall pay that portion of the costs (plus associated accrued interest) for which they did not prevail to the United States within 30 days after the resolution of the dispute. SD shall be disbursed any balance of the escrow account. All payments to the United States under this Paragraph shall be made in accordance with ¶¶ 46.a (instructions for Future Specified Response Cost payments). The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XV (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding SD's obligation to reimburse the United States for its Future Specified Response Costs.

48.    **Interest**. In the event that any payment for Past Response Costs or for Future Specified Response Costs required under this Section is not made by the date required, SD shall pay Interest on the unpaid balance. The Interest on Past Response Costs shall begin to accrue on the Effective Date. The Interest on Future Specified Response Costs shall begin to accrue on the date of the bill. The Interest shall accrue through the date of SD's payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to Plaintiffs by virtue of SD's failure to make timely payments under this Section including, but not limited to, payment of stipulated penalties pursuant to Section XVI (Stipulated Penalties).

49.    **Additional Natural Resource Damages Payments**. In addition to the payment for assessment costs specified in Paragraph 43, SD shall pay a total of $25 million for the Trustees' Natural Resource Damages claim as follows:

$10,000,000, plus Interest from the Date of Lodging, to be paid on January 15, 2020, or 30 days after the Effective Date, whichever is later;

$2,100,000, plus Interest from the Date of Lodging, to be paid each year for six years on or before the anniversary of the Effective Date; and

$2,400,000, plus Interest from the Date of Lodging, to be paid no later than seven years after the Effective Date.

The Natural Resource Damages payments made pursuant to this Paragraph shall be paid into a Site-specific sub-account within the NRDAR Fund, to be managed by DOI for the joint benefit and use of the Trustees to pay for Natural Resource Damages restoration projects jointly selected by the Trustees and for costs associated with such projects, including but not limited to planning, designing, overseeing, monitoring, and maintaining such projects. Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice account, in accordance with current EFT procedures, in accordance with instructions provided to SD by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Western District of Michigan. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which Defendant shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions to:

Bryan Heath

24

Senior Environmental Manager
864 Spring Street NW
Atlanta, GA 30308
Bryan.Heath@ncr.com


Office of the General Counsel
NCR Corporation
864 Spring Street, NW
Atlanta, GA 30308
Law.notices@ncr.com

on behalf of SD. SD may change the individual to receive payment instructions on its behalf by providing written notice of such change to the United States, the State, DOI, and DOC in accordance with Section XXII (Notices and Submissions).

50.     **State Future Response Costs.** SD shall pay 10 consecutive payments of $300,000 per year for the State's Future Response Costs, with the first payment to be made on January 15, 2020, or 30 days after the Effective Date, whichever is later, and the subsequent payments to be made on the anniversary of that date.

51.     **State Payment Instructions**. Payments to the State under ¶ 50 shall be made by certified check, made payable to the "State of Michigan – Environmental Response Fund" and shall be sent by first class mail to:

Michigan Department of Environment, Great Lakes, and Energy
Cashier's Office
P.O. Box 30657
Lansing, Michigan 48909-8157

To ensure proper credit, the Site ID and the Account Number RRD50118 shall be designated on the check.  A transmittal letter shall be provided simultaneously to the State as provided in ¶ 107 and to MDAG at:

Division Chief
Environment, Natural Resources, and Agriculture Division
Department of Attorney General
P. O. Box 30755
Lansing, MI 48909

52.     **Payments Prior to Final Non-Appealable Judgment.** If the Consent Decree requires SD to make a payment prior to either affirmation on appellate review of such entry or the expiration of time to appeal such entry, NCR shall deposit such payment into the Court Registry Account. The withdrawal order shall provide that the payment shall be directed to the intended recipient plus the interest accrued in the Court Registry Account.

## XIII.   INDEMNIFICATION AND INSURANCE

53.     **SD's Indemnification of the United States and the State**

a.    The United States and the State do not assume any liability by entering into this CD or by virtue of any designation of SD as EPA's authorized representatives under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e). SD shall indemnify, save, and hold harmless the United States, the State, and their officials, agents, employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of SD, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on SD's behalf or under its control, in carrying out activities pursuant to this CD, including, but not limited to, any claims arising from any designation of SD as EPA's authorized representative under Section 104(e) of CERCLA. Further, SD agrees to pay the United States and the State all costs they incur including, but not limited to, attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States and the State based on negligent or other wrongful acts or omissions of SD, its officers, directors, employees, agents, contractors, subcontractors, and any persons acting on their behalf or under their control, in carrying out activities pursuant to this CD. Neither the United States nor the State shall be held out as a party to any contract entered into by or on behalf of SD in carrying out activities pursuant to this CD. Neither SD nor any such contractor shall be considered an agent of the United States or the State.

b.    The United States and the State, respectively, shall give SD notice of any claim for which the United States or the State plan to seek indemnification pursuant to this ¶ 53, and shall consult with SD prior to settling such claim.

54.    SD covenants not to sue and agrees not to assert any claims or causes of action against the United States and the State, respectively, for damages or reimbursement or for set-off of any payments made or to be made to the United States or the State, arising from or on account of any contract, agreement, or arrangement between SD and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays. In addition, SD shall indemnify, save and hold harmless the United States and the State with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between any one or more of SD and any person for performance of Work on or relating to the Site, including, but not limited to, claims on account of construction delays.

