IN THE UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and THE STATE OF MICHIGAN, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No.  1:19-cv-1041 |
| v. | ) ) | Chief Judge Robert J. Jonker |
| NCR CORPORATION, | ) ) | Magistrate Judge Ray Kent |
| Defendant. | ) ) ) | |

**UNITED STATES' MEMORANDUM IN SUPPORT OF A
MOTION TO ENTER THE CONSENT DECREE WITH NCR CORPORATION**

## TABLE OF CONTENTS

BACKGROUND ........................................................................................................... 2

   A.   Statutory Framework ................................................................................... 2

   B.   Kalamazoo Superfund Site ......................................................................... 4

   C.   Natural Resource Damages ......................................................................... 6

   D.   NCR's Production of Carbonless Copy Paper ("CCP") ............................. 8

   E.   The Contribution Litigation ...................................................................... 10

   F.   The Proposed Consent Decree .................................................................. 12

ARGUMENT ........................................................................................................... 15

   I.   Standard of Review ................................................................................... 15

   II.   The Consent Decree Should Be Entered Because It Is Fair, Adequate, Reasonable, and in the Public Interest ..................................................................................................... 16

      A.   The Consent Decree Is Fair, Adequate, and Reasonable ............................... 16

      B.   Georgia-Pacific's Concerns About Fairness Should Not Prevent Entry ...................... 20

      C.   The Consent Decree is in the Public Interest .................................................. 24

   III.   Additional Public Comments Do Not Justify Rejection of the Consent Decree ........... 24

      A.   EPA Intends to Use the Money That it Will Receive Under the Consent Decree at the Site but the Consent Decree Does Not Need to be Modified ................................. 25

      B.   The Consent Decree is Consistent With CERCLA Guidance ......................................... 27

      C.   Georgia-Pacific Does Not Have a Section 107 Claim Against NCR ............................. 27

      D.   Settlement Money Should Not Be Used to Perform Health Studies or Pay Individuals 28

      E.   Settlement Money Should Not Be Used to Change Fish Consumption Warnings ........ 29

      F.   The Consent Decree Need Not Provide for Full Remediation of the Site .................... 29

      G.   The Consent Decree Does Not Need to Be Modified to Address Pre- and Post-Judgment Interest on Georgia-Pacific's Judgment Against NCR ....................................... 30

CONCLUSION ........................................................................................................... 30

**Certification of Compliance**

Pursuant to W.D. Mich. LCivR 7.2(b)(i), this brief does not exceed 10,800 words including headings, footnotes, citations and quotations but not including the case caption, cover sheets, any table of contents, any table of authorities, the signature block, attachments, exhibits, and affidavits, according to Microsoft Word.

The United States asks this Court to approve and enter the Consent Decree with NCR Corporation ("NCR"), which was lodged on December 11, 2019.  ECF. No. 2.  The United States and the State of Michigan (the "State") sued NCR under Sections 106 and/or 107 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9606 & 9607, for recovery of the United States Environmental Protection Agency's ("EPA") unreimbursed past and future response costs and the performance of work associated with the clean-up of the Allied Paper/Portage Creek/Kalamazoo River Superfund Site ("Kalamazoo Site" or the "Site").  Simultaneously, the United States and the State lodged a Consent Decree valued at more than $245 million, which resolves NCR's liability at the Site. Under the Consent Decree, NCR will: (1) perform cleanup work at the Site at an estimated cost of $135.7 million; (2) pay $76.5 million for past and future response costs at the Site; (3) pay $27 million for natural resources damages, including $2 million for assessment costs; and (4) pay $6 million to the State for past and future response costs.  NCR will also withdraw its appeal of this Court's judgment in *Georgia-Pac. Consumer Prod. LP v. NCR Corp.*, 1:11-cv-483 (W.D. Mich.) and satisfy the judgment by paying approximately $20 million to Georgia-Pacific Consumer Products LP, Fort James Corporation, and Georgia-Pacific LLC (collectively, "Georgia-Pacific" or "GP").

After lodging the Consent Decree, the United States also published notice of the proposed settlement in the Federal Register to solicit public comments and held a 60-day public comment period, which closed on February 18, 2020.  *See* 84 Fed. Reg. 68,946 (Dec. 17, 2019); 85 Fed. Reg. 529 (Jan. 6, 2020).  The United States received 11 sets of comments, which are attached as Appendix A.  Notwithstanding these comments, the United States believes that the Consent Decree is fair, adequate, reasonable, and in the public interest and the Court should approve and

enter the Decree.  The Consent Decree ensures the next decade of cleanup work at the Site will proceed without interruption or delay, provides substantial funding to perform additional cleanup work, and provides early funding for restoration projects to address natural resources damages at the Site that would otherwise not occur for years.

## BACKGROUND

### A.      Statutory Framework

Congress enacted CERCLA in response to serious environmental problems posed by improper handling, treatment, and disposal of hazardous substances.  *See e.g.*, *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009); *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1039-40 (2d Cir. 1985).  CERCLA "provides a mechanism for cleaning up hazardous waste sites, and imposes the costs of the cleanup on those responsible for the contamination."  *Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 7 (1989).

Under Section 107(a) of CERCLA, the federal government may file actions to recover, *inter alia*, all costs it incurs for removal or remediation of hazardous substances at a given site from potentially responsible parties. 42 U.S.C. § 9607(a)(1)-(4)(A).  Liable parties under Section 107(a) include present site owners and operators, past site owners and operators at the time of disposal, and specified categories of generators and transporters of hazardous substances. 42 U.S.C. § 9607(a).  Under Section 107(a) responsible parties are strictly liable.  *Burlington*, 556 U.S. at 608 ("CERCLA imposes strict liability for environmental contamination upon four broad classes of PRPs").

CERCLA also establishes a framework for recovering damages to compensate the public when natural resources are injured, lost or destroyed as a result of releases of hazardous

substances.[1]  *See* 42 U.S.C. § 9607(a).  CERCLA specifies that natural resource damages

("NRD") liability "shall be to the United States Government and to any State for natural

resources within the State or belonging to, managed by, controlled by, or appertaining to such

State and to any Indian tribe for natural resources belonging to, managed by, controlled by, or

appertaining to such tribe."  42 U.S.C. § 9607(f)(1).

 In general, the proper measure of NRD are the cost of measures needed to restore,

replace, or acquire the equivalent of the injured resources after the remedial action has been

implemented or taken into account, plus compensation for public losses due to impairment of

natural resources from the time of injury until restoration or recovery is complete.  *See generally,*

*Ohio v. Dep't of the Interior*, 880 F.2d 432 (D.C. Cir. 1989); *Kennecott Utah Copper Corp. v.*

*Dep't of the Interior*, 88 F.3d 1191 (D.C. Cir. 1996).  Recoverable NRD explicitly include the

reasonable costs of assessing the injuries resulting from a release of hazardous substances.  42

U.S.C. § 9607(a)(4)(C).

