UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF MICHIGAN,<br><br>                              Plaintiffs,<br><br>        v.<br><br>NCR CORPORATION,<br><br>                              Defendants. | Civil Action No. 1:19-cv-1041<br><br>Judge Robert J. Jonker |

**WEYERHAEUSER'S RESPONSE TO MOTION TO ENTER CONSENT DECREE**

NCR's proposed consent decree with the United States and the State of Michigan should be reviewed for fairness, reasonableness, and consistency with the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* The Court's review should be limited to determine compliance with that standard, and nothing more. In particular, review of the proposed consent decree does not require resolution of the dispute between NCR and Georgia-Pacific regarding the potential effect of the consent decree's contribution protection provision on a Georgia-Pacific claim. If the consent decree is fair, reasonable, and consistent with CERCLA's purposes, then the Court should grant the United States' motion to enter the decree without providing an advisory opinion on any other issue.

### I.        BACKGROUND

The facts related to the Site history, the parties' responsibility for the Site contamination, and cleanup progress until 2015 are well known to the Court. *See Georgia-Pacific Consumer Prods. LP v. NCR Corp.*, 358 F. Supp. 3d 613 (W.D. Mich. 2018); *Georgia-Pacific Consumer Prods. LP, et al. v. NCR Corp., et al.*, 980 F. Supp. 2d 821 (W.D. Mich. 2013). The Site consists

of approximately 80 miles of the Kalamazoo River, a 3-mile portion of Portage Creek, and several paper mill properties and papermaking waste disposal areas. *See* ECF No. 11, PageID.274. Beginning in the early 1950s and continuing into the 1970s, many of the paper mills along the Kalamazoo River and Portage Creek recycled NCR's carbonless copy paper ("CCP"), which contained polychlorinated biphenyls ("PCBs") that were discharged into the environment in the mills' wastewater. *See Georgia-Pacific Consumer Prods.*, 358 F. Supp. 3d at 618-19.

Georgia-Pacific filed suit against NCR and International Paper ("IP") in 2010 to recover its cleanup costs and added Weyerhaeuser to the case in 2011. Weyerhaeuser stipulated to elements of CERCLA liability as the former owner and operator of the Plainwell Mill, a small mill located approximately fourteen miles downstream of the largest mills on Portage Creek and the Kalamazoo River. ECF No. 11-1, PageID.349. Although NCR and IP contested their CERCLA liability, the Court found them liable for Site response costs in the first phase of litigation. *See Georgia-Pacific Consumer Prods.*, 980 F. Supp. 2d at 836. The Court's decision in the second phase of litigation allocated Georgia-Pacific's recoverable costs incurred through September 2014. *See Georgia-Pacific Consumer Prods.*, 358 F. Supp. 3d at 627, 653.

The Court's allocation confirmed NCR's significant responsibility for contamination at the Site. Finding that NCR was involved in the release of PCBs to the Site even before it had explicit knowledge of the harm posed by recycling CCP because it "created the PCB-containing emulsion, held title to the product as it was converted to usable paper, and then sold that finished product," the court allocated to NCR a 40% share of liability for Georgia-Pacific's recoverable Site cleanup costs. *Id.* at 649, 653. In stark contrast, the court allocated to Weyerhaeuser a 5% share of Georgia-Pacific's recoverable past costs. *Id.* at 651-52.

Since the Site was placed on the National Priorities List in 1990, Weyerhaeuser, Georgia-Pacific, IP, the State of Michigan, and EPA have spent millions of dollars to respond to PCB contamination. ECF No. 11-1, PageID.350. Weyerhaeuser entered into a consent decree with EPA in 2005 to conduct remedial design/remedial action work at OU4 (the 12th Street Landfill) and to conduct a remedial investigation/feasibility study and remedial design/remedial action at OU7 (the Plainwell Mill). *See Georgia-Pacific Consumer Prods.*, 358 F. Supp. 3d at 624. Pursuant to the consent decree, Weyerhaeuser paid $6.2 million to a special account for OU5 work and $138,851.53 for EPA's past costs. ECF No. 11-1, PageID.349. Weyerhaeuser completed the OU4 cleanup as required by the consent decree and continues to perform operations and maintenance activities. *Id.* Weyerhaeuser is performing the OU7 cleanup pursuant to the consent decree and a record of decision ("ROD") issued by EPA in 2015 and anticipates completing construction in 2020. *Id.*

Pursuant to a unilateral administrative order and an action memorandum (which EPA declined to issue to NCR), Weyerhaeuser, Georgia-Pacific, and International Paper completed a time-critical removal action in Area 3 of OU5 to remove PCB-contaminated sediments and soils and to stabilize riverbanks to prevent erosion and recontamination in roughly 1.7 miles of OU5. *Id.* In addition, Georgia-Pacific and IP have incurred costs at Area 1. *See id.*, PageID.319.