55.    **Insurance**. No later than 15 days before commencing any on-site Work, SD shall secure, and shall maintain until the first anniversary after Certification of Completion pursuant to ¶ 6.4 of the SOW (Certification of RA Completion) of the last RA completed pursuant to this CD, commercial general liability insurance with limits of liability of $1 million per occurrence, automobile liability insurance with limits of liability of $1 million per accident, and umbrella liability insurance with limits of liability of $5 million in excess of the required commercial general liability and automobile liability limits, naming the United States and the State as an additional insured with respect to all liability arising out of the activities performed by or on behalf of SD pursuant to this CD. In addition, for the duration of this CD, SD shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of SD in furtherance of this CD. Prior to commencement of the Work, SD shall provide to EPA and the State certificates of such insurance and a copy of each insurance policy. SD shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date. If SD demonstrates by evidence satisfactory to EPA and the State that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a

lesser amount, then, with respect to that contractor or subcontractor, SD need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor. SD shall ensure that all submittals to EPA and the State under this Paragraph identify the Site name and the civil action number of this case.

## XIV.   FORCE MAJEURE

56.     "Force majeure," for purposes of this CD, is defined as any event arising from causes beyond the control of SD, of any entity controlled by SD, or of SD's contractors that delays or prevents the performance of any obligation under this CD despite SD's best efforts to fulfill the obligation. The requirement that SD exercises "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure (a) as it is occurring and (b) following the potential force majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible. "Force majeure" does not include financial inability to complete the Work or a failure to achieve the Performance Standards.

57.     If any event occurs or has occurred that may delay the performance of any obligation under this CD for which SD intends or may intend to assert a claim of force majeure, SD shall notify EPA's Project Coordinator orally or, in his or her absence, EPA's Alternate Project Coordinator or, in the event both of EPA's designated representatives are unavailable, the Director of the Superfund Division, EPA Region 5, within five days of when SD first knew that the event might cause a delay. Within 20 days thereafter, SD shall provide in writing to EPA and the State an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; SD's rationale for attributing such delay to a force majeure; and a statement as to whether, in the opinion of SD, such event may cause or contribute to an endangerment to public health or welfare, or the environment. SD shall include with any notice all available documentation supporting its claim that the delay was attributable to a force majeure. SD shall be deemed to know of any circumstance of which SD, any entity controlled by SD, or SD's contractors or subcontractors knew or should have known. Failure to comply with the above requirements regarding an event shall preclude SD from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure under ¶ 56 and whether SD has exercised its best efforts under ¶ 56, EPA may, in its unreviewable discretion, excuse in writing SD's failure to submit timely or complete notices under this Paragraph.

58.     If EPA, after a reasonable opportunity for review and comment by the State, agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this CD that are affected by the force majeure will be extended by EPA, after a reasonable opportunity for review and comment by the State, for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance of any other obligation. If EPA, after a reasonable opportunity for review and comment by the State, does not agree that the delay or anticipated delay has been or will be caused by a force majeure, EPA will notify SD in writing of its decision. If EPA, after a reasonable opportunity for review and comment by the State, agrees that the delay is attributable to a force majeure, EPA will notify SD in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

59.     If SD elects to invoke the dispute resolution procedures set forth in Section XV (Dispute Resolution) regarding EPA's decision, it shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, SD shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that SD complied with the requirements of ¶¶ 56 and 57. If SD carries this burden, the delay at issue shall be deemed not to be a violation by SD of the affected obligation of this CD identified to EPA and the Court.

60.     The failure by EPA to timely complete any obligation under the CD or under the SOW is not a violation of the CD, provided, however, that if such failure prevents SD from meeting one or more deadlines in the SOW, SD may seek relief under this Section.

## XV.   DISPUTE RESOLUTION

61.     Unless otherwise expressly provided for in this CD, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes regarding this CD. However, the procedures set forth in this Section shall not apply to actions by the United States to enforce obligations of SD that have not been disputed in accordance with this Section.

62.     A dispute shall be considered to have arisen when one party sends the other parties a written Notice of Dispute. Any dispute regarding this CD shall in the first instance be the subject of informal negotiations between the parties to the dispute. The period for informal negotiations shall not exceed 20 days from the time the dispute arises, unless it is modified by written agreement of the parties to the dispute.

63.     **Statements of Position**

a.      In the event that the parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by EPA shall be considered binding unless, within 10 days after the conclusion of the informal negotiation period, SD invokes the formal dispute resolution procedures of this Section by serving on the United States and the State a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by SD. The Statement of Position shall specify SD's position as to whether formal dispute resolution should proceed under ¶ 64 (Record Review) or ¶65.

b.      Within 30 days after receipt of SD's Statement of Position, EPA will serve on SD its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA. EPA's Statement of Position shall include a statement as to whether formal dispute resolution should proceed under ¶ 64 (Record Review) or ¶ 65. Within 30 days after receipt of EPA's Statement of Position, SD may submit a Reply.

c.      If there is disagreement between EPA and SD as to whether dispute resolution should proceed under ¶ 64 (Record Review) or ¶65, the parties to the dispute shall follow the procedures set forth in the Paragraph determined by EPA to be applicable. However, if SD ultimately appeal to the Court to resolve the dispute, the Court shall determine which Paragraph is applicable in accordance with the standards of applicability set forth in ¶¶ 64 and 65.