 CERCLA does not prescribe any method or formula for determining NRD in all cases,

but CERCLA did require promulgation of Federal regulations for the natural resources damages

assessment ("NRDA") at individual CERCLA sites.  42 U.S.C. § 9651(c).  Those regulations,

issued by the Department of Interior ("DOI"), are codified at 43 C.F.R. Part 11.  In any judicial

action to recover NRD, CERCLA establishes a rebuttable presumption in favor of a Federal or

State Trustee's determination or assessment of damages done in accordance with the DOI NRDA

regulations.  *Id.* at § 9607(f)(2)(C).  By law, any NRD recovery by a Trustee must be used "only

---

 [1] "Natural resources" include "land, fish, wildlife, biota, air, water, ground water,
drinking water supplies, and other such resources belonging to, managed by, held in trust by,
appertaining to, or otherwise controlled by" the United States, any State or any Indian tribe.
42 U.S.C. § 9601(16).

to restore, replace, or acquire the equivalent of" the injured natural resources.  *Id.* at § 9607(f)(1).

## B.    Kalamazoo Superfund Site

The Kalamazoo Site is located in Allegan and Kalamazoo Counties, Michigan.  The Site includes soil and sediment contamination in disposal areas, paper mill properties, about 80 miles of the Kalamazoo River ("River") from Morrow Dam to Lake Michigan, adjacent riverbanks and contiguous floodplains, as well as a 3-mile stretch of Portage Creek ("Creek").  EPA listed the Site on the National Priorities List on August 30, 1990.  55 Fed. Reg. 35,502 (August 30, 1990).  Since the late 1800s, and for most of the 1900s, numerous paper mills were located on the River and on the Creek.  Waste from the paper mills was discharged directly or indirectly to those waterbodies, and was disposed of in areas adjacent to those waterbodies.  As a result of these activities, the mills, disposal areas, and waterbodies became contaminated with PCBs as well as other contaminants.  After approximately 1954, the recycling of paper led to PCB contamination because the recycling included carbonless copy paper (CCP) produced by NCR and contained PCBs.

EPA divided the Site into several Operable Units (OUs).  OUs 1-4 and 7[2] are land-based, source area OUs at which EPA issued Records of Decision ("RODs") to address contaminated soils and paper-waste.  With the exception of OU1, the land-based OUs have been or will be cleaned up through various existing agreements.  These OUs are either former mill properties or disposal areas for the mills.  At OU1, remedial design ("RD") work is currently being performed and the remedial action ("RA") work will be performed in the future.

---

[2] OU5 is described below and OU6, designated as a placeholder, is not currently being used as a designation for any ongoing activities.

4

OU5 consists of a portion of the Kalamazoo River and Portage Creek, and includes sediments, wetlands, and floodplains in and along the River and Creek.  OU5 is further divided into 7 areas.  Generally, the cleanup in OU5 is proceeding from upstream to downstream to avoid recontamination of remediated areas.  ECF No. 8 (Declaration of James Saric) at ¶2.  To date, EPA has only issued RODs for Areas 1 and 2 of OU5.  Georgia-Pacific is conducting supplemental remedial investigation ("RI") and feasibility study ("FS") work in the remaining areas of the River.  *Id.*  While EPA has not selected a remedy for all areas of OU5, EPA's current estimate of Site costs are as follows:

| Site Costs[3] | | |
|---|---|---|
| | | |
| Site Area | Amount ($) | Scheduled ROD Date |
| OU5 | $609,400,00 | |
| Area 1 (currently incurred by GP and IP) | $23,000,000 | 2016 |
| Area 2 | $46,400,000 | 2017 |
| Area 3 | $35,000,000 | 2020 |
| Area 4 | $175,000,000 | 2021 |
| Area 5 | $75,000,000 | 2022 |
| Area 6 | $205,000,000 | 2026 |
| Area 7 | $50,000,040 | 2027 |
| OU1 | $63,000,000 | 2016 |
| Other Site Costs including prior removal actions, OUs 2-4 & 7, EPA past costs | $179,000,000 | |

ECF No. 8 at ¶3.  EPA estimates total Site costs to be approximately $851 million.  *Id.*

---

[3] Cost estimates for OU5, Area 2 and OU1 are based on the Record of Decision costs estimates.  ECF No. 8 at ¶3.  The cost estimate for OU5, Area 1 is based on RD/RA work performed by Georgia-Pacific and International Paper.  *Id.* Costs estimates for OU5, Areas 3 through 7 are based on existing RI/FS data and Site expenses in other areas of the River.  *Id.* Other costs incurred at the Site are costs that various Parties have incurred at the Site in other operable units or through removal actions, including removal action in OU5, as well as costs EPA has incurred.  *Id.*

### C.    Natural Resource Damages

The Natural Resource Trustees for the Site are the Michigan Department of Environment, Great Lakes, and Energy ("EGLE"), the Michigan Department of Natural Resources ("DNR"), the Michigan Department of Attorney General, the U.S. Department of the Interior represented by the U.S. Fish and Wildlife Service ("USFWS"), and the U.S. Department of Commerce represented by the National Oceanic and Atmospheric Administration ("NOAA") (collectively, the ("Trustees").

In 2005, the Trustees released a Stage I Assessment report for the Site, based on data known to and available to the Trustees through approximately 2003.[4]  The Stage I Assessment was prepared in accordance with DOI NRDA regulations as set forth at 43 C.F.R. Part 11.  This report included initial conclusions about the types and magnitudes of injuries and damages resulting from hazardous substance releases at the Site.  If deemed necessary by the Trustees, the Trustees may conduct a more detailed Stage II Assessment, which would include focused studies to expand upon the Stage I Assessment.

The preliminary conclusions of the Stage I Assessment indicated that the following natural resources, including surface water and sediment, floodplain soils, fish, benthic invertebrates, bald eagles, other birds, and mink, have been injured throughout the Site by releases of PCBs.  Contamination-related recreational fishing losses for the Kalamazoo River and Lake Michigan were also calculated.  To assert a claim in the bankruptcy of a responsible party at this Site in 2009, the Trustees performed a habitat equivalency analysis ("HEA") to

---

[4] The Stage 1 Assessment documents are available at:  https://pub-data.diver.orr.noaa.gov/admin-record/6723/2005_0315_Kalzoo_InjuryRpt.pdf
https://pub-data.diver.orr.noaa.gov/admin-record/6723/2005_0315_Kalzoo_vol2.pdf
https://pub-data.diver.orr.noaa.gov/admin-record/6723/Stage1_errata.pdf

quantify ranges of damages from injuries to natural resources and compensatory restoration needs and costs and also updated estimates of recreational fishing losses from the Stage I Assessment.[5]  The resulting bankruptcy claim asserted estimated natural resource damages of at least $330 million in 2009 dollars.  *See In re: Lyondell Chemical Company*, *et al*., Case No. 09-10023 (Bankr. S.D.N.Y.).