Despite its significant liability at the Site, NCR only recently began performing work to address the contamination caused by the release of PCBs from its CCP. *See* ECF No. 11, PageID.283 (asserting NCR has begun design work for a time-critical removal action). Pursuant to the proposed consent decree, NCR would perform or pay for cleanup work worth, in EPA's estimate, approximately $135.7 million. ECF No. 11, PageID.282 (estimating value of NCR's future cleanup work or payments in lieu of work). Based on EPA's estimate of total remaining

costs ($609.4 million for only OU5, *see* ECF No. 11, PageID.275), NCR will be obligated to pay for approximately 22% percent of cleanup costs, less than its allocated "starting point" of 40% of future costs, *see Georgia-Pacific Consumer Prods.*, 358 F. Supp. 3d at 645.

## II.     ARGUMENT

Applying the well-established standard for consent decrees, the Court should enter the proposed consent decree between NCR, the United States, and the State of Michigan if it is fair, reasonable, and consistent with CERCLA's purposes. Review of the proposed consent decree under that standard does not require or authorize the Court to analyze the consent decree's contribution protection against abstract, inactive, or future claims. The consent decree speaks for itself, and any opinion on the scope of its contribution protection would be advisory.

### A.     An opinion on the scope of the proposed consent decree's contribution protection would be advisory.

In its brief supporting entry of the proposed consent decree, NCR makes two requests. First, NCR asks the Court to enter the consent decree "as submitted." ECF No. 26, PageID.439. Second, NCR asks the Court to "expressly confirm" the scope of the decree's contribution protection. *Id.* NCR's first request is squarely before the Court and should be resolved based on whether the proposed consent decree meets the test for fairness, reasonableness, and consistency with CERCLA's purposes. *See infra* Section II.B. NCR's second request inappropriately seeks an advisory opinion that would not address any active case or controversy.

This Court's jurisdiction is limited to "cases" and "controversies." U.S. Const. art. III, § 2. Article III jurisdiction allows courts "to resolve concrete disputes, not to pronounce judgments on theoretical disputes that may or may not materialize and, if they do, may appear in a variety of forms." *Saginaw County v. STAT Emergency Med. Servs.*, 946 F.3d 951, 954 (6th Cir. 2020) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-03 (1998)). A party may not

request a judgment merely to avoid possible future injury or to prevent a harm that is not actual or impending. *Saginaw County*, 946 F.3d at 954. In *Saginaw County*, a county contracted with an ambulance service pursuant to an ordinance permitting just one service to operate within county boundaries. *Id.* at 953. When another ambulance service began operating within the county, the county government did not attempt to enforce the ordinance but, instead, sought a declaratory judgment that the ordinance complied with state and federal law. *Id.* The county claimed that the non-preferred ambulance service had complained about the exclusive ordinance and said the ordinance violated antitrust law, but the non-preferred service never took legal action to challenge the ordinance. *Id.* at 954-55. The Sixth Circuit confirmed the lack of jurisdiction over the county's request for a declaratory judgment, holding that the county had no more than a speculative concern of future legal action. *Id.* at 955. "[T]here is a world of difference between talking about potential legal claims and acting on them." *Id.*

NCR asks this Court to resolve a dispute regarding the scope of the consent decree's contribution protection, without any active case or controversy requiring such resolution. *See* ECF No. 26, PageID.421-22. Specifically, NCR opposes "certain public comments" submitted by Georgia-Pacific that raise the prospect of a future action against NCR under CERCLA Section 107, but NCR does not (and cannot) point to any case or claim actively challenging the scope of the contribution protection offered by the proposed consent decree. There is a world of difference between Georgia-Pacific "talking about potential legal claims" under Section 107 "and acting on them" in a way that would require a decision on the scope of NCR's contribution protection. *See Saginaw County*, 946 F.3d at 955.

The stayed claims by Weyerhaeuser, International Paper, and Georgia-Pacific seeking to recoup costs incurred since the 2015 allocation trial do not alter this analysis. *See International*

*Paper Co. v. Georgia-Pacific Prods. LP*, No. 1:18-cv-1229, ECF Nos. 1, 3, 14. The parties asserted claims against each other and against NCR under Section 113 and Section 107, but the court issued a stay upon stipulation of the parties "pending issuance of a mandate after final adjudication" of all parties' appeals. *Id.*, ECF No. 17. Although NCR agrees to dismiss its appeal upon entry of the proposed consent decree, the remaining appeals have not been resolved. Indeed, briefing to the Sixth Circuit has not even commenced. A lift of the stay is not imminent, demonstrating that any claims arising under Section 107 in that case are "theoretical" and "may or may not materialize and, if they do, may appear in a variety of forms." *Saginaw County*, 946 F.3d at 954. NCR's request for "express[] confirm[ation]" of the scope of its proposed contribution protection prematurely asks for an advisory opinion to address only a speculative concern of future legal action.