28

64.    **Record Review**. Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph. For purposes of this Paragraph, the adequacy of any response action includes, without limitation, the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by EPA under this CD, and the adequacy of the performance of response actions taken pursuant to this CD. Nothing in this CD shall be construed to allow any dispute by SD regarding the validity of the provisions of the Area 2 ROD or Area 3 ROD.

a.    An administrative record of the dispute shall be maintained by EPA and shall contain all statements of position, including supporting documentation, submitted pursuant to this Section. Where appropriate, EPA may allow submission of supplemental statements of position by the parties to the dispute.

b.    The Director of the Superfund Division, EPA Region 5, will issue a final administrative decision resolving the dispute based on the administrative record described in ¶ 64.a. This decision shall be binding upon SD, subject only to the right to seek judicial review pursuant to ¶¶ 64.c and 64.d.

c.    Any administrative decision made by EPA pursuant to ¶ 64.b shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by SD with the Court and served on all Parties within 10 days after receipt of EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this CD. The United States may file a response to SD's motion.

d.    In proceedings on any dispute governed by this Paragraph, SD shall have the burden of demonstrating that the decision of the Superfund Division Director is arbitrary and capricious or otherwise not in accordance with law. Judicial review of EPA's decision shall be on the administrative record compiled pursuant to ¶ 64.a.

65.    Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under applicable principles of administrative law, shall be governed by this Paragraph.

a.    The Director of the Superfund Division, EPA Region 5, will issue a final decision resolving the dispute based on the statements of position and reply, if any, served under ¶ 63. The Superfund Division Director's decision shall be binding on SD unless, within 15 days after receipt of the decision, SD files with the Court and serve on the parties a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the CD. The United States may file a response to SD's motion.

b.    Notwithstanding ¶ U (CERCLA § 113(j) record review of the Area 2 ROD, Area 3 ROD, and the Work) of Section I (Background), judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

66.    The invocation of formal dispute resolution procedures under this Section does not extend, postpone, or affect in any way any obligation of SD under this CD, except as provided in

¶ 47 (Contesting Future Specified Response Costs), as agreed by EPA, or as determined by the Court. Stipulated penalties with respect to the disputed matter shall continue to accrue, but payment shall be stayed pending resolution of the dispute, as provided in ¶ 74. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this CD. In the event that SD does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XVI (Stipulated Penalties).

## XVI.   STIPULATED PENALTIES

67.      SD shall be liable to the United States and the State for stipulated penalties in the amounts set forth in ¶¶ 68.a and 69 for failure to comply with the obligations specified in ¶¶ 68.b and 69, unless excused under Section XIV (Force Majeure). Fifty percent of stipulated penalties shall be paid the United States and fifty percent shall be paid to the State. "Comply" as used in the previous sentence includes compliance by SD with all applicable requirements of this CD, within the deadlines established under this CD. If an initially submitted or resubmitted deliverable contains a material defect, and the deliverable is disapproved or modified by EPA under ¶ 10.6 (a)(Initial Submissions) or 10.6(b) (Resubmissions) of the SOW due to such material defect, then the material defect shall constitute a lack of compliance for purposes of this Paragraph.

68.   **Stipulated Penalty Amounts - Payments, Financial Assurance, Major Deliverables, and Other Milestones**

a.      The following stipulated penalties shall accrue per violation per day for any noncompliance identified in ¶ 68.b:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $1,000 |
| 15th through 30th day | $2,500 |
| 31st day and beyond | $5,000 |

b.      Obligations

(1)      Payment of any amount due under Section XII (Payments).

(2)      Establishment and maintenance of financial assurance in accordance with Section XI (Financial Assurance).

(3)      Establishment of an escrow account to hold any disputed Future Specified Response Costs under ¶ 47 (Contesting Future Specified Response Costs)

(4)      Timely initiation, performance, and completion of construction of the Area 2 RD or the Area 2 RA in accordance with the Area 2 ROD, the SOW, or this CD, and plans and schedules approved thereunder, including any deadline imposed by a  SOW modification or by any plan which is prepared pursuant to the SOW and approved by EPA;

(5)      Subject to ¶ 13 timely initiation, performance, and completion of the Area 3 RD or Area 3 RA incorporated into this CD in accordance with the Area 3 ROD, the SOW, or this CD, and plans and schedules approved thereunder, including any deadline with respect to RD imposed by a SOW modification or by any plan which is prepared pursuant to a SOW modification and approved by EPA;

30

(6)    Timely implementation of any O&M as set forth in this CD in accordance with all applicable RODs, the SOW, or this CD, and plans and schedules approved thereunder, including any deadline with respect to O&M imposed by a SOW modification or by any plan which is prepared pursuant to a SOW modification and approved by EPA;

(7)    Timely implementation of the Area 4 Removal Response Action in accordance with the Area 4 Action Memorandum, the SOW or this CD;

(8)    Obligations imposed by the Emergency Response and Reporting Provisions of the SOW;

(9)    Obligations imposed by Section X (Property Requirements);

(10)    Performance of studies and investigations pursuant to Section IX (Remedy Review).

69.    **Stipulated Penalty Amounts – Other Deliverables**. The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate deliverables pursuant to the CD other than those specified in Paragraph 68.b:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $500 |
| 15th through 30th day | $1,000 |
| 31st day and beyond | $2,000 |

70.    In the event that EPA assumes performance of a portion or all of the Work pursuant to ¶ 86 (Work Takeover), SD shall be liable for a stipulated penalty in the amount of $600,000. Stipulated penalties under this Paragraph are in addition to the remedies available under ¶¶ 39 (Access to Financial Assurance) and 86 (Work Takeover).