As part of the bankruptcy settlement, an Environmental Trust was established into which $2 million was deposited to be used to restore, replace, rehabilitate, or acquire the equivalent of the natural resources injured and services lost as a result of the release of hazardous substances from OU1.  The Trustees later directly received $1.38 million in general unsecured claims to be used to restore, replace, rehabilitate, or acquire the equivalent of the natural resources injured and services lost as a result of the release of hazardous substances from the Site as a whole.  In 2012, the Trustees released a Draft Restoration Plan / Environmental Assessment ("Draft RP/EA") proposing restoration actions to address public natural resource losses caused by the release of hazardous substances from OU1 for public review and comment.  The RP/EA for OU1 was finalized in August 2013.

The Trustees also prepared a HEA for Area 1 of OU5, in anticipation of EPA's ROD and a legal agreement with the potentially responsible parties ("PRPs").  The Area 1 HEA document contained the Trustees' basis of calculations and a summary of assumptions.  *Id*.  A Restoration Plan / Programmatic Environmental Impact Statement ("RP/PEIS") for the Site was finalized by

---

[5] The updated State 1 Recreational Fishing Assessment is available at: https://pub-data.diver.orr.noaa.gov/admin-record/6723/Kalamazoo.Rec.Fishing.Update.7.16.2009.pdf.

the Trustees in 2016.  The RP/PEIS outlines the Trustees' restoration approaches, strategy, and criteria by which projects will be evaluated.[6]

In preparing to settle with NCR, the Trustees updated the HEA performed in conjunction with the bankruptcy, the Area 1 HEA, and the updated estimated value of recreation fishing losses.  Based on all these available studies and analysis conducted through late 2018, the Trustees estimated total damages, including past assessment costs and an estimate of future assessment and restoration costs, to be in the range of $344 million to $373 million, which included $296 million for habitat damages. ECF No. 9 (Declaration of Lisa L. Williams) at ¶4. The habitat damages estimate included certain assumptions about the cost of restoration projects and the benefits derived from each project.  *Id*.  If only projects that are the most cost-effective are used, habitat damages are reduced to $135 million.  *Id.* at ¶5.  Because few projects have been implemented at the Site, the Site has many available projects that are cost-effective.  *Id*.  If the cost-effective projects can be implemented, the low end of the total damages range is reduced to $183 million (from $344 million).  *Id*.

### D.      NCR's Production of Carbonless Copy Paper ("CCP")

From the early 1950s until early 1971, NCR marketed a special type of "carbonless" copy paper called "no carbon required" paper, "NCR Paper," "carbonless copy paper," or "CCP."  For this type of two-part CCP form, the back side of the first page was coated with an emulsion containing PCBs and an undeveloped ink enclosed in microcapsules.  A different coating that contained an ink developer was applied to the front side of the second page.  When writing or

---

[6] The RP/REIS can be found at: https://pub-data.diver.orr.noaa.gov/admin-record/6723/Final_Restoration_Plan_and_Programmatic_Environmental_Impact_Statement_for_Restoration_Resulting_from_the_Kalamazoo_River_Natural_Resource_Damage_Assessment.pdf.

typing on the forms applied pressure, it broke the microcapsules coated on the back of the first

page, so that the ink and the developer would mix and form a duplicate image of the writing or

typing on the second page.

NCR did not make this CCP product on its own. NCR manufactured its proprietary

coatings itself – including the PCB-containing emulsion – but it outsourced the paper coating

process to three independent licensees in the United States. Those coating companies were:

(1) Appleton Coated Paper Company ("ACPC") in Wisconsin; (2) Combined Paper Mills

("CPM") in Wisconsin; and (3) Mead Corporation ("Mead") in Ohio. NCR would provide its

proprietary coatings to the coating companies which would spray the coatings onto large rolls of

paper that they procured and then trim the rolls to remove roll edges and roll ends that were only

partially coated. NCR would then buy the large trimmed rolls of fully-coated paper from the

coating companies. Among the three coaters, the major NCR Paper producers were ACPC

(estimated as making 57% of the total production) and Mead (estimated 39%), while CPM was a

minor producer (estimated 4%, only from 1968 or 1969 until 1971).

NCR sold this specially-coated bulk paper to its "paper converter" customers, who cut the

large rolls and printed on the coated paper to convert it into consumer products, such as pre-

printed two-part CCP business forms. NCR also owned some converting facilities of its own,

which were organized under its "Systemedia" business unit.

Three types of PCB-containing wastepaper were generated in the production and use of

NCR Paper products:

> First, in trimming the coated paper to produce the fully-coated rolls that they
>
> needed to sell to NCR, the coating companies produced a large volume of PCB-coated
>
> scrap paper that was called CCP "broke." This broke was used as a source of paper fiber

for paper mills that made products such as paper towels, napkins, and toilet tissue from recycled paper.  ACPC, CPM, and Mead collected, bundled, stored, and sold to wastepaper brokers for a positive price.

Second, the process of cutting and converting coated NCR Paper into products like business forms generated a category of scrap paper called CCP "converter trim." Just like the broke produced by the coaters, converter trim was a source of paper fiber that companies such as Systemedia sold to wastepaper recycling mills.

Third, after use by the ultimate consumer, NCR Paper would be collected with other types of office wastepaper and supplied to recycling mills.

During the paper recycling process, the ink and developer in NCR Paper would react and turn blue – an undesirable process called "blueing" – so a recycling mill that produced white paper products could only accept NCR Paper if the mill had special "de-inking" processes to remove unwanted dyes and coatings from its wastepaper feedstock.  The wastewater discharge from that de-inking process released PCBs from the recycled NCR Paper to the receiving waterbody.  This caused significant PCB contamination in the Kalamazoo River, as well as the Lower Fox River in northeastern Wisconsin, which has been the subject of similar environmental litigation.

### E.    The Contribution Litigation

In 2010, Georgia-Pacific sued NCR, International Paper Co. ("IP"), and Weyerhaeuser Co. ("Weyerhaeuser") under Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607(a) & 9613, for (i) the recovery of past and future response costs at the Site; and (ii) a declaratory judgment that they are liable for future costs at the Site.  *Georgia Pac. Consumer Prod. LP v. NCR Corp.*, 1:11-cv-483 (W.D. Mich.) (the "Contribution Litigation").

After a two-week trial, this court found that NCR was liable as an arranger at the Site. *Georgia-Pac. Consumer Prod. LP v. NCR Corp.*, 980 F. Supp. 2d 821, 824 (W.D. Mich. 2013). This Court found that by "no later than 1969" NCR knew that selling CCP broke created a hazardous waste, but continued to sell it. *Id.* at 832. This Court also found that CCP broke from ACPC, CPM, Mead, and the Systemedia reached the Kalamazoo River mills. *Id.* at 835-36. This Court, focusing on NCR's knowledge, held that NCR's activities relating to CCP broke rendered it liable as an arranger for the disposal of PCBs at the Kalamazoo River Site, a decision contrary to that in the Fox River matter, where the court focused on ACPC's knowledge about the recycling of CCP broke and concluded that ACPC did not arrange for disposal of CCP broke.[7] *Id.* at 836.