### B. The standard for entry of a consent decree is fairness, reasonableness, and consistency with CERCLA's purposes.

When reviewing a proposed consent decree for entry, courts consider whether the decree is fair, reasonable, and consistent with CERCLA. *See United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1426 (6th Cir. 1991). A court considering a proposed CERCLA consent decree between EPA and a potentially responsible party ("PRP") must ensure that the government "has considered all of the relevant evidence in the record and has acted in the public interest." *Id.* The court must perform a comparative analysis of the adequacy of the proposed settlement relative to the PRP's comparative fault at the site and "actually engage" with the evidence supporting entry. *Arizona v. City of Tucson*, 761 F.3d 1005, 1012 (9th Cir. 2014). *See also Best Foods v. Aerojet-General Corp.*, 2000 WL 1238910, at *4 (W.D. Mich. 2000) ("In evaluating whether a settlement amount is fair and adequate, the court must compare the

- 6 -

proportion of projected costs to be paid by the settling defendants with the proportion of responsibility attributed to them.").

The Court's review of the proposed consent decree should, without consideration of extraneous issues, apply well-established factors that indicate whether a proposed CERCLA consent decree is fair, reasonable, and consistent with the statute's purposes. To determine whether a proposed consent decree is fair, courts consider the strength of the government's case against the settling PRP, the good faith efforts of the negotiating parties, and the litigation risks if the settlement is not approved. *See id.* at 1435. A court should also consider the fairness of the settlement to non-settling PRPs and ensure the settlement is within "broad range" of the settling PRP's proportional liability. *See id.*; *Best Foods*, 2000 WL 1238910 at *4. To determine reasonableness, courts consider the nature and extent of the site contamination, the degree to which the remedy required in the settlement will adequately address the contamination, and the extent to which the settlement furthers the goals of CERCLA. *See Akzo Coatings*, 949 F.2d at 1436. The cleanup actions required in a consent decree are reasonable if they are likely to effectively address environmental concerns. *Id.* Finally, to determine if a proposed consent decree is consistent with CERCLA's purposes, courts consider CERCLA's goals of encouraging early settlement, prompt cleanup, and private payment for response actions. *See Best Foods*, 2000 WL 1238910 at *12. Congress also enacted CERCLA to ensure that the costs of cleaning up contamination fall on the parties responsible for the contamination. *See Akzo Coatings*, 949 F.2d at 1417.

The Court's review of the proposed consent decree should be guided by these factors to determine if it is fair, reasonable, and consistent with CERCLA's purposes. The standard for entry requires careful consideration of the administrative record, a comparative analysis of the

148579133.1

- 8 -

settlement amount relative to NCR's proportional share of liability at the Site, and an assessment of the degree to which the proposed consent decree supports CERCLA's purposes. In short, the Court's review is already extensive and does not require consideration of extraneous issues.[1] Georgia-Pacific's and NCR's arguments about the scope of the proposed consent decree's contribution protection are not necessary for the Court's review of the settlement under the well-established standard for entry.

### III.   CONCLUSION

If the proposed consent decree is entered, NCR, a party with a significant share of liability at the Site, will finally be obligated to pay for and perform significant response actions. Weyerhaeuser files this Response to ensure the Court's decision on the entry is limited to review of the proposed consent decree for fairness, reasonableness, and consistency with CERCLA's purposes and does not resolve speculative disputes.

---

[1] If the Court reviews the proposed consent decree for anything other than fairness, reasonableness, and consistency with CERCLA, Weyerhaeuser respectfully requests an opportunity for supplemental briefing on the issues of interest to the Court.

- 8 -

148579133.1

- 9 -

Respectfully submitted.

DATED: July 14, 2020                **WEYERHAEUSER COMPANY**

By: /s/ *Margaret C. Hupp*

**PERKINS COIE LLP**
Mark W. Schneider, WA Bar No. 14105
MWSchneider@perkinscoie.com
Margaret C. Hupp, WA Bar No. 43295
MHupp@perkinscoie.com
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000

**Warner Norcross & Judd, LLP**
Scott M. Watson, MI Bar No. P70185
swatson@wnj.com
900 Fifth Third Center
111 Lyon St. N.W.
Grand Rapids, MI 49503-2487
Telephone:  616.752.2000
Facsimile:  616.752.2500

Attorneys for Intervenor
Weyerhaeuser Company

## WORD COUNT CERTIFICATE OF COMPLIANCE

I certify that Weyerhaeuser's Memorandum in Support of Unopposed Motion to Intervene complies with LCivR 7.2(b)(i) and contains 2,264 words as counted by Microsoft Word for Office 365, version 16.0.11328.20562.

Dated:  July 14, 2020                                  *s/  Margaret C. Hupp*