71.    All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: (a) with respect to a deficient submission under ¶ 10.7 (Approval of Deliverables) of the SOW, during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies SD of any deficiency; (b) with respect to a decision by the Director of the Superfund Division, EPA Region 5, under ¶ 64.b or 65.a of Section XV (Dispute Resolution), during the period, if any, beginning on the 21st day after the date that SD's reply to EPA's Statement of Position is received until the date that the Director issues a final decision regarding such dispute; or (c) with respect to judicial review by this Court of any dispute under Section XV (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute. Nothing in this CD shall prevent the simultaneous accrual of separate penalties for separate violations of this CD.

72.    Following EPA's determination that SD has failed to comply with a requirement of this CD, EPA and the State may give SD written notification of the same and describe the noncompliance. EPA may send SD a written demand for payment of the penalties. However,

31

penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified SD of a violation.

73.     All penalties accruing under this Section shall be due and payable to the United States and the State within 30 days after SD's receipt from EPA of a demand for payment of the penalties, unless SD invokes the Dispute Resolution procedures under Section XV (Dispute Resolution) within the 30-day period. All payments to the United States or the State under this Section shall indicate that the payment is for stipulated penalties and shall be made in accordance with ¶ 46.a (instructions for Future Specified Response Cost payments) and ¶ 51 (State Payment Instructions).

74.     Penalties shall continue to accrue as provided in ¶ 71 during any dispute resolution period, but need not be paid until the following:

        a.     If the dispute is resolved by agreement of the parties or by a decision of EPA that is not appealed to this Court, accrued penalties determined to be owed shall be paid to EPA and the State within 15 days after the agreement or the receipt of EPA's decision or order;

        b.     If the dispute is appealed to this Court and the United States prevails in whole or in part, SD shall pay all accrued penalties determined by the Court to be owed to EPA and the State within 60 days after receipt of the Court's decision or order, except as provided in ¶ 74.c;

        c.     If the District Court's decision is appealed by any Party, SD shall pay all accrued penalties determined by the District Court to be owed to the United States into an interest-bearing escrow account, established at a duly chartered bank or trust company that is insured by the FDIC, within 60 days after receipt of the Court's decision or order. Penalties shall be paid into this account as they continue to accrue, at least every 60 days. Within 15 days after receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to EPA and the State or to SD to the extent that they prevail.

75.     If SD fails to pay stipulated penalties when due, SD shall pay Interest on the unpaid stipulated penalties as follows: (a) if SD has timely invoked dispute resolution such that the obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution, Interest shall accrue from the date stipulated penalties are due pursuant to ¶ 74 until the date of payment; and (b) if SD fails to timely invoke dispute resolution, Interest shall accrue from the date of demand under ¶ 73 until the date of payment. If SD fails to pay stipulated penalties and Interest when due, the United States or the State may institute proceedings to collect the penalties and Interest.

76.     The payment of penalties and Interest, if any, shall not alter in any way SD's obligation to complete the performance of the Work required under this CD.

77.     Nothing in this CD shall be construed as prohibiting, altering, or in any way limiting the ability of the United States or the State to seek any other remedies or sanctions available by virtue of SD's violation of this CD or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(*l*) of CERCLA, 42 U.S.C. § 9622(*l*), provided, however, that the United States shall not seek civil penalties pursuant to Section 122(*l*) of CERCLA for any violation for which a stipulated penalty is provided in this CD, except in the case of a willful violation of this CD.

78.    Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this CD.

## XVII.  COVENANTS BY PLAINTIFFS

79.    **Covenants for SD by United States**. Except as provided in ¶¶ 81 and 82 (Plaintiffs' Pre- and Post-Certification Reservations) and ¶¶ (General Reservations of Rights), the United States covenants not to sue or to take administrative action against SD pursuant to Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607, and Section 311(f) of the Clean Water Act, 33 U.S.C. § 1321(f), relating to the Site. Except with respect to future liability, these covenants shall take effect upon the Effective Date. With respect to future liability, these covenants shall take effect upon Final Certification of RA Completion by EPA.  These covenants are conditioned upon the satisfactory performance by the SD of its obligations under this CD. These covenants extend only to SD and do not extend to any other person.

80.    **Covenants for SD by the State**. Except as provided in ¶¶ 81 and 82  (Plaintiffs' Pre- and Post-Certification Reservations) and ¶¶ (General Reservations), the State covenants not to sue or to take administrative action against SD pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607, and Section 311(f) of the Clean Water Act, 33 U.S.C. § 1321(f), and Michigan statutory or common law relating to the Site. Except with respect to future liability, these covenants shall take effect upon the Effective Date. With respect to future liability, these covenants shall take effect upon Final Certification of RA Completion by EPA.  These covenants are conditioned upon the satisfactory performance by the SD of its obligations under this CD. These covenants extend only to SD and do not extend to any other person.

81.    **Plaintiffs' Pre-Certification Reservations**. Notwithstanding any other provision of this CD, the United States and the State reserve, and this CD is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel SD to perform further response actions relating to the Site and/or to pay the United States and the State for additional costs of response if, (a) prior to Final Certification of RA Completion, (1) conditions at the Site, previously unknown to EPA, are discovered, or (2) information, previously unknown to EPA, is received, in whole or in part, and (b) EPA, after consultation with the State, determines that these previously unknown conditions or information together with any other relevant information indicates that the RA for a particular Operable Unit or Area of OU5 is not protective of human health or the environment.