Following a 20-day allocation trial, this Court found the Parties liable as follows: Georgia Pacific 40%; NCR 40%; International Paper 15%; and Weyerhaeuser 5%. *Georgia-Pacific Consumer Products LP v. NCR Corp.*, 358 F. Supp. 3d 613 (W.D. Mich. Mar. 2018). This Court rejected arguments that any party, including NCR in particular, was uniquely culpable at the Site. *Id.* at 638-41. This Court also rejected any arguments that the Site was reasonably capable of apportionment. *Id.* at 641-44. This Court limited its allocation to certain past costs that only Georgia-Pacific was seeking and expressly declined to allocate future Site costs or costs for NRD because the future costs and the future remedies at the Site were uncertain. *Id.* at 632, 645. Additionally, this Court rejected the allocation methodologies proposed by the Parties, including

---

[7] The district court's decision about the sale of CCP at the Fox River can be found at *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2012 WL 2704920 (E.D. Wis. July 3, 2012). The Seventh Circuit's decision affirming the district court's decision can be found at *NCR Corp. v. George A. Whiting Paper Co.,* 768 F.3d 682 (7th Cir. 2014).

11

NCR's argument that it should have minimal liability and Georgia-Pacific's argument that NCR should have 100% liability.  *Id*. at 645-47.

In allocating a 40% share to NCR, this Court found that NCR was involved in the discharges of PCBs even outside of the period when it arranged for disposal and noted that NCR was responsible for the PCB-containing emulsion.  *Id*. at 648-49.  This Court entered judgment, finding NCR liable to Georgia-Pacific for 40% of certain past response costs or $19,826,752.67. *Georgia-Pac. Consumer Prod. LP v. NCR Corp.*, 1:11-cv-483 (W.D. Mich.), ECF No. 925 at PageID.34746. *Id*.  Finally, This Court entered a declaratory judgment, finding all parties, including NCR and Georgia-Pacific, liable at the Site under CERCLA Section 107, 42 U.S.C. § 9607 for future response costs.  *Id*.

### F.      The Proposed Consent Decree

The Consent Decree is valued at more than $245 million in work and payments.  Under the Consent Decree, NCR will: (1) perform response work at the Site at an estimated cost of $135.7 million; (2) pay $76.5 million to the United States for past and future response costs at the Site; (3) pay $27 million to the Trustees for NRD, including $2 million for reimbursement of past assessment costs; and (4) pay $6 million to the State for its past and future response costs. Additionally, NCR will withdraw its appeal of the judgment in the Contribution Litigation and pay approximately $20 million to Georgia-Pacific to satisfy that judgment.

The first work that NCR will perform is a time-critical removal action ("TCRA") in OU5, Area 4 at an estimated cost of $55 million.  ECF No. 2-1 at ¶¶16-19; ECF No. 8 at ¶¶3, 6.  The TCRA will remove sediment and soils that are highly contaminated with PCBs that are located immediately upstream of the Trowbridge Dam.  ECF No. 2-6 at PageID.215.  The Trowbridge Dam is at risk of failure and the State has determined that it is in "very poor" condition.  *Id*. at

PageID.220.  If the dam were to fail, the PCB-contaminated sediment would be released to the riverbanks, floodplains, and instream sediment in locations where contamination does not currently exist or exists at lower levels.  *Id* at PageID.216.  As part of the work, NCR will also remove the Trowbridge Dam, eliminating the threat of future failure.  *Id*.  at  PageID.223-24.  NCR agreed to perform this work prior to the entry of the Consent Decree and NCR has indeed begun design work on the TCRA.  ECF No. 2-1 at PageID.30.

Next, NCR will perform the RD/RA work in OU5, Area 2 at an estimated cost of $46.4 million.  ECF No. 2-1 at ¶ 20; ECF No. 2-4 at PageID.110.  The RD/RA work will implement the remedy that was selected in that Area by the ROD.  The remedy consists of: (1) removal of the Otsego City Dam; (2) realignment of the river channel to create a stable, single channel; (3) excavation of contaminated soils along the banks, floodplain, and Gun River; (5) excavation of areas with high concentrations of PCBs; (6) capping anabranches; (7) placing institutional controls; and (8) conducting long-term monitoring.  ECF No. 2-4 at PageID.109-10.

NCR may also perform the RD/RA work in OU5, Area 3.  To date, EPA has not issued a ROD or selected the remedy for Area 3.  ECF No. 2-1 at ¶¶ 21-25; ECF No. 8 at ¶5.  However, EPA has conditionally approved the RI/FS, which identifies potential remedial options. ECF No. 8 at ¶4. Based on current Site conditions and investigations, EPA estimates that the RD/RA work in Area 3 will cost approximately $35 million.  *Id*. at ¶3.  Since EPA has not yet issued the ROD for Area 3, the Consent Decree has several provisions to address the uncertainty associated with cleaning up this Area.

First, after issuance of the OU5, Area 3 ROD, the United States will propose a Consent Decree Modification and Statement of Work Modification that are consistent with Appendix F to the Consent Decree in order to incorporate the Area 3 ROD into the Consent Decree.  ECF No.

13

2-1 at ¶ 13.  NCR will have 30 days from the receipt of the proposed modification to opt-out of performing the Area 3 RD/RA work.  *Id.*  If NCR opts out of the Area 3 RD/RA work, it must pay EPA $52.5 million, which is 1.5 times the current estimated value of the work to reflect the uncertainty associated with the current estimates and to encourage NCR to perform the work.  *Id.* at ¶ 23.  If EPA fails to issue an Area 3 ROD, EPA no longer believes it is in the public interest to modify the Consent Decree to include the Area 3 ROD, or this Court does not enter the modification to the Consent Decree, NCR will pay EPA $35 million (the current estimated cost of the Area 3 RD/RA work).  *Id.* at ¶ 24.  If the court enters the Consent Decree Modification, NCR will perform the Area 3 RD/RA work, which will likely consist of excavation of PCB-contaminated sediment and soils, institutional controls, and long-term monitoring.  ECF No. 8 at ¶5.

If NCR implements the response work in Areas 2, 3, and 4 included in the Consent Decree, it will spend approximately $135.7 million and it will be implementing that work over the course of the next decade.  *Id.* at ¶3.   At the same time, Georgia-Pacific will continue to conduct RI/FS work in the remaining areas of the River pursuant to an existing Administrative Agreement on Consent.  *Id.* at ¶2.  Georgia-Pacific and IP will also continue to implement the RD/RA work in OU5, Area 1 pursuant to a Unilateral Administrative Order ("UAO").  *Id.*

In addition to the substantial work obligation, NCR will pay EPA $1.5 million for its past response costs and $75 million for additional response costs.  ECF No. 2-1 at ¶¶ 42-44.  The Consent Decree contains EPA's model language for payment of response cost such that it provides that the money will be deposited into "the Site-wide Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred

by EPA to the EPA Hazardous Substance Superfund."[8]  *Id*.  Additionally, NCR will pay EPA's oversight costs for overseeing the work that NCR is performing.  *Id*. at ¶ 45.