82.    **Plaintiffs' Post-Certification Reservations.** Notwithstanding any other provision of this CD, the United States and the State, and this CD is without prejudice to, the right to institute proceedings in this action or in a new action, and/or to issue an administrative order, seeking to compel NCR to perform further response actions relating to the Site and/or to pay the United States and the State for additional costs of response if, (a) subsequent to Final Certification of RA Completion, (1) conditions at the Site, previously unknown to EPA, are discovered, or (2) information, previously unknown to EPA, is received, in whole or in part, and (b) EPA, after consultation with the State, determines that these previously unknown conditions or this information together with other relevant information indicate that the RA for a particular Operable Unit or Area of OU5 is not protective of human health or the environment.

33

83.    For purposes of ¶ 81 (Plaintiffs' Pre-Certification Reservations), the information and the conditions known to EPA will include only that information and those conditions known to EPA as of the date of lodging of the Consent Decree. For purposes of ¶ 82 (Plaintiffs' Post-Certification Reservations), the information and the conditions known to EPA shall include only that information and those conditions known to EPA as of the date of Final Certification of RA Completion and set forth in the RODs, the administrative record supporting the RODs, the post-ROD administrative record, which will include the administrative records for all subsequent RODs at the Site or in any information received by EPA pursuant to the requirements of this CD prior to Final Certification of RA Completion.

84.    **Plaintiffs' Reservations for Unknown NRD Conditions and New NRD Information.** Notwithstanding any other provision of this Consent Decree, the United States and the State reserve the right to institute proceedings against NCR in this action or in a new action seeking recovery of Natural Resource Damages, based on: (1) conditions with respect to the Site, unknown to the Trustees as of the Date of Lodging, that result in releases of hazardous substances that contribute to injury to, destruction of, or loss of Natural Resources ("Unknown NRD Conditions"), or (2) information received by the Trustees after the Date of Lodging which indicates that the releases of hazardous substances at the Site have resulted in injury to, destruction of, or loss of Natural Resources of a type or future persistence that was unknown to the Trustees as of the Date of Lodging of this Consent Decree ("New NRD Information"). The following shall not be considered Unknown NRD Conditions or New NRD Information for the purpose of this Paragraph: (1) an increase solely in any trustee's assessment of the magnitude of a known injury to, destruction of, or loss of Natural Resources at the Site; or (2) injury to, destruction of, or loss of Natural Resources at the Site arising from the re-exposure, resuspension, or migration of hazardous substances known to be present in the sediments of the Site. For the purpose of this Paragraph, the information and conditions known to the Trustees shall include any information or conditions listed or identified in records relating to the Site that were in the possession or under the control of the Trustees as of the Date of Lodging of this Consent Decree.

85.    **General Reservations of Rights**. The United States and the State reserve, and this CD is without prejudice to, all rights against SD with respect to all matters not expressly included within Plaintiffs' covenants. Notwithstanding any other provision of this CD, the United States and the State reserve all rights against SD with respect to:

a.    liability for failure by SD to meet a requirement of this CD;

b.    liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Site;

c.    liability arising from past, present, or future disposal, release, or threat of release of non-PCB Waste Material within the Site;

d.    liability based on the ownership of the property that is part of the Site by SD when such ownership commences after signature of this CD by SD;

e.    liability based on the operation of the Site by SD when such operation commences after signature of this CD by SD and does not arise solely from SD's performance of the Work;

34

      f.     liability based on SD's transportation, treatment, storage, or disposal, or arrangement for transportation, treatment, storage, or disposal of Waste Material at or in connection with the Site, other than as provided in the Area 2 ROD, Area 3 ROD, the Area 4 Action Memorandum, the Work, or otherwise ordered by EPA, after signature of this CD by SD;

      g.     criminal liability;

      h.     liability for violations of federal or state law that occur during or after implementation of the Work; and

      i.     liability, prior to achievement of Performance Standards, for additional response actions that EPA determines are necessary to achieve and maintain Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the Area 2 ROD or Area 3 ROD, but that cannot be required pursuant to ¶ 14 (SOW or Related Deliverables).

86.    **Work Takeover**

      a.     In the event EPA determines that SD: (1) has ceased implementation of any portion of the Work, including payment of Installment Payments; (2) is seriously or repeatedly deficient or late in its performance of the Work; (3) is implementing the Work in a manner that may cause an endangerment to human health or the environment; or (4) does not perform the response actions as described in Sections VI, VII or VIII, EPA may issue a written notice ("Work Takeover Notice") to SD. Any Work Takeover Notice issued by EPA will specify the grounds upon which such notice was issued, the portion of the work to be taken over, and will provide SD a period of 15 days within which to remedy the circumstances giving rise to EPA's issuance of such notice.  If EPA issues a Work Takeover Notice, EPA will send a copy to the State.  EPA will not issue a Work Takeover Notice that includes the payment of Installment Payments unless the SD has failed to make Installment Payments.

      b.     If, after expiration of the 15-day notice period specified in ¶ 86.a, SD has not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, EPA may at any time thereafter assume the performance of all or any portion(s) of the Work as EPA deems necessary ("Work Takeover"). EPA will notify SD in writing (which writing may be electronic) if EPA determines that implementation of a Work Takeover is warranted under this ¶ 86.b. Funding of Work Takeover costs is addressed under ¶ 39 (Access to Financial Assurance).

      c.     SD may invoke the procedures set forth in ¶ 64 (Record Review), to dispute EPA's implementation of a Work Takeover under ¶ 86.b. However, notwithstanding SD's invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA may in its sole discretion commence and continue a Work Takeover under ¶ 86.b until the earlier of (1) the date that SD remedies, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, or (2) the date that a final decision is rendered in accordance with ¶ 64 (Record Review) requiring EPA to terminate such Work Takeover.