NCR will also pay a total of $6 million for the State's past and future response costs at the Site.  *Id*. at ¶¶ 42-43, 50-51.  NCR will pay $2 million to cover a portion of Trustee's past assessment costs and $25 million to the Trustees to conduct restoration work at the Site.[9]  *Id*. at ¶¶ 42-43; 49.

## ARGUMENT

### I.    Standard of Review

In determining whether to enter a proposed consent decree, the reviewing court considers "whether the decree is 'fair, adequate, and reasonable, as well as consistent with the public interest.'"  *United States v. Lexington-Fayette Urban Cty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010) (internal quotations omitted); *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1426 (6th Cir. 1991).  Approval of a settlement is committed to the informed discretion of the reviewing court, which is to exercise that discretion in a limited and deferential manner.  *Akzo Coatings*, 949 F.2d at 1424.

This limited standard of review reflects a public policy that strongly favors settlements of disputes without protracted litigation.  *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976).  Settlements conserve the resources of the courts, the litigants, and the taxpayers and "should . . . be upheld whenever equitable and policy considerations so permit."  *Id.* at 1372;

---

[8] EPA's model RD/RA Consent Decree can be found here: https://cfpub.epa.gov/compliance/models/view.cfm?model_ID=81.  The relevant language is located in Paragraph 35.

[9] The agencies will receive the following amounts for a portion of their assessment costs: NOAA $719,374; USFWS $373,967; DOI Solicitors Office $79,907; EGLE and Michigan Attorney General's Office $710,702; and MDNR $116,050.  ECF No. 9 at ¶8.

*Akzo Coatings*, 949 F.2d at 1436 (recognizing CERCLA's "presumption in favor of voluntary settlement"); *In re: Acushnet River & New Bedford Harbor Proceedings Re Alleged PCB Pollution,* 712 F. Supp. 1019, 1027 (D. Mass. 1989) (it was "Congress' intent to encourage CERCLA settlements that reduce the time and expense of enforcement litigation that necessarily diverts money from cleanup and restoration").

The presumption in favor of settlement is particularly strong where, as here, the Department of Justice and State law enforcement officials played a significant role in negotiating the consent decree on behalf of federal and State agencies with substantial expertise in the environmental field. *Lexington-Fayette*, 591 F.3d at 490–91 (*quoting Akzo Coatings*, 949 F.2d at 1436).

## II.      The Consent Decree Should Be Entered Because It Is Fair, Adequate, Reasonable, and in the Public Interest

### A.  The Consent Decree Is Fair, Adequate, and Reasonable

The fairness prong has two components: procedural fairness and substantive fairness. *United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1018 (8th Cir. 2002); *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990). There is no question that the Consent Decree is procedurally fair. To evaluate procedural fairness, "[a] court should 'look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance.'" *In re Tutu Water Wells CERCLA Litigation*, 326 F.3d 201, 207 (3rd Cir. 2003); *BP Amoco Oil*, 277 F.3d at 1018. The Consent Decree is the result of several years of negotiations during which each side was represented by experienced counsel. Further, the Consent Decree was subject to public comment and there is no allegation of bad faith or collusion in the negotiations. *See United States v. BP Expl. & Oil Co.*, 167 F. Supp. 2d 1045, 1051-52 (N.D. Ind. 2001)

16

(procedural fairness is satisfied as long as the consent decree is lodged for public comment and there is no bad faith or collusion in negotiations).

The substantive fairness prong is also satisfied in this case and also shows the Decree's fairness and adequacy.  The starting point for the substantive fairness inquiry is usually the comparative fault of the entities involved in the contamination.  *See, e.g., BP Amoco Oil*, 277 F.3d at 1018-20; *Cannons,* 899 F.2d at 87-88.  A consent decree that is substantively fair incorporates "concepts of corrective justice and accountability: a party should bear the cost of harm for which it is legally responsible."  *Id.* at 87.  Similarly, the most important of these reasonableness factors is the "decree's likely effectiveness as a vehicle for cleansing" the Site. *Akzo Coatings*, 949 F.2d at 1437.

The Consent Decree requires NCR to expend in excess of $245 million to perform the work or to pay to EPA, the Trustees, or the State.  Importantly, NCR is agreeing to perform approximately $135 million worth of work, which constitutes the next three phases of work to be performed on the River over the next decade.  The TCRA, the very first work NCR is required to perform, is urgently needed to remove contaminated sediment that was deposited behind the Trowbridge Dam, which is failing.  In fact, NCR agreed to begin and has begun the TCRA work prior to the entry of the Consent Decree.  Therefore, the Consent Decree is already advancing the cleanup of the River and it will continue to do so for the next ten years.  After performing this PCB hot spot removal, NCR will then continue the RD/RA work in Areas 2 and 3.

Importantly, NCR is agreeing to perform the next three phases of work under a Consent Decree.  EPA has had to issue UAOs to have work performed in other parts of the River, including OU5, Area 1 and a removal action in OU5, Area 3.  Implementing work through a Consent Decree is important because it provides finality that the work will be performed, and

resolves EPA's claims and removes any objections from the work party, as opposed to leaving issues for potential future litigation.

NCR is also paying $75 million that will be deposited into a Special Account and can be used to fund further response actions at the Site. EPA can offer funds from the Special Account to the other responsible parties as an incentive to agree in a Consent Decree to perform additional work at the Site. Alternatively, EPA may use the money itself to pay for additional cleanup. While this is a large and expensive Site, $75 million is a substantial sum that will further advance the cleanup of the Site. NCR is also paying EPA's and the State's oversight costs related to the work performed under the Consent Decree, ensuring that these additional costs are not left to other parties.

Finally, the Consent Decree also provides $25 million in funding to perform NRD restoration work. Because NRD is meant to be "residual" to the remedial action, there is an even longer path to the completion of an NRD assessment and the development of a future restoration plan.[10] Indeed, at sites included on the National Priorities List or where remedial action under CERCLA is "otherwise scheduled," CERCLA Section 113(g)(1) bars the filing of an action for NRD prior to selection of the remedial action. 42 U.S.C. § 9613(g)(1). The United States has consistently interpreted "the remedial action" to encompass all phases of remedial decision-making at a multiple OU site like the Kalamazoo and, therefore, the Trustees have limited ability

---

[10] *See, e.g., In Re Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB Pollution*, 712 F. Supp. 1019, 1035 (D. Mass. 1989) ("[C]ustomarily, natural resource damages are viewed as the difference between the natural resource in its pristine condition and the natural resource **after the cleanup**, together with the lost use value and the costs of assessment. As a residue of the cleanup action, in effect, [damages] are thus not generally settled prior to a cleanup settlement.") (emphasis added). *Accord, Utah v. Kennecott Corp.*, 801 F. Supp. 553, 568 (D. Utah 1992).

to file an action for NRD until the final remedial decision, presently scheduled for 2027, has been issued.[11]  Thus, absent an early settlement like the one proposed with NCR, the Trustees would have a long wait before they could begin to recover NRD and initiate substantial restoration work at the Site.  The Trustees expect the proceeds from this settlement to significantly advance the restoration work and further development of the damages.   To date, the responsible parties have only agreed to perform very limited natural resources restoration work and, except for the bankrupt parties, have not legally resolved any of their NRD liability.