87.    Notwithstanding any other provision of this CD, the United States and the State retain all authority and reserves all rights to take any and all response actions authorized by law.

## XVIII. COVENANTS BY SD

88.    **Covenants by SD**. Subject to the reservations in ¶ 90, SD covenants not to sue and agrees not to assert any claims or causes of action against the United States or the State with respect to the Site, and this CD, including, but not limited to:

a.    any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through CERCLA §§ 106(b)(2), 107, 111, 112 or 113, or any other provision of law;

b.    any claims under CERCLA §§ 107 or 113, RCRA Section 7002(a), 42 U.S.C. § 6972(a), or state law regarding the Work, past response actions regarding the Site, Past Response Costs, Future Specified Response Costs, State Past Response Costs, State Future Response Costs, SD's Past Response Costs, SD's Future Specified Response Costs, and this CD; or

c.    any claims arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the Michigan Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law.

89.    Except as provided in ¶¶ 92 (Waiver of Claims by SD) and 98 (Res Judicata and Other Defenses), the covenants in this Section shall not apply if the United States or the State brings a cause of action or issues an order pursuant to any of the reservations in Section XVII (Covenants by Plaintiffs), other than in ¶¶ 85.a (claims for failure to meet a requirement of the CD), 85.g (criminal liability), and 85.h (violations of federal/state law during or after implementation of the Work), but only to the extent that SD's claims arise from the same response action, response costs, or damages that the United States or the State is seeking pursuant to the applicable reservation.

90.    SD reserves, and this CD is without prejudice to, claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, and brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States, as that term is defined in 28 U.S.C. § 2671, while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, the foregoing shall not include any claim based on EPA's selection of response actions, or the oversight or approval of SD's deliverables or activities.

91.    Nothing in this CD shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

92.    **Waiver of Claims by SD**

a.    Subject to the reservations in this ¶ 92, SD waives and agrees not to assert any claims or causes of action (including but not limited to claims for contribution under CERCLA) that it may have for all matters relating to the release of PCBs to the Site against any other person who is a potentially responsible party under CERCLA at the Site. This waiver includes, but is not limited to, any asserted or unasserted claims or causes of action by SD, whether in this action, or any future action related to the Site, for recovery of its costs based on contract law or any other theory of recovery.

b.    The waiver in ¶ 92.a shall not apply to any claims that SD may have against a PRP at this Site if a PRP pursues a claim of any type based on any theory relating to this Site against SD.

c.    The waiver in ¶ 92.a shall not apply to any claims that SD may have as a result of the Plaintiffs' exercising any rights against the SD pursuant to ¶¶ 81,82, 83, 84, or 85.

d.    The waiver in ¶ 92.a shall not apply to any claims that SD may have against its own insurance carriers or indemnitors.

e.    The claim waivers in this ¶ 92 shall take effect upon the Effective Date, but are conditioned on this CD's continued effectiveness. Nothing in this ¶ 92 is intended to diminish the contribution protection provided to the SD by this CD or any other CD or administrative settlement agreement relating to this Site.

## XIX.   EFFECT OF SETTLEMENT; CONTRIBUTION

93.    Except as provided in ¶ 92 (Waiver of Claims by SD), nothing in this CD shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this CD. Except as provided in Section XVIII (Covenants by SD), each of the Parties expressly reserves any and all rights (including, but not limited to, pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action that each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto. Nothing in this CD diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

94.    The Parties agree, and by entering this CD this Court finds, that this CD constitutes a judicially-approved settlement pursuant to which SD has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "matters addressed" in this CD. The "matters addressed" in this CD include Natural Resource Damages and all response actions taken or to be taken and all response costs incurred or to be incurred by the United States or any other person with respect to the Site, including any claims against SD for the imposition or allocation of any costs (other than the judgment for past costs and interest imposed on SD on June 19, 2018) that have been or could be asserted in Case No. 1:11-cv-00483, including, without limitation the Petition for Further Relief filed by GP on August 10, 2018.  SD agrees, within

30 days following the Effective Date, to voluntarily dismiss its appeal in Case No. 1:11-cv-00483, docketed in the Sixth Circuit as Case No. 18-1805.

95.    The Parties further agree, and by entering this CD this Court finds, that the complaint filed by the United States in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this CD constitutes a judicially-approved settlement pursuant to which SD has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

96.    SD shall, with respect to any suit or claim brought by it for matters related to this CD, notify the United States and the State in writing no later than 60 days prior to the initiation of such suit or claim.

97.    SD shall, with respect to any suit or claim brought against it for matters related to this CD, notify in writing the United States and the State within 10 days after service of the complaint on SD. In addition, SD shall notify the United States and the State within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial.

98.    **Res Judicata and Other Defenses**. In any subsequent administrative or judicial proceeding initiated by the United States or the State for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, SD shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States or the State in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Section XVII (Covenants by Plaintiffs).

## XX.    ACCESS TO INFORMATION

99.    SD shall provide to EPA and the State, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within SD's possession or control or that of their contractors or agents relating to activities at the Site or to the implementation of this CD, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work. SD shall also make available to EPA and the State for purposes of investigation, information gathering, or testimony, its employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

100.    **Privileged and Protected Claims**

a.    SD may assert that all or part of a Record requested by Plaintiffs is privileged or protected as provided under federal law, in lieu of providing the Record, provided SD complies with ¶ 100.b, and except as provided in ¶ 100.c.

b.    If SD asserts a claim of privilege or protection, it shall provide Plaintiffs with the following information regarding such Record: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, of each addressee, and of each recipient; a description of the Record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a Record, SD shall provide the Record to Plaintiffs in redacted form to

38

mask the privileged or protected portion only. SD shall retain all Records that it claims to be privileged or protected until Plaintiffs have had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in the SD's favor.

        c.     SD may make no claim of privilege or protection regarding: (1) any data regarding the Site, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological or engineering data, or the portion of any other Record that evidences conditions at or around the Site; or (2) the portion of any Record that SD is required to create or generate pursuant to this CD.