Providing $25 million at this time in NRD funding may enable the Trustees to conduct initial restoration planning and actions simultaneously and in coordination with some of the response action decision-making and work, creating opportunities for efficiencies in implementation where response actions and restoration occur in the same area.  Furthermore, earlier implementation of natural resource restoration projects accelerates accrual of their restoration benefits to natural resources and their human (e.g., recreational) uses, thus reducing total damages over the long run.  The Trustees will also be able to select the most cost-effective projects such that each dollar spent in this early phase (where the most cost-effective projects are still available) can provide more benefits than dollars that may be spent in the future.  Providing $25 million in NRD funding through this settlement allows the public to benefit from the restoration sooner, and provides for cost-effective planning to ensure each dollar provides greater benefit.

All of the cleanup work in OU5 over the past 4 years has been performed through UAOs because the PRPs have refused to sign Consent Decrees.  NCR is the first party to voluntarily

---

[11]  Accordingly, the Complaint does not include a claim for natural resources damages.

commit to perform substantial work and pay substantial money towards future remedial work and NRD projects under a Decree. "Given CERCLA's joint and several liability scheme, the government may find it appropriate to offer relatively favorable terms to early settlers, thereby encouraging other parties to settle based on the possibility that late settlers and non-settlers bear the risk that they might ultimately be responsible for an enhanced share of the total claim." *United States v. Fort James Operating Co.*, 313 F. Supp. 2d 902, 909 (E.D. Wis. 2004); *see also Cannons*, 899 F.2d at 92 ("Disproportionate liability, a technique which promotes early settlements and deters litigation for litigation's sake, is an integral part of the statutory plan."). The Consent Decree is fair, adequate, and reasonable.

### B. Georgia-Pacific's Concerns About Fairness Should Not Prevent Entry

Georgia-Pacific makes several arguments in its comments that the Consent Decree is unfair, but none of its concerns should prevent entry of the Decree in light of the Consent Decree's provision of substantial benefits to accomplish the cleanup and restore the River. At the outset, Georgia-Pacific argues that because future Site costs are uncertain, establishing the share of costs to be borne by NCR is likewise uncertain. Attachment A at KZ016-19. While the United States acknowledges that future costs are uncertain, there are good reasons to have confidence in EPA's estimates. At this time, EPA's best estimate is that total OU5 costs will be $609 million. ECF No. 8 at ¶3. EPA bases this estimate on site-specific knowledge, experience in performing cleanup work on the River, and the available sampling information regarding Site contamination. *Id*. Moreover, EPA's estimate of the cost for future cleanup is very similar to Georgia-Pacific's own estimate of costs -- $670 million to cleanup OU5. *See Georgia-Pacific v. NCR*, 1:11-cv-483 (W.D. Mich.), ECF No. 838 at PageID.28145. Despite some uncertainty, the

costs can be estimated and EPA routinely enters into settlements based on cost estimates that are inherently subject to uncertainty.

Moreover, the structure of NCR's obligations under the Consent Decree takes into account that uncertainty regarding the work NCR is agreeing to perform. While EPA estimates that the work will cost $135.7 million, NCR has not agreed to perform a specified dollar amount of work. Rather, NCR has committed to perform the OU5, Area 4 TCRA; the OU5, Area 2 RD/RA work; and the OU5, Area 3 RD/RA regardless of cost except for the Area 3 RD/RA work in OU5. If the RD/RA work in Area 3 ultimately exceeds the current estimate, NCR will still be required to perform that work or, at NCR's option pay a premium of 150% of the estimate for the work agreed to for that Area. Therefore, NCR is bearing the risk that costs will increase.

Georgia-Pacific also asserts that NCR is not paying its fair share because it is paying a 28.78% share instead of the 40% share assigned by this Court in the Contribution Litigation. Attachment A at KZ021. First, this Court's 40% allocation only applied to certain past response costs incurred by Georgia-Pacific. *Georgia-Pac. Consumer Prod.*, 358 F. Supp. 3d at 618. This Court explicitly declined to establish an allocation for future costs. *Id.* By dropping its appeal of that ruling, NCR is committed to fully satisfying that judgment relating to past response costs and paying approximately $20 million to Georgia-Pacific, which represents NCR's 40% share of Georgia-Pacific's past costs.

Second, a discount from that allocation, even if it were applied to costs other than certain Georgia-Pacific's past costs, is appropriate in a settlement that takes into account the litigation risk and the costs and delays of litigation. Third, in addition to the funds provided by NCR through the Consent Decree, EPA has approximately $50 million in Special Account money and

$48 million in an Environmental Trust dedicated to cleanup of the Site.  These sums may be used to reduce costs to be incurred by other responsible parties, either through inclusion in future settlements with responsible parties to perform work, reducing their share of cleanup costs, or spent directly by EPA to clean up the Site, which would also reduce Georgia-Pacific's costs at the Site.

While Georgia-Pacific claims that the arranger decisions in the Fox River litigation are of "no moment," that decision presents some litigation risk on appeal.  Attachment A at KZ022. This Court in finding NCR liable as an arranger relied in part on broke being sent from ACPC to mills on the Kalamazoo River.  *Georgia-Pac. Consumer Prod. LP*, 980 F. Supp. 2d at 835. While this Court focused on NCR's knowledge as opposed to the knowledge of ACPC's employee as occurred in the Fox River litigation, the underlying conduct remains the same.  In upholding the district court's decision in the Fox River litigation, the Seventh Circuit also found that ACPC's "lack of control" over the broke once it was in the seller's hand was "a good reason to find Appleton Coated was not arranging for disposal."  *NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 706-07 (7th Cir. 2014).  NCR did not have any more control over the broke once it was sold than ACPC did.  Accordingly, while this Court's factual findings would be subject to great deference on appeal, there is some risk that the Sixth Circuit would agree with the Seventh Circuit in Fox River, and find NCR does not qualify as an arranger.

While the Court found that NCR was equitably liable for more than the amount that it arranged to dispose, CERCLA is not a product liability statute.  Putting aside NCR's manufacturer status, the evidence does not show that NCR contributed 40% of the PCBs to the Site under a purely volumetric allocation.  That evidence is limited to a truck driver's testimony about transporting shipments of broke in the "latter part of '70 into '71," and "later too"; three

entries on the Kalamazoo River Valley mill's records; and a letter from an ACPC employee describing sending "limited quantities" of broke to Allied Paper Company, Kalamazoo Michigan." *Georgia-Pac. Consumer Prod. LP*, 980 F. Supp. 2d at 835.  While it is difficult to derive a precise volume from this evidence for use in a volumetric allocation, it is undoubtedly a small amount compared to the volume of PCBs discharged from the mills owned by Georgia-Pacific, IP, and Weyerhaeuser.