101.    **Business Confidential Claims**. SD may assert that all or part of a Record provided to Plaintiffs under this Section or Section XXI (Retention of Records) is business confidential to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). SD shall segregate and clearly identify all Records or parts thereof submitted under this CD for which SD asserts business confidentiality claims. Records that SD claims to be confidential business information will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies Records when they are submitted to EPA or the State, or if EPA has notified SD that the Records are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to SD.

102.    If relevant to the proceeding, the Parties agree that validated sampling or monitoring data generated in accordance with the SOW and reviewed and approved by EPA shall be admissible as evidence, without objection, in any proceeding under this CD.

103.    Notwithstanding any provision of this CD, Plaintiffs retain all of their information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XXI.   RETENTION OF RECORDS

104.    Until 10 years after EPA's final Certification of Work Completion under ¶ 8 (Certification of Work Completion) of the SOW, SD shall preserve and retain all non-identical copies of Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to its liability under CERCLA with respect to the Site, and all Records that relate to the liability of any other person under CERCLA with respect to the Site. SD must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above all non-identical copies of the last draft or final version of any Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to the performance of the Work, provided, however, that SD (and its contractors and agents) must retain, in addition, copies of all data generated during the performance of the Work and not contained in the aforementioned Records required to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

105.    At the conclusion of this record retention period, SD shall notify the United States and the State at least 90 days prior to the destruction of any such Records, and, upon request by the United States or the State, and except as provided in ¶ 100 (Privileged and Protected Claims), SD shall deliver any such Records to EPA or the State.

106.    SD certifies that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by the United States or the State and that it has fully complied with any and all EPA and State requests for information regarding the Site pursuant to Sections 104(e) and 122(e)(3)(B) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e)(3)(B), and Section 3007 of RCRA, 42 U.S.C. § 6927, and state law.

## XXII.  NOTICES AND SUBMISSIONS

107.    All approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, and requests specified in this CD must be in writing unless otherwise specified. Whenever, under this CD, notice is required to be given, or a report or other document is required to be sent, by one Party to another, it must be directed to the person(s) specified below at the address(es) specified below. Any Party may change the person and/or address applicable to it by providing notice of such change to all Parties. All notices under this Section are effective upon receipt, unless otherwise specified. Notices required to be sent to EPA, and not to the United States, should not be sent to the DOJ. Except as otherwise provided, notice to a Party by email (if that option is provided below) or by regular mail in accordance with this Section satisfies any notice requirement of the CD regarding such Party.

**As to the United States**:                    EES Case Management Unit
                                                U.S. Department of Justice
                                                Environment and Natural Resources Division
                                                P.O. Box 7611
                                                Washington, D.C. 20044-7611
                                                eescdcopy.enrd@usdoj.gov
                                                Re: DJ # 90-11-2-07912/11


**As to EPA**:                                  Director, Superfund Division
                                                U.S. Environmental Protection Agency, Region 5
                                                77 W. Jackson Blvd.
                                                Chicago, IL 60604-3507

**and**:                                        James Saric
                                                Remedial Project Manager
                                                U.S. Environmental Protection Agency, Region 5
                                                77 W. Jackson Blvd, S-6J
                                                Chicago, IL 60604-3507
                                                Saric.James@epa.gov
                                                (312) 886-0992

**As to the Regional Financial**                Justin Abrams
**Management Officer**:                           Accountant
                                                 U.S. Environmental Protection Agency, Region 5
                                                77 West Jackson Blvd., MC:MF-10J
                                                Chicago, IL 60604-3507

**At to EPA Cincinnati Finance Center**:

EPA Cincinnati Finance Center
26 W. Martin Luther King Drive
Cincinnati, Ohio 45268
cinwd_acctsreceivable@epa.gov

**As to DOI:**

Lisa L. Williams
NRDA Representative for FWS
2651 Coolidge Road, Suite 101
East Lansing, MI 48823
lisa_williams@fws.gov

Kelly Brooks Bakayza
Attorney Advisor
Office of the Solicitor
3 Parkway Center, Suite 385
Pittsburgh, PA 15220
kelly.bakayza@sol.doi.gov

**As to DOC:**

Laurie Lee
Deputy Section Chief
Office of General Counsel
Natural Resources Section
501 W. Ocean Blvd., Suite 4470
Long Beach, CA  90802
laurie.lee@noaa.gov

**As to the State**:

Daniel Peabody
State Project Coordinator
525 W. Allegan St.,
Lansing, MI 48933
PeabodyD@michigan.gov

Jay Wesley
Fisheries Division
Michigan Department of Natural Resources
621 N. 10th Street
Plainwell, MI 49080
WesleyJ@michigan.gov

**As to SD**:                           James M. Bedore
Executive VP, General Counsel, & Secretary
NCR Corporation
864 Spring Street NW
Atlanta, GA 30308
James.Bedore@ncr.com

Christopher Murphy
Law VP & Chief Litigation Counsel
NCR Corporation
864 Spring Street NW
Atlanta, GA 30308
Christopher.Murphy@ncr.com

Bryan Heath
Senior Environmental Manager
864 Spring Street NW
Atlanta, GA 30308
Bryan.Heath@ncr.com

Office of the General Counsel
NCR Corporation
864 Spring Street, NW
Atlanta, GA 30308
Law.notices@ncr.com

## XXIII. RETENTION OF JURISDICTION

108.    This Court retains jurisdiction over both the subject matter of this CD and SD for the duration of the performance of the terms and provisions of this CD for the purpose of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this CD, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XV (Dispute Resolution).