Georgia-Pacific devotes only a footnote to the NRD portion of the settlement, pointing out that the Trustees have not done a final assessment.  Attachment A at KZ022.  While the United States acknowledges the Trustees have only done a first stage of an assessment, the HEA prepared by the Trustees is based on the Stage I Assessment report that is available to the public and the Area 1 HEA that has been shared with Georgia-Pacific.  Importantly, the $25 million in NRD funds is valuable beyond just the mere dollar figure precisely because it is a significant sum that is provided at this time, as discussed above.  The NRD money provided by NCR can be used in a cost-efficient manner and be used to implement cost-effective projects.  Thus, NCR's $25 million spent on NRD in the near future is likely to restore significantly more benefits than $25 million spent in the decades into future, considering the remedies will not even be fully selected on the River until 2027.

Finally, it is notable that other PRPs, who have yet to resolve their Site liability, – Weyerhaeuser and International Paper – do not challenge the fairness of the Consent Decree. Resolution of NCR's liability would also extinguish International Papers' suit against NCR, yet it did not assert that the Consent Decree was unfair.  *See International Paper Company v. Georgia-Pacific Consumer Products LP et al.*, 1:18-cv-1229 (W.D. Mich.).  On the contrary, Weyerhaeuser and IP agree that the settlement is arguably "considered in the ballpark of a fair

and reasonable reflection of NSR's proportional responsibility for the Site."  Appendix A at KZ001; KZ039.  Given the amount of work being performed, significant payments towards EPA and the State's past and future costs, as well as the $27 million in NRD, the Consent Decree is fair, adequate and reasonable.

### C.  The Consent Decree is in the Public Interest

The final consideration for this Court is whether the settlement is in the public interest. In evaluating the public interest, the district court must consider whether the decree is "consistent with the public objectives sought to be attained by Congress." *Williams v. Vukovich,* 720 F.2d 909, 923 (6th Cir.  1983) (citation omitted).  Naturally, a settlement that is fair and reasonable will generally also satisfy the statutory objectives.  *Cannons*, 899 F.2d at 90-91.  The Consent Decree ensures that cleanup work at the Site will continue, and the Consent Decree satisfies one of CERCLA's main purposes: making responsible parties pay for site costs and minimizing litigation and transaction costs through settlements.  *See United States v. Union Elec. Co.*, 934 F. Supp. 324, 331-32 (E.D. Mo. 1996), *aff'd* 132 F.3d 422 (8th Cir. 1997); *United States v. Bay Area Battery*, 895 F. Supp. 1524, 1535 (N.D. Fla. 1995); *Cannons*, 899 F.2d at 90; *United States v. Rohm & Haas Co.*, 721 F. Supp. 666, 696 (D.N.J. 1989).

### III.    Additional Public Comments Do Not Justify Rejection of the Consent Decree

During the 60-day public comment period, the United States received eleven sets of comments from Georgia-Pacific, IP, Weyerhaeuser, local citizen groups, concerned citizens, and a member of congress. The comments are attached as Appendix A.  In addition to Georgia-Pacific's fairness arguments, which are addressed above, the comments are grouped in the seven areas below.  For the reasons outlined below, the United States supports entry of the Consent Decree, notwithstanding the comments received.

24

### A. EPA Intends to Use the Money That it Will Receive Under the Consent Decree at the Site but the Consent Decree Does Not Need to be Modified

The Consent Decree contains EPA's model language that provides for settlement funds to be deposited in a special account for use at the Site or transferred to the Superfund.  EPA guidance provides that settlement funds for future response work may be placed in a Special Account "so long as those funds are intended to be used to finance future CERCLA work remaining at the Site."  *See* Appendix B at 4 (Woolford, James, Updated Consolidated Guidance on the Establishment, Management, and Use of CERCLA Special Account, Aug. 5, 2019).  The model language, consistent with EPA guidance, simply ensures money not needed for the Site is not stuck in a special account.

EPA has established the following hierarchy for its use of special account funds:

1. Use to facilitate settlement with PRPs for response action;
2. Use to fund EPA's costs for response actions;
3. Apply to previous EPA site expenditures through reclassification; and
4. Transfer to the Superfund Trust Fund.

Appendix B at 9.  Therefore, EPA guidance provides that special account funds should be used for Site-specific expenditures before funds are transferred to the Superfund generally.  The guidance further advises that funds should be transferred to the Superfund "[i]f a Region can reasonably estimate that a special account contains more funds than are needed to address remaining known and potential future CERCLA work at a site."  *Id.* at 10.  Therefore, EPA guidance directs that funds should be transferred to the Superfund, if the Special Account has excess funds.

Notwithstanding the guidance, Georgia-Pacific, IP, and Weyerhaeuser assert further protections are needed to ensure the funds received from NCR are used at the Site.  Specifically,

they request that Paragraph 44 of the Consent Decree be modified to include the following additional language shown as underline:

> EPA shall deposit the Response Cost Payments in the Site-wide Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or, if all such actions have been completed, to be transferred by EPA to the EPA Hazardous Substance Superfund.

Appendix A at KZ001-2; KZ023-25; KZ036-41.  Since the guidance provides that excess special account funds should be transferred if the amounts are more than is needed at the Site, it would be inappropriate for EPA to agree to language that could contradict its guidance. Notwithstanding that, EPA intends to use the funds for cleanup at this Site, consistent with its guidance.  ECF No. 8 at ¶7.

Second, Georgia-Pacific argues that the Consent Decree should include an explicit acknowledgement that NCR's payment reduces the liability of the other PRPs at the Site. Appendix A at KZ024.  Georgia-Pacific's request is unnecessary.  The CERCLA statute itself provides that when a person resolves its liability to the United States, "it reduces the potential liability of the others by the amount of that settlement."  42 U.S.C. § 9613(f)(2).  The statutory language protects Georgia-Pacific's interests here and the United States has no basis to provide it any protections beyond the ones afforded by that statute.

Finally, Georgia-Pacific argues that the Consent Decree should be modified to require EPA to annually provide statements of funds remaining in the Site-specific Special Account so that the PRPs can "make informed decision regarding their own remaining liability and avoid future litigation."  Appendix A at KZ024-25.  In the past, EPA has shared with the PRPs its Itemized Costs Summaries, which show all of EPA's costs and recoveries at the Site.  It has also shared with the PRPs statements reflecting the balance of the Special Account.  And, EPA will

26

continue to inform Georgia-Pacific, IP, and Weyerhaeuser as to both the amount of EPA's unreimbursed costs and funds remaining in the Special Account.  However, those disclosures are most useful to the Parties at times when they are discussing potential performance of additional work at the Site, not on an arbitrary, annual deadline selected by Georgia-Pacific.  Accordingly, the United States does not believe the suggested modification of the Consent Decree is necessary or appropriate.