## XXIV. APPENDICES

109.    The following appendices are attached to and incorporated into this CD:

"Appendix A" is the Site map.

"Appendix B" is the SOW.

"Appendix C" is the Area 2 ROD.

"Appendix D" is the draft Area 4 Action Memorandum.

"Appendix E' is reserved for the Area 3 ROD.

"Appendix F" is the form for modification of the Consent Decree after the Areas 3 ROD.

## XXV.   MODIFICATION

110.     Except as provided in ¶ 14 (SOW or Related Deliverables), material modifications to this CD, including the SOW, shall be in writing, signed by the United States, the State, and SD, and shall be effective upon approval by the Court. Except as provided in ¶ 14, non-material modifications to this CD, including the SOW, shall be in writing and shall be effective when signed by duly authorized representatives of the United States and SD. A modification to the SOW shall be considered material if it implements a ROD amendment that fundamentally alters the basic features of the selected remedy within the meaning of 40 C.F.R. § 300.435(c)(2)(ii). Before providing its approval to any modification to the SOW, the United States will provide the State with a reasonable opportunity to review and comment on the proposed modification.

111.     Nothing in this CD shall be deemed to alter the Court's power to enforce, supervise, or approve modifications to this CD.

## XXVI. LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

112.     This CD shall be lodged with the Court for at least 30 days for public notice and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the CD disclose facts or considerations that indicate that the CD is inappropriate, improper, or inadequate. SD consents to the entry of this CD without further notice.

113.     If for any reason the Court should decline to approve this CD in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

## XXVII.        EFFECTIVE DATE

114.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket; provided, however, that SD hereby agrees that it shall be bound to perform duties scheduled to occur prior to the Effective Date.  In the event the United States withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter the Consent Decree, then the preceding requirement to perform duties scheduled to occur before the Effective Date shall terminate.

## XXVIII.        SIGNATORIES/SERVICE

115.     Each undersigned representative of a SD to this CD, the State, and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice certifies that he or she is fully authorized to enter into the terms and conditions of this CD and to execute and legally bind such Party to this document.

116.     SD agrees not to oppose entry of this CD by this Court or to challenge any provision of this CD unless the United States has notified SD in writing that it no longer supports entry of the CD.

117.     Each SD shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on behalf of that Party with respect to all matters arising under or relating to this CD. SD agrees to accept service

43

in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons. SD need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this CD.

## XXIX. FINAL JUDGMENT

118.    This CD and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties regarding the settlement embodied in the CD. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this CD.

119.    Upon entry of this CD by the Court, this CD shall constitute a final judgment between and among the United States, the State, and SD. The Court enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.


SO ORDERED THIS __ DAY OF _____, 20__.


_____
United States District Judge

Signature Page for CD regarding the Allied Paper Kalamazoo River Superfund Site

**FOR THE UNITED STATES OF AMERICA:**

12/4/19

Dated

Jeffrey Bossert Clark
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
Washington, D.C. 20530

Kristin M. Furrie
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, D.C. 20044-7611

ANDREW BYERLY BIRGE
United States Attorney
Western District of Michigan

Adam B. Townshend
Assistant United States Attorney
Western District of Michigan
330 Ionia Ave. N.W., Suite 501
Grand Rapids, MI  49503

45

Signature Page for CD regarding the Allied Paper Kalamazoo River Superfund Site

For the Environmental Protection Agency:

_11/13/19_
Dated

Douglas Ballotti
Director
Superfund & Emergency Management Division
U.S. Environmental Protection Agency, Region 5
77 West Jackson Blvd.
Chicago, IL 60604-3507

Nicole Wood-Chi
Associate Regional Counsel
U.S. Environmental Protection Agency, Region 5
77 West Jackson Blvd.
Chicago, IL 60604-3507

46

Signature Page for CD regarding the Allied Paper Kalamazoo River Superfund Site

**FOR THE STATE OF MICHIGAN:**

DANA NESSEL
Attorney General of Michigan

Dated  12/6/19

Megen Miller (P78901)
Assistant Attorney General
Environment, Natural Resources, and Agriculture Division
Michigan Department of Attorney General
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664

Dated  12/6/2019

Liesl Clark, Director
Michigan Department of Environment, Great Lakes, and Energy
P.O. Box 30473
Lansing, MI 48909-7973
(517) 284-6700

Dated  12/2/19

Daniel Eichinger, Director
Michigan Department of Natural Resources
Constitution Hall, 525 West Allegan Street
P.O. Box 30028
Lansing, MI  48909-7528
(517) 284-6367

47

Signature Page for CD regarding the Allied Paper Kalamazoo River Superfund Site

**FOR NCR Corporation:**

11/5/19
Dated

Owen Sullivan
Chief Operating Officer

NCR Corporation
864 Spring Street NW
Atlanta, GA 30308

Agent Authorized to Accept Service
on Behalf of Above-signed Party:

David R. Marriott
Darin P. McAtee
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
T: (212) 474-1000
DMarriott@cravath.com
DMcAtee@cravath.com

48