### B.  The Consent Decree is Consistent With CERCLA Guidance

Georgia-Pacific also argues that the settlement violates EPA guidance regarding the definition of "matters addressed" in the Consent Decree, because NCR is obtaining a covenant for the entire Site but only performing work in OU5.  Appendix A at KZ019-20.  The proposed Consent Decree does not contradict such guidance.  As addressed above, NCR is paying its fair share for the entire Site.  While NCR is only performing work in a portion of OU5, it is providing significant funding that EPA could use to perform cleanup of other areas of OU5 or OU1.  NCR is also paying Georgia-Pacific $20 million to cover its liability for some of the land-based OUs where Georgia-Pacific performed the cleanup work.  Based on the amount of work and the significant funding for remediation and restoration, a Site-wide covenant is appropriate in these circumstances.

### C.  Georgia-Pacific Does Not Have a Section 107 Claim Against NCR

Georgia-Pacific asks that the Consent Decree be modified to state that other PRPs can bring a CERCLA § 107 claim against NCR.  Attachment A at KZ019-22.  The Consent Decree should not be so modified, because Georgia-Pacific does not have a § 107 claim against NCR. The Sixth Circuit has ruled that "PRPs must proceed under § 113(f) if they meet one of that section's statutory triggers."  *Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*, 758 F.3d 757, 767 (6th

Cir. 2014).  Section 113(f) provides that "[a]ny person may seek contribution ... during or following any civil action under section 9606 of this title or under section 9607(a) of this title." 42 U.S.C. § 9613(f)(1).  In the Contribution Litigation, this Court found that Georgia-Pacific was liable under 42 U.S.C. § 9607.  *Georgia-Pacific v. NCR*, 1:11-cv-483-RFF, ECF No. 925 at PageID.34746.  Having been held liable under 42 U.S.C. § 9607 (i.e. Section 107), Georgia-Pacific's only available claims are pursuant to 42 U.S.C. § 9613 (i.e. Section 113).  *See Hobart*, 758 F.3d at 767.  Therefore, it would be inappropriate to modify the Consent Decree consistent with Georgia-Pacific's request.

### D.  Settlement Money Should Not Be Used to Perform Health Studies or Pay Individuals

Several commenters request that the settlement money be used to fund health studies, conducted by local and federal health agencies, regarding the impact of the consumption of PCB-contaminated fish or to pay residents as compensation for the impact of such consumption on their health.  Appendix A at KZ004-5; KZ008; KZ027.  CERCLA, however, does not provide for funding to compensate people for the impact of hazardous substances on their health.  Rather, CERCLA § 107(a) makes a party liable for "all costs of removal or remedial action" incurred by the United States and "any other necessary costs of response incurred by any other person."  42 U.S.C. § 9607(a).

Courts have routinely held that CERCLA does not provide compensation for private party damages from the contamination, including personal injury resulting from hazardous substances.  *E.g. Exxon Corp. v. Hunt*, 475 U.S. 355, 360 (1986) ("Superfund money may not be used to pay for injury to persons or property caused by hazardous wastes, except for payment to the Federal and State Governments for their natural resource losses."); *Artesian Water Co. v. Gov't of New Castle Cty.*, 659 F. Supp. 1269, 1285-86 (D. Del. 1987), *aff'd*, 851 F.2d 643 (3d

Cir. 1988) (describing the legislative history of CERCLA).  Therefore, the United States cannot use response cost funds to pay for residents' medical costs under CERCLA.

### E.  Settlement Money Should Not Be Used to Change Fish Consumption Warnings

Several commenters expressed concern about past incorrect fish consumption advisories for the Kalamazoo River and the need for additional signage warning people not to eat fish. Appendix A at KZ008; KZ027.  The State is responsible for putting up signs to warn individuals about fish consumption advisories.  In 2016, the State replaced many of the fish consumption advisory signs on the Kalamazoo River.  Unfortunately, the signs are sometimes vandalized or stolen.  The State, however, replaces signs when it becomes aware of the need for additional signs.  While the United States agrees that it is important to advise the public of fish consumption concerns, the State is performing that role and, therefore, the settlement proceeds are better used to perform additional response work.

### F.  The Consent Decree Need Not Provide for Full Remediation of the Site

Several commenters praised the settlement for including a substantial commitment to perform cleanup work at the Site, including the work near the Trowbridge Dam.  Appendix A at KZ028-31; KZ035.  However, certain commenters also expressed concern about the cleanup of the rest of the Site, including Lake Allegan and Kalamazoo Lake.  *Id*.  The United States recognizes that this Consent Decree does not address the entire cleanup of the Site.  As the commenters acknowledge, however, NCR is committed to performing a substantial portion of work for at least the next 10 years.

In much of the rest of the Kalamazoo River, including Lake Allegan and Kalamazoo Lake, EPA has not yet selected a remedy and the RI/FS study continues.  EPA has already secured Georgia-Pacific's agreement to perform the RI/FS work.  EPA will continue to pursue

29

the remaining PRPs to finish the cleanup of the Site.  The Consent Decree provides additional funds that EPA intends to use to incentivize settlements with the other responsible parties at the Site to perform the cleanup work not addressed by this Decree.  Nothing in the Consent Decree limits EPA's ability to work with the other PRPs to ensure the Site is ultimately cleaned up.  On the contrary, EPA expects this Consent Decree to advance substantially the cleanup of the Site as a whole.

### G.  The Consent Decree Does Not Need to Be Modified to Address Pre- and Post-Judgment Interest on Georgia-Pacific's Judgment Against NCR

Finally, Georgia-Pacific requests that the Consent Decree be modified to include an obligation that NCR pay pre- and post-judgment interest on the judgment Georgia-Pacific obtained in the Contribution Litigation.  Appendix A at KZ025.  This Court's judgment in the Contribution Litigation governs whether NCR has an obligation to pay any such interest.  In the event NCR does not pay interest, Georgia-Pacific can seek to enforce the judgment in the manner it deems appropriate.  The Consent Decree does not need to be modified to provide Georgia-Pacific with additional protections.

## CONCLUSION

The proposed Consent Decree ensures that remediation on the Kalamazoo River will be conducted for approximately the next decade, provides significant funding for additional work at the Site, and establishes early restoration funding to address NRD at the Site.  NCR will also satisfy this Court's judgment in the Contribution Litigation.  The Consent Decree is fair, adequate reasonable, and consistent with the public interest.  For the reasons outlined above, the United States now asks the Court to enter the Consent Decree.

Respectfully submitted,

KAREN S. DWORKIN
Deputy Section Chief
Environmental Enforcement Section
Environment & Natural Resources Division
U.S. Department of Justice

Date:  May 22, 2020

 s/ *Kristin M. Furrie*
KRISTIN M. FURRIE
Senior Counsel
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044
(202) 616-6515
Kristin.Furrie@usdoj.gov


ANDREW BYERLY BIRGE
United States Attorney
Western District of Michigan

Adam B. Townshend
Assistant United States Attorney
Western District of Michigan
330 Ionia Ave. N.W., Suite 501
Grand Rapids, MI  49503

Of Counsel:
NICOLE WOOD-CHI
Associate Regional Counsel
U.S. Environmental Protection Agency - Region 5
77 W. Jackson Blvd. (C-14J)
Chicago, IL  60604

31