IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| THE UNITED STATES OF AMERICA AND THE STATE OF MICHIGAN | ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | No: 1:19-cv-01041 |
| v. | ) ) | Chief Judge Robert J. Jonker |
| NCR CORPORATION | ) ) | |
| Defendant, | ) ) | |
| GEORGIA-PACIFIC LLC, GEORGIA-PACIFIC CONSUMER PRODUCTS LP, INTERNATIONAL PAPER COMPANY, AND WEYERHAEUSER COMPANY | ) ) ) ) ) ) | |
| Intervenors. | ) | |

**GEORGIA-PACIFIC'S BRIEF IN OPPOSITION TO THE
UNITED STATES' MOTION TO ENTER THE PROPOSED
<u>CONSENT DECREE WITH NCR CORPORATION</u>**

**TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS..................................................................................................ii

TABLE OF AUTHORITIES ......................................................................................... iv

INTRODUCTION .........................................................................................................1

BACKGROUND ...........................................................................................................3

I.      Georgia-Pacific has voluntarily incurred substantial costs at the Site and will
        continue to do so for the foreseeable future..................................................................3

        A.      1990-2007 ................................................................................................... 3

        B.      2007-2016 ................................................................................................... 4

                1.      The 2007 Administrative Settlements and Orders on Consent ................... 4

                2.      State of Michigan Response Costs............................................................. 5

                3.      Millennium Bankruptcy ............................................................................ 5

                4.      OU2 Consent Decree ................................................................................ 5

                5.      Plainwell Dam No. 2 TCRA ...................................................................... 6

        C.      2016 to present ............................................................................................. 6

II.     Georgia-Pacific conclusively proved NCR's liability after a trial before this Court..........6

III.    Summary of OU5 costs incurred to date...................................................................8

IV.     Future costs will be substantial, but still very uncertain. .............................................9

V.      The Proposed Consent Decree ................................................................................11

ARGUMENT ...............................................................................................................13

I.      Standard of Review ...............................................................................................13

II.     The proposed Consent Decree is unfair to non-settling PRPs. .....................................15

        A.      Under EPA's projections of future response costs, NCR pays substantially
                less than its adjudicated fair share of liability....................................................... 16

        B.      The Consent Decree is substantively unfair under the framework EPA set
                forth in the 1997 Policy............................................................................... 18

                1.      The United States has failed to demonstrate that the Consent
                        Decree reflects a reasonable compromise of NCR's total liability........... 19

                2.      The Consent Decree fails to account for the uncertainty of future
                        costs......................................................................................................... 22

III.    The Consent Decree should include stronger mechanisms to ensure the money NCR
        pays gets spent at the Site. ....................................................................................23

IV.     The Court should reject NCR's invitation to address its unripe argument about
        Georgia-Pacific's continuing rights against NCR under CERCLA section 107. ..............26

A. The viability of a claim by Georgia-Pacific against NCR is not ripe. .................. 27

B. The Consent Decree cannot affect Georgia-Pacific's section-107 rights. ............ 28

C. This Court did not address the residual section-107 cost-recovery rights when it entered its order on the form of the judgment. .................................................. 29

D. NCR's theory about the triggers for section 107 and section 113 claims is wrong. ...................................................................................................................... 30

E. Georgia-Pacific can sue NCR (or any other PRP) to recover work performed pursuant to Unilateral Administrative Orders. ..................................................... 34

CONCLUSION ................................................................................................................. 35

CERTIFICATE OF SERVICE ......................................................................................... 36

CERTIFICATE OF COMPLIANCE ................................................................................ 36

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Agere Systems, Inc. v. Advanced Environmental Technology Corp*,
    603 F.3d 204 (3d Cir. 2010)............................................................................32

*Am. Cyanamid Co. v. Capuano*,
    381 F.3d 6 (1st Cir. 2004)...........................................................................32, 33

*Bernstein v. Bankert*,
    733 F.3d 190 (7th Cir. 2012) ..........................................................................32

*Centerior Service Co. v. Acme Scrap Iron & Metal Corp.*,
    153 F.3d 344 (6th Cir. 1998) .....................................................................34, 35

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)........................................................................................24

*Consol. Edison Co. of New York v. UGI Utilities, Inc.*,
    423 F.3d 90 (2d Cir. 2005)..............................................................................28

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
    543 U.S. 157 (2004)............................................................................28, 34, 35

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
    No. 18-587, 2020 WL 3271746 (U.S. June 18, 2020) ...............................19, 20

*Diamond X Ranch, LLC v. Atl. Richfield Co.*,
    No. 3:13-cv-00570, 2016 WL 4498211 (D. Nev. Aug. 26, 2016)........................34

*Emhart Indus., Inc. v. New England Container Co.*,
    478 F. Supp. 2d 199 (D.R.I. 2007).....................................................................34

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016)....................................................................................19

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)........................................................................................19

*GenCorp, Inc. v. Olin Corp.*,
    390 F.3d 433 (6th Cir. 2004) ..........................................................................21

*Georgia Pacific Consumer Products, LP v. NCR Corp.*,
    358 F. Supp. 3d 613 (W.D. Mich. 2018) .................................................. *passim*

iv

*Hobart Corp. v. Dayton Power & Light Co.*,
    336 F. Supp. 3d 888 (S.D. Ohio 2018) ...................................................................34

*Hobart Corp. v. Waste Mgmt. Corp.*,
    758 F.3d 757 (6th Cir. 2014) ...................................................................28, 31, 34

*ITT Indus., Inc. v. BorgWarner, Inc.*,
    506 F.3d 452 (6th Cir. 2007) ...................................................................34

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)...................................................................20

*Nat'l Cable & Telecomms. Assn. v. Brand X Internet Serv.*,
    545 U.S. 967 (2005)...................................................................19

*NCR Corp. v. George A. Whiting Paper Co.*,
    768 F.3d 682 (7th Cir. 2014) ...................................................................33

*NLRB v. Bell Aerospace Co.*,
    416 U.S. 267 (1974)...................................................................20

*Pharmacia Corp. v. Clayton Chem. Acquisition LLC*,
    382 F. Supp. 2d 1079 (S.D. Ill. 2005)...................................................................34

*Raytheon Aircraft Co. v. U.S.*,
    435 F.Supp.2d 1136 (D. Kan. 2006) ...................................................................34

*RSR Corp. v. Commercial Metals Co.*,
    496 F.3d 552 (6th Cir. 2007) ...................................................................33

*Smiley v. Citibank (S. Dakota), N.A.*,
    517 U.S. 735 (1996)...................................................................20

*United States v. Akzo Coatings of Am., Inc.*,
    949 F.2d 1409 (6th Cir. 1991) ...................................................................13

*United States v. Atl. Research Corp.*,
    551 U.S. 128 (2007)...................................................................28, 30, 31, 34, 35

*United States v. Bd. of Cty. Commissioners of Hamilton Cty., Ohio*,
    937 F.3d 679 (6th Cir. 2019) ...................................................................25

*United States v. Cannons Eng'g Corp.*,
    899 F.2d 79 (1st Cir. 1990)...................................................................13, 15, 22

*United States v. Consolidation Coal Co.*,
    345 F.3d 409 (6th Cir. 2003) ...................................................................21

*United States v. Penn. Indus. Chem. Corp.*,
    411 U.S. 655 (1973) ..........................................................................................19

*Whittaker Corp. v. United States*,
    825 F.3d 1002 (9th Cir. 2016) ......................................................................31, 32

**Statutes**

5 U.S.C. § 553 ..................................................................................................24

42 U.S.C. § 9607 ...................................................................................... *passim*

42 U.S.C. § 9613(f) ................................................................................... *passim*

42 U.S.C. § 9617 ..............................................................................................11

**Other Authorities**

40 C.F.R. § 300.430 ........................................................................................11

## INTRODUCTION

Since 1990, Georgia-Pacific LLC and Georgia-Pacific Consumer Products LP ("Georgia-Pacific") have incurred hundreds of millions of dollars to investigate and clean up the poly-chlorinated biphenyls (PCBs) from NCR Corporation's carbonless copy paper (CCP) at the Allied Paper/Kalamazoo River/Portage Creek Superfund site (the "Site").  Throughout that time, the United States Environmental Protection Agency (the "Government" or "EPA") and the State of Michigan have had in Georgia-Pacific a reliable partner to help study the Site, identify other potentially responsible parties, and fund the clean-up.

In the late 00s, Georgia-Pacific began to uncover substantial evidence showing that NCR arranged for the disposal of a hazardous substance when it sold wastepaper generated in the production of its proprietary carbonless copy paper to Kalamazoo mills in the 50s, 60s, and early 70s.  So Georgia-Pacific sued NCR in 2010 to establish NCR's liability at the Site and recover some of Georgia-Pacific's past costs.  After a three-week trial in 2013, this Court found NCR liable.  And after another trial that spanned parts of four months, the Court assigned NCR the largest share of liability—40%—for the past costs at issue in the case, which related to work throughout the site for actions taken during all stages of CERCLA's investigative and remedial process.

NCR appealed, but the Sixth Circuit soon put the appeal on hold so the parties could mediate.  That process took nearly a year, with the uncertainty of future costs posing a substantial obstacle.  Any deal that would give NCR complete peace would leave the other PRPs bearing all the risk that costs could exceed current estimates, perhaps substantially.  Pricing the premium for that assumption of risk proved challenging.

NCR was simultaneously negotiating with the Government.  The proposed Consent Decree is the product of that negotiation.  It is, in effect, a cash-out deal.  NCR agrees (a) to take

on work in Areas 2, 3, and 4 of Operable Unit 5 (OU5) that the Government values at $135.7 million, (b) to pay $27 million to resolve potential claims for natural resource damages, (c) to pay $82.5 million to EPA and the State for response actions at the Site, and (d) to satisfy the judgment in favor of Georgia-Pacific.  In exchange, the Government agrees not to sue NCR in the future and grants NCR protection against "contribution" claims from other PRPs for any costs incurred cleaning up the Site.

The Government appears to have ignored the difficult problem of setting a premium for the risk the non-settling PRPs would bear for the unknown costs for the remaining work in Areas 4, 5, 6, and 7, not to mention the steadily growing costs in Area 1.  If the lowest of the projections of future costs proves accurate, NCR pays about 28.83% of the total cost to investigate and clean up OU5.  So even in the best-case scenario, NCR pays no premium at all, but instead gets a *discount* off the 40% share the Court assigned NCR for past costs.  And even *that* assumes that NCR's cash contribution is used for response costs at the Site, something the Consent Decree stops short of guaranteeing.  If costs exceed the Government's current projections, NCR's discount gets even bigger.

The Court should not enter the proposed Consent Decree.  Georgia-Pacific appreciates that NCR is finally standing up to its responsibilities at the Site.  But the deal does not require enough from NCR to justify complete, site-wide contribution protection.  Because the total cost to investigate and remediate the Site is so uncertain, long-standing EPA policy mandates that NCR pay a premium to offset the risk it shifts to the non-settling PRPs to secure that protection.  And the Court should require a stronger commitment from EPA to firmly devote the NCR cash contribution for use at the Site and require either assurances that the non-settling PRPs will have access to that money or at a minimum be allowed to monitor how that money is managed.

The Court also should decline NCR's invitation to extinguish Georgia-Pacific's residual cost-recovery rights under CERCLA section 107.  Cost-recovery claims under CERCLA section 107 are not claims for "contribution," so they are not covered by CERCLA section 113(f)(2). But NCR nonetheless asks the Court to rule now that Georgia-Pacific no longer can sue NCR or anyone else to recover costs under CERCLA section 107, relying in part on an implausible reading of one of this Court's orders.  The Court has not decided this question, and it need not do so here.

## **BACKGROUND**

I.    **Georgia-Pacific has voluntarily incurred substantial costs at the Site and will continue to do so for the foreseeable future.**

The Court is familiar with Georgia-Pacific's historic operations at the Site and its role in cleaning up the Site since 1990.  *See Georgia Pacific Consumer Products, LP v. NCR Corp.*, 358 F. Supp. 3d 613 (W.D. Mich. 2018) (the "Phase II Opinion").  Relevant background facts from the Phase II Opinion are summarized here.  The Declaration of Shannon Johnson (Ex. 1) details the costs Georgia-Pacific has incurred since September 2014, the agreed cut-off for past costs in the previous litigation.

A.    **1990-2007**

Georgia-Pacific LLC and its affiliates are the former owners of several paper mills along the Kalamazoo River.  Georgia-Pacific bought the Kalamazoo Paper Company (KPC) in 1967 and operated its mill (the "KPC Mill") in Kalamazoo until the mill closed in 2000.  Fort James Corporation and Georgia-Pacific Consumer Products LP, owned and operated two other facilities—a large boxboard mill in Kalamazoo and a specialty-papers mill in Parchment.  The KPC Mill recycled NCR paper, which resulted in the discharge of PCBs to the Kalamazoo River and the mill's associated landfills.

3

Unlike NCR, Georgia-Pacific has never disputed its liability at the Site.  Along with

Millennium Holdings, LLC and Simpson Plainwell Paper Co., Georgia-Pacific formed the

Kalamazoo River Study Group (KRSG) in 1990 after the Site was listed.  The KRSG then

executed the initial Administrative Order on Consent (AOC) with the State of Michigan to begin

studying and cleaning up the Site.  Georgia-Pacific performed work pursuant to that order until

the mid-2000s, when EPA assumed responsibility as regulatory lead.

From 1990 to 2007 Georgia Pacific funded significant work under the auspices of the

1990 AOC and other orders.  In addition to RI/FS work, Georgia-Pacific performed (1) removal

actions in and around the Willow Boulevard and A-Site landfills (OU2), (2) a time-critical

removal action at the site of the former KPC Mill, and (3) the remedy at the King Highway

Landfill (OU3).  Georgia-Pacific incurred nearly $42 million in NCP-consistent costs for these

actions:

| Category | Cost |
| --- | --- |
| 1990 AOC (excluding OU3) | $26,350,1345.46 |
| All OU3 Costs | $11,946,045.28 |
| 2006 KPC Mill TCRA | $3,522,485.47 |
| **TOTAL** | **$41,818,665.21[1]** |

**B.     2007-2016**

**1.     The 2007 Administrative Settlements and Orders on Consent**

In the mid-00s, EPA became regulatory lead at the site, and in 2007, entered into two

Administrative Settlement Agreements and Orders on Consent (ASAOCs) with Georgia-Pacific

---

[1]This figure is net of various credits and offsets, including settlements reached with other
PRPs.  A full description of Georgia-Pacific's historic costs at the Site can be found in the Phase
II post-trial brief Georgia-Pacific submitted in its cost-recovery action against NCR and others.
*See Georgia Pacific Consumer Products, LP v. NCR Corp.*, No. 1:11-cv-483 (W.D. Mich. Feb.
19, 2016) (ECF No. 882).

and Millennium.  One required the parties to perform a supplemental remedial investigation and feasibility study (SRI/FS) in OU5.  The other directed the parties to conduct a time-critical removal action (TCRA) in the former Plainwell Impoundment area of OU5 Area 1.

Georgia-Pacific alone has performed nearly all of the work required under the two 2007 ASAOCs.  Georgia-Pacific completed the Plainwell Impoundment TCRA at a net cost of $17,825,746.76.  Work under the SRI/FS ASAOC continues to this date.  Georgia-Pacific has incurred $43,041,821.41 and expects to incur almost that much more to finish all work required by that agreement.  Ex. 1 at ¶ 5.

### 2.   State of Michigan Response Costs

The State of Michigan incurred oversight costs during the period before 2007.  Georgia-Pacific and Millennium agreed to pay the State a total of $4 million to reimburse those costs.  Georgia-Pacific's share was $1.85 million.  *See* Phase II Opinion at 19, 358 F. Supp. 3d at 630.

### 3.   Millennium Bankruptcy

In early 2009, Millennium filed for bankruptcy and stopped paying for work at the Site.  EPA submitted a claim in the Millennium bankruptcy proceedings to recover future Site cleanup.  That claim estimated total site costs would be roughly $2.6 billion, $2.4 billion of which was for OU5.  Ex. 5, United States Proof of Claim at 10.  The bankruptcy trustee settled the claim for roughly $100 million.  Half of that sum was placed in a trust to be used for the remedy in OU1.  The remaining $50 million is to be used for work in OU5.  Georgia-Pacific is not aware that EPA has, to date, used any of the money reserved for OU5.

### 4.   OU2 Consent Decree

In 2009, Georgia-Pacific entered into a consent decree with EPA to perform the remedy in OU2.  The remedy is complete.  As of September 1, 2014, Georgia-Pacific had incurred roughly $15.6 million to perform this work.  Phase II Opinion at 19, 358 F. Supp. 3d at 630.

**5.      Plainwell Dam No. 2 TCRA**

In 2009, Georgia-Pacific negotiated an ASAOC with EPA to perform a time-critical removal action in the area formerly impounded by a dam immediately upstream of Plainwell, Michigan.  Georgia-Pacific alone completed this action at a net cost of roughly $6.8 million.

**C.      2016 to present**

In 2016, Georgia-Pacific committed to perform two actions in OU5 at EPA's direction. Georgia-Pacific, International Paper, and Weyerhaeuser each agreed to perform a time-critical removal action in Area 3, and Georgia-Pacific and International Paper agreed to implement the remedy in Area 1.  Ex. 1 at ¶ 6.

Although Georgia-Pacific was willing to perform both of these actions, it was not willing to do so through a liability-resolving settlement, such as an ASAOC or consent decree.  Instead, Georgia-Pacific agreed to comply with unilateral administrative orders (UAOs) to perform the work, thereby preserving the right to assert a more powerful claim under CERCLA section 107 to recover costs from other PRPs if necessary.  *See infra* at 27–34.

The Area 3 TCRA is now complete with Georgia-Pacific spending $11.7 million for its share of the cost.  Ex. 1 at ¶ 7.  Georgia-Pacific is still working with International Paper on remedy work in Area 1.  Although EPA originally projected that action would cost no more than $23.4 million, Georgia-Pacific now expects the total cost to be at least $58 million.  Ex. 1 at ¶¶8-9.

**II.      Georgia-Pacific conclusively proved NCR's liability after a trial before this Court.**

After it accepted liability in 1990, Georgia-Pacific did what CERCLA incentivizes PRPs to do—it went looking for other PRPs.  And it found them.  Between 1990 and 2010, Georgia-Pacific identified other paper companies who, like Georgia-Pacific, had unwittingly accepted NCR's waste for processing (e.g., Rock-Tenn, Gould Paper Co.).  Georgia-Pacific also attempted

(admittedly without much success) to demonstrate that companies outside the paper industry also contributed PCBs to the site.

Starting in the late 00s, Georgia-Pacific began uncovering evidence showing that, by at least the late 1960s, NCR knew that carbonless copy paper broke and trim was actually an environmentally hazardous waste.  Despite this knowledge, NCR continued to sell it to unwitting brokers and paper companies for recycling.  Georgia-Pacific then found evidence showing that NCR itself sold broke and trim to Kalamazoo-area mills.  So in 2010, Georgia-Pacific sued NCR, arguing that NCR was liable as an arranger under CERCLA for the PCB contamination at the Site.  After years of costly litigation, Georgia-Pacific won.  This Court found NCR liable as an arranger in 2013, and in 2018 it assigned NCR a 40% share of responsibility for a portion of Georgia-Pacific's past costs.  *See* Phase II Opinion at 64, 358 F. Supp. 3d at 653.

The Court entered its final judgment in June 2018, awarding Georgia-Pacific roughly $30 million in past costs.  That judgment partially compensates Georgia-Pacific for work it performed under the 1990 AOC with the State of Michigan, the reimbursement of the State of Michigan's response costs in 2008, the Plainwell Dam No. 2 TCRA, and the OU2 remedy.  The judgment requires NCR to pay Georgia-Pacific $19,826,725.67 plus $683,913.47 in prejudgment interest through May 31, 2018.  Post-judgment interest continues to run.

Georgia-Pacific asked this Court to assign equitable shares for all future costs.  But NCR opposed that request, arguing that future costs were subject to too many variables to allow a fair allocation at that time.  *See* Proposed Final Judgment, *Georgia Pacific Consumer Products, LP v. NCR Corp.*, No. 1:11-cv-483 (W.D. Mich. May 31, 2018) (ECF No. 923-1), at 2–3.  This Court agreed with NCR and limited its judgment to a simple finding that Georgia-Pacific, NCR, International Paper, and Weyerhaeuser were jointly and severally liable under CERCLA for

future costs at the Site.  The Court did not allocate responsibility for those costs among the PRPs, but it recognized that the Phase II allocation would be a "useful starting point" for any allocation of future costs.  *See* Phase II Opinion at 50, 358 F. Supp. 3d at 645.

## III.    Summary of OU5 costs incurred to date

Based on the Court's findings in the cost-recovery litigation and Georgia-Pacific's own records, costs incurred to date in OU5 *alone* are substantial.  To perform the work in OU5 under the 1990 AOC and pay the State of Michigan's response costs, the work required by the 2007 SRI/FS ASAOC, and three of the four OU5 TCRAs, the four remaining solvent PRPs have incurred (or have been allocated) no less than **$128,870,930.91**[2]:

---

[2]This does not include the roughly $20 million that Millennium and Simpson Plainwell incurred under the 1990 AOC, money Millennium spent under the 2007 ASAOCs, or the nearly $10 million Weyerhaeuser incurred in the vicinity of the 12th Street landfill, which Weyerhaeuser contends should relate to OU5.

| | Georgia-Pacific | NCR | International Paper | Weyerhaeuser |
|---|---|---|---|---|
| RI/FS[3] | $51,194,768.66[4] | $8,152,947.25 | $3,057,355.22 | $1,019,118.41 |
| Area 1[5] | $23,349,811.49 | $2,731,450.82 | $3,816,907.97 | $341,431.35 |
| Area 3[6] | $11,735,713.25 | $0.00 | $11,735,713.25 | $11,735,713.25 |
| TOTAL | $86,280,293.40 | $10,884,398.07 | $18,609,976.44 | $13,096,263.01 |
| % | 67% | 8% | 14% | 10% |

## IV.   Future costs will be substantial, but still very uncertain.

Notwithstanding the substantial cost incurred to investigate and clean up OU5 so far,

hundreds of millions of dollars in work remains.  Exactly how much is subject to wildly different

estimates.

---

[3]For each party, the figure in this row includes that party's share of Georgia-Pacific's and Fort James's OU5-related costs incurred under the 1990 AOC plus Georgia-Pacific's payment of the State of Michigan's costs to oversee work performed under the 1990 AOC, less the money Georgia-Pacific received in settlement from other PRPs and the amount the Court concluded was unnecessary or inconsistent with the NCP.  *See* Phase II Opinion at 19–20, 28, 358 F. Supp. 3d at 630–31, 633.

[4]On top of the categories of costs outlined in note 3 above, Georgia-Pacific's past RI/FS costs also include costs incurred to date under the 2007 SRI/FS ASAOC with EPA.  *See id.* at 19, 358 F. Supp. 3d at 630. To calculate the 2007 SRI/FS component of this figure, Georgia-Pacific uses the figures from the tables in the Phase II Opinion for costs incurred before September 1, 2014  ($21,527,061.54), *see id.*, and adds the costs incurred since that date ($21,514,759.87), Ex. 1 at ¶ 5.

[5]For each party, the figure in this row includes that party's share of Georgia-Pacific's costs incurred to perform the Plainwell Dam No. 2 TCRA.  *See* Phase II Opinion at 19, 358 F. Supp. 3d at 630.  For Georgia-Pacific and International Paper, the figure also includes those parties' costs incurred to date to implement the Area 1 remedy.  *See* Ex. 1 at ¶ 8.  For Georgia-Pacific, this figure includes costs incurred to perform the Plainwell Impoundment TCRA. *See* Phase II Opinion at 19, 358 F. Supp. 3d at 630.

[6]This includes costs incurred by Georgia-Pacific, International Paper, and Weyerhaeuser to perform the Area 3 TCRA.  We assume that costs incurred by International Paper and Weyerhaeuser are the same as the costs incurred by Georgia-Pacific.  Ex. 1 ¶ 7.

In 2009, EPA projected the total cost to clean up OU5 at $2.4 billion.  As of March 2015, EPA had neither withdrawn nor amended that estimate, even though substantial study of potential remedies had been completed in Areas 1 through 3.

But in support of this motion, EPA estimates that future removal and remedial work in OU5 will cost dramatically less—roughly $609 million:

| EPA Removal/Remedy Implementation Cost Estimate | |
|---|---|
| Area 1 | $23,000,000 |
| Area 2 | $46,400,000 |
| Area 3 | $35,000,000 |
| Area 4 | $175,000,000 |
| Area 5 | $75,000,000 |
| Area 6 | $205,000,000 |
| Area 7 | $50,000,000 |
| | |
| Total | $609,400,000 |

The Government offers only a conclusory explanation of how it derived these numbers.  EPA Br. at 5 n.3.  It does not identify the assumptions on which these projections are based or explain why this estimate is so much lower than the one it submitted in support of its claim in the Millennium bankruptcy.  Whatever the basis for this projection, we already know it is wrong. The expected cost for the remedy in Area 1 has increased to $58 million, two-and-a-half times the top end of the range estimated in the record of decision.  Ex. 1 at ¶ 9.  And as explained below, the Government and NCR think it likely enough that the cost of the Area 3 remedy will exceed its $35 million projection that they have included $52.5 million buy-out option for NCR.

The investigation into potential remedies for Areas 4, 5, 6, and 7 has not matured to a point where anyone can make a reliable cost projection.  The known variables involved are extensive, and even small changes in assumptions can affect the final cost dramatically.  EPA cannot resolve these uncertainties today.  CERCLA requires the Government to go through an

extensive process, involving public participation and a formal evaluation of potential remedies, before selecting a final remedy for any area of the Site. *See* 42 U.S.C. § 9617; 40 C.F.R. § 300.430. And even the cost estimates derived through that process nearly always serve only as a "floor" for future costs, as the experience in Area 1 and the Government's expectation about a potential increase in Area 3 demonstrate. If the Government's estimate for Area 6, where the SRI/FS process has barely begun, is off by as much as its estimate for Area 1, where the SRI/FS process has been complete since 2015, costs could jump dramatically.

The Government's estimate is also incomplete. It excludes Georgia-Pacific's future SRI/FS costs, which Georgia-Pacific estimates will cost a net of $36.4 million. Ex. 1 at ¶ 5. It also excludes the State and EPA's unreimbursed past response costs. EPA's unreimbursed costs are reportedly close to $50 million; we do not know Michigan's number. And both EPA and the State will incur costs going forward. If we assume Michigan's past costs plus the combined future costs for EPA and the State are $20 million, EPA's estimate of Site costs that private parties will be asked to pay or reimburse must be increased by at least another $106 million.

## V.    The Proposed Consent Decree

After the Court entered its judgment in the cost-recovery litigation, NCR appealed. The Sixth Circuit encouraged the parties to mediate, and they did so for nearly a year without producing a deal. NCR was simultaneously negotiating with the Government and the State of Michigan. On December 11, 2019, the Government announced it had reached a deal and published the proposed Consent Decree. Georgia-Pacific submitted comments on the proposed Consent Decree on February 18, 2020. *See* Ex. 2. The United States filed its motion for entry on May 22.

The proposed Consent Decree requires NCR to satisfy its judgment to Georgia-Pacific and drop its appeal, to perform work that EPA estimates will cost $135.7 million, and to make

11

payments to EPA and the State of Michigan totaling $82.5 million.  The work involved includes

the remedial design and remedial action in Areas 2 and 3, and a TCRA in Area 4.  The

Government estimates that the work in Area 2 will cost $46.4 million and that the TCRA in Area

4 will cost $55 million, but there is no cap on those costs—they could go up.  In Area 3, the

Government estimates the cost will be $35 million, but EPA has not yet selected the remedy for

that area.  The Government protects NCR against the risk that the cost of that remedy expands,

allowing it opt out of performing the remedy and pay $52.5 million—150% of the estimated

cost.  The Consent Decree also requires NCR to pay $27 million associated with natural resource

damages (NRDs)—$25 million to compromise a potential future assessment and $2 million for

assessment costs.

With respect to the money NCR pays for response costs, the Consent Decree stops short

of committing to spend the money at the Site.  It states in various places:

> EPA shall deposit the Response Cost Payments in the Site-wide
> Special Account to be retained and used to conduct or finance
> response actions at or in connection with the Site, *or to be
> transferred by EPA to the EPA Hazardous Substance Superfund*.

*See, e.g.*, Proposed Consent Decree, ECF No. 2-1, at 22, ¶ 44 (emphasis added).

In exchange for NCR's work and payments, EPA and the State agree not to sue NCR for

any further work at the Site.  Because the Consent Decree broadly defines the "matters

addressed" by the agreement to include all past and future work at the entire Site, the agreement

eliminates the rights of other PRPs to seek contribution from NCR for any Site costs in the

future.

## ARGUMENT

### I.    Standard of Review

The Court must ensure that the terms of a CERCLA Consent Decree "are fair, reasonable and adequate—in other words, 'consistent with the purposes that CERCLA is intended to serve.'" *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1435 (6th Cir. 1991) (citation omitted).  It also must determine "whether a decree is rational and not arbitrary or capricious." *Id.*  Although the Court may not substitute its own judgment for that of the parties, it must "eschew any rubber stamp approval in favor of an independent evaluation." *Id.* (citation omitted).  "[F]airness in the CERCLA settlement context has both procedural and substantive components." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990). Moreover, "[f]airness should be evaluated from the standpoint of signatories *and nonparties* to the decree," and "[t]he effect on non-settlers should be considered." *Akzo Coatings*, 949 F.2d at 1435 (citations omitted) (emphasis added).  The Court's review of a proposed CERCLA Consent Decree "must be thorough and penetrating," and search for "serious omissions of substantive evidence." *Id.* at 1425–26.

A judicially-approved CERCLA settlement affects the rights of non-settlers, because that type of settlement bars "contribution" claims by non-settlers against the settling party for "matters addressed" by the settlement.  42 U.S.C. § 9613(f).  So an agreement's definition of the "matters addressed" is centrally important.

In 1997, EPA issued its own policy for defining "matters addressed."  *See* Ex. 3, Memorandum from Bruce Gelber to Sandra Connors, Defining "Matters Addressed" in CERCLA Settlements (Mar. 14, 1997) (the "1997 Policy").  The 1997 Policy explains that the "matters addressed" should be defined in settlement agreements to avoid ambiguity that would

invite future litigation, while also ensuring that the settlement is "fair, reasonable, and consistent with the goals of CERCLA."  1997 Policy at 4.

The 1997 Policy further instructs that fairness to other PRPs is critical.  An overly broad definition of "matters addressed" unfairly intrudes on the legitimate right of non-settling PRPs to seek contribution.  So the agency must show that the amount paid in settlement reflects a reasonable compromise in reference to the "matters addressed":

> Ordinarily, the required demonstration can be accomplished by showing that the response actions or costs within the definition of "matters addressed" were taken into consideration in determining the amount of the settlement, and that the settlors' payment or other contribution represents a reasonable contribution to those costs based on some defensible criterion such as the settlors' volumetric share or ability to pay, or a fair assessment of the litigation risks.  Moreover, the impact of the settlement on the contribution rights of any non-parties must be fair under all of the relevant circumstances.

1997 Policy at 5.

In settlements involving the performance of specific work, the "matters addressed" are the work tasks contemplated by the settlement.  "In RD/RA settlements for only one of several operable units, the 'matters addressed' are likely to be limited to the portion of the cleanup which the settlors are performing or funding."  1997 Policy at 8.  For example, when Georgia-Pacific performed the Plainwell Impoundment TCRA, the settlement defined the matters addressed to be limited to that single TCRA.  Ex. 4, Excerpts from 2007 Plainwell TCRA ASAOC.

In de minimis and cash-out settlements, the Policy emphasizes that the amount to be paid in settlement must be fair in light of the overall scope of the "matters addressed."  Where the payment is for a share of fixed specified costs, it should fairly reflect the settling party's equitable share of those costs, accounting for litigation risk.

14

The task of constructing an appropriate settlement is significantly more difficult when the payment seeks to extinguish liability for an uncertain amount of future costs.  The 1997 Policy instructs that, in such cases, the settling party should pay a premium to account for the risk associated with that uncertainty:

> Other items whose costs cannot be estimated at the time of settlement (e.g., additional work that may be required as a result of conditions that are not known or anticipated at the time of the settlement, or work performed by other PRPs for which an accurate accounting is unavailable) may be included in "matters addressed" if the settlors pay a *premium* that reflects the risk that such costs will ultimately be incurred.

1997 Policy at 7 (emphasis added).  Stated differently, when the amount of work yet to be done is uncertain, the settling party must pay *above* the odds.  *See, e.g.*, *Cannons Eng'g*, 899 F.2d at 85 (noting that EPA demanded that de minimis settlors pay 160% of the amount of their share of responsibility).

Finally, when assessing the fairness of the matters addressed, the Government must consider the work that other PRPs have performed or will perform.  If work is mostly complete, and the contribution of other PRPs to the total cleanup is ascertainable, a broad definition of matters addressed that includes all site work may be appropriate.  Conversely, such broad protection is not appropriate where EPA cannot fairly conclude that the settling party is "paying an appropriate portion of *all* costs."  1997 Policy at 8 (emphasis in original).

## II.    The proposed Consent Decree is unfair to non-settling PRPs.

The Consent Decree is unfair to non-settling PRPs, because NCR's effective share of the total cost to clean up OU5 is too low, when *all* OU5 costs are considered.  In the best-case scenario, NCR will pay 28.83% of the total costs to investigate and clean up OU5, which is significantly less than the fair share this Court assigned to NCR, based on the substantial evidence of NCR's culpability documented in the Court's findings of fact.

15

That discount is not defensible as a reasonable approximation of litigation risk,[7] and it does not account for the significant uncertainty over the total cost for the OU5 work.  We cannot know now the remedies the Government will select for most of OU5 or how much those remedies will cost.[8]  Under these circumstances, EPA's 1997 Policy and the fairness considerations it embodies dictate that NCR pay a premium to account for the uncertainty of total Site costs.  But the Government does not even acknowledge this uncertainty, much less impose the premium its own policy requires.

### A.  Under EPA's projections of future response costs, NCR pays substantially less than its adjudicated fair share of liability.

NCR's commitments for response actions and payments fall well short of the 40% share this Court assigned to NCR.

Using the Government's projection of the cost of future response actions in OU5 submitted in this case, the *total* sum for work in OU5 is roughly $794.7 million, assuming that what remains of the money Millennium paid in bankruptcy gets used to defray costs.

---

[7]No one contends that NCR lacks an ability to pay.

[8]NCR can hardly dispute this point, having successfully used that uncertainty as grounds to avoid an allocation of future liability in this Court.  *See* Proposed Final Judgment, *Georgia Pacific Consumer Products, LP v. NCR Corp.*, No. 1:11-cv-483 (W.D. Mich. May 31, 2018) (ECF No. 923-1), at 2–3.

| TOTAL OU5 COSTS | |
|---|---|
| Total Past OU5 Costs | $128,870,930.91 |
| EPA Projection of Future Costs | $609,400,000.00 |
| State/EPA Past and Future Response Costs | $70,000,000.00 |
| SRI/FS Costs[9] | $36,400,000.00 |
| Millennium Balance | ($50,000,000.00) |
| **TOTAL OU5** | **$794,670,930.91** |

If the work NCR has agreed to perform costs what the Government projects, and all of the money NCR pays is used to finance or reimburse response costs at the Site, NCR pays roughly $229 million of the total OU5 costs:

| NCR OU5 PAYMENTS | |
|---|---|
| Total Past NCR OU5 Payments | $10,884,398.07 |
| Value of NCR Work in Areas 2, 3, and 4 | $135,700,000.00 |
| NCR Response Cost Payments | $82,500,000.00 |
| **TOTAL NCR OU5 PAYMENTS** | **$229,084,398.07** |

So in this best-case scenario, NCR pays roughly 28.83% of the total OU5 costs.  That share is, coincidentally, roughly 28% less than the 40% share assigned by this Court.

But there is a real risk that costs will exceed the estimate the Government proffers in its motion, and the non-settling PRPs bear that risk disproportionately.  We already know that EPA's best-case scenario for costs in Area 1 is low based on the most recent estimate developed during remedial design, which *exceeds* the high-end of EPA's original estimate by 150%.  Ex. 1

---

[9]The Government or NCR may contend that Georgia-Pacific's SRI/FS costs and the costs incurred to perform the Plainwell TCRA should not be included, because the Court concluded those costs are time-barred.  But these costs are indisputably part of the total incurred in OU5.  And just as Georgia-Pacific relinquished its right to recover those costs by not suing to recover them sooner, NCR has relinquished the right to recover the costs it would incur under the Consent Decree by agreeing not to sue other PRPs to recover them.  Proposed Consent Decree, ECF No. 2-1, at 37, ¶ 92.

at ¶ 9.  In Area 3, costs are uncertain enough that NCR agreed to a cash-out option of $52.5 million, 50% more than EPA's current estimate for the RD/RA work in that area.  And these are areas where the SRI/FS process is either complete or well-advanced.  The SRI/FS process has hardly begun in Areas 5, 6, and 7.  In those areas, where the work is likely to be more costly,[10] the Government has even less information from which to make informed estimates.  So the risk of a miss is greater, and the consequences more profound.

As noted above, EPA itself, as recently as 2015, projected that OU5 costs would run up to $2.4 billion.  We do not believe that number is realistic, and it certainly does not square with the Government's current cost projections.  But the Government has not ruled it out either.  It has not stipulated that costs will not exceed its current estimates or even 150% of current estimates.  Indeed, the Government has not even explained why its 2015 projection is no longer operative.  If that extreme scenario comes to pass, NCR would wind up paying only about 14% of the total OU5 costs, even if NCR's total outlay for NCR's work in Areas 2, 3 and 4 increases to $300 million.

Bottom line, uncertainty over the cost of the future work in OU5 is substantial.  By giving NCR complete contribution protection, the Consent Decree shifts the risk of escalating costs from NCR to the non-settling PRPs.  The Consent Decree ignores that risk—it does nothing to prevent it, and it does not compensate the non-settling PRPs for assuming it.

### B.    The Consent Decree is substantively unfair under the framework EPA set forth in the 1997 Policy.

The Consent Decree violates EPA's 1997 Policy in at least two respects:  (1) the United States has failed to demonstrate that the work and payments required of NCR reflect a reasonable

---

[10]Area 6, for example, contains approximately 40% of the PCB mass in OU5 and likely will cost the most to remediate.  Ex. 1 at ¶ 4.e.

compromise based on defensible criteria; and (2) EPA fails to grapple with the uncertainty of future response costs.

### 1.    The United States has failed to demonstrate that the Consent Decree reflects a reasonable compromise of NCR's total liability.

At the threshold, the United States' estimate of future site costs is arbitrary.  In 2009, EPA, in the proof of claim it submitted in the Millennium bankruptcy, projected the total response costs in OU5 to be $2.4 billion.  Ex. 5 at 10.  And under oath in 2015, EPA's designee, Jim Saric, offered no revised estimate.  *See* Ex. 6, Excerpts from Deposition of James Saric.  Yet now, in attempting to justify the fairness of the Consent Decree, the United States, based on Mr. Saric's declaration, offers an estimate of $609MM for work in OU5.  That is a massive swing, and the Government provides no explanation for it.

*This is the very definition of arbitrary agency action*.  Agencies generally must offer some explanation when they have changed positions.  "An '[u]nexplained inconsistency' in agency position is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'"  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *Nat'l Cable & Telecomms. Assn. v. Brand X Internet Serv.*, 545 U.S. 967, 981 (2005)).  To be sure, an agency can change its existing position, but it must provide "a reasoned explanation for the change."  *Id*. at 2125.  The agency "must at least 'display awareness that it is changing position' and 'show that there are good reasons'" for the new one.  *Id*.  (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

An agency must "provide a more detailed justification" when "its new policy rests upon factual findings that contradict those which underlay its prior policy" or "when its prior policy has engendered serious reliance interests that must be taken into account."  *Fox Television*, 556 U.S. at 515.  Just last month, the Supreme Court reaffirmed that "[i]t would be arbitrary or

19

capricious to ignore such matters." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, No. 18-587, 2020 WL 3271746, at *14 (U.S. June 18, 2020) (quoting *Fox Television*, 556 U.S. at 515). "Sudden and unexplained change . . . or change that does not take account of legitimate reliance on prior interpretation . . . may be arbitrary, capricious, or an abuse of discretion." *See Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) (quotations omitted) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 46-57 (1983); *United States v. Penn. Indus. Chem. Corp.*, 411 U.S. 655, 670-75 (1973); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 295 (1974)).

EPA does not explain its change in position, apart from noting that the number is close to Georgia-Pacific's internal projections from 2015. But the United States does not explain why that estimate is better than the one it affirmed earlier in 2015. And for good reason: the new estimate already has been called into doubt by the experience in Area 1, where the remedy is expected to cost two-and-a-half times what the Government projects.

Even if the United States had adequately supported its change in position, its rationale for why NCR's response work and payments reflects a reasonable compromise still falls short. The United States does not dispute that NCR's work and payments comprise only 28.83% of total OU5 work using EPA's current (unexplained) cost estimate, notwithstanding this Court's finding that NCR was responsible for 40% of costs incurred site-wide involving all aspects of CERCLA work. The Government notes that this percentage may not apply to future costs. True, but that percentage is, at a minimum, the "starting point," and the Government offers no reason why NCR's share of future costs should be lower, apart from restating arguments about NCR's supposed "volumetric share" that this Court rejected when it allocated fault. Phase II Opinion at 43–44, 56–57, 358 F. Supp. 3d at 641–42, 649.

The Government next notes the litigation risk.  But unlike many settlements, which are executed to avoid trial on liability and allocation, NCR already has been found liable, and the Court assigned it an equitable share for a category of costs that is representative, both geographically and in terms of tasks, of work to come.  And the Government incurred no litigation risk at all with respect to NCR on this Site.  Georgia-Pacific did, working for nearly eight years, including two weeks-long trials and extensive discovery, to establish NCR's liability and substantial responsibility for costs at the Site.

NCR is now appealing the judgment, but it faces very low odds of success.  The Court's liability finding is a straightforward application of settled arranger law based on a series of factual findings supported by ample evidence, which the Sixth Circuit will review for clear error.[11]  *United States v. Consolidation Coal Co.*, 345 F.3d 409, 413 (6th Cir. 2003).  And NCR faces an even steeper "run uphill" to disturb the Court's allocation.  *GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 450 (6th Cir. 2004).  NCR's slim chance of success on appeal certainly does not approximate the significant discount NCR would receive off this Court's 40% allocation, even in the unlikely event the Government's unsubstantiated projection of future costs proves accurate.

The United States also mentions the avoidance of "litigation delay."  But the United States is not involved in any cost-recovery litigation against NCR relating to the Site, because Georgia-Pacific and others have voluntarily undertaken that task.  And the United States will not need to sue NCR in the future, either.  Even if NCR continues to refuse to perform work,

---

[11]The fact that NCR defeated a claim of arranger liability in litigation involving costs at the Fox River Superfund Site is of no moment.  Judge Griesbach's decision in that case centered on the actions and intent of Appleton Coated Paper Company, not NCR itself.  Georgia-Pacific's claim against NCR involved the actions and intent of NCR, and the judgment against NCR is based on substantial additional evidence not presented in the Fox River litigation. *See Georgia-Pacific Consumer Products, LP v. NCR Corp.*, No. 1:11-cv-483, 2013 WL 12075957 (W.D. Mich.) (denying NCR motion for summary judgment on issue preclusion).

Georgia-Pacific (and hopefully International Paper and Weyerhaeuser) will.  The United States need not file a single additional complaint against NCR.

### 2.   The Consent Decree fails to account for the uncertainty of future costs.

The Consent Decree's biggest flaw is that it fails to account for the substantial uncertainty in future costs for the extensive work NCR is not performing.  This is directly contrary to the 1997 Policy, EPA's historical practice, and basic notions of fairness.  *See* 1997 Policy, at 7; *Cannons Eng'g*, 899 F.2d at 88.  Georgia-Pacific noted this problem in its comments, and the Government says nothing about it in its motion.  This is reason alone to refuse to enter the Consent Decree.

The 1997 Policy recognizes that, where future costs that other PRPs will incur are uncertain, settling PRPs who obtain full, site-wide contribution protection avoid all the risk that costs exceed expectations.  So the settling PRP should pay a premium that reflects the risk that such costs will ultimately be incurred.  Here, as explained above, that risk is real.  This proposed settlement gives NCR complete protection against claims by the other PRPs when the final remedy for much of the Site is unknown and the costs cannot be reasonably estimated.  So there must be a premium, and it must be equivalent to that uncertainty.

Under the Consent Decree, the premium is non-existent, and the United States does not explain its absence.  If the United States no longer considers this aspect of its 1997 Policy to be operative, it must at least acknowledge the change and provide a rationale.  *See* supra at 19–20.  Its failure to do so is arbitrary and capricious.

Of course, EPA did not need to define the "matters addressed" by the Consent Decree as broadly as it did.  For example, one way to account for the uncertainty of future costs was to limit the matters addressed to the next $609 million of work in OU5.  Under that approach, NCR

22

would enjoy contribution protection, but only to the extent that costs are in line with projections. If, and only if, costs exceed EPA's projections, non-settling PRPs would be able to return to NCR for additional money.

This approach would offer at least two clear advantages. First, it significantly mitigates the substantive unfairness of the Consent Decree to non-settling PRPs, while imposing no unfairness on NCR. If, as in Area 1, costs in downstream areas escalate meaningfully beyond current estimates, Georgia-Pacific and the others could assert contribution claims against NCR, asking no more than that NCR pay its fair share of those costs. That result is not unfair to NCR.

Second, a provision like this would obviate the need to price the premium associated with the uncertainty of future costs. There is no need for the Court, or the parties, to assess the reliability of the estimate or the likelihood of various scenarios under which the total might exceed it. If the United States and NCR are confident in EPA's $609 million estimate, they should have no qualms about limiting the matters addressed in this way.

## III.    The Consent Decree should include stronger mechanisms to ensure the money NCR pays gets spent at the Site.

The Consent Decree includes the following language regarding the use of money NCR pays for future response actions:

> EPA shall deposit the Response Cost Payments in the Site-wide Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, *or to be transferred by EPA to the EPA Hazardous Substance Superfund*.

*See, e.g.*, Proposed Consent Decree, ECF No. 2-1, at 22, ¶ 44 (emphasis added). Given the substantial amount of cash EPA will have received if this settlement is approved—roughly $132 million for OU5 from Millennium and NCR alone—the Court should require EPA to make a firmer commitment to use that money to defray costs at the Site.

CERCLA dictates that amounts paid to EPA in settlement reduce the liability of other PRPs.  42 U.S.C. § 9613(f)(2).  The easiest way to give effect to that legal mandate is for EPA to use the money NCR pays expeditiously, and Georgia-Pacific has urged EPA to do so.  But Georgia-Pacific's experience with EPA's use of the money Millennium paid in bankruptcy to fund OU5 actions leaves Georgia-Pacific pessimistic on that score.

So to protect the rights of other Site PRPs, Georgia-Pacific asks the Court to require that EPA augment its standard language regarding the use of response cost payments in four ways.

First, the Court should require the United States to include an additional recitation acknowledging that it intends to use NCR's Response Cost Payments for clean-up actions at the Site:

> EPA expects and intends to use all Response Cost Payments to conduct or finance response actions at or in connection with the Site.

The United States says that this additional language is unnecessary, because its guidance requires as much.  EPA Br. 25–26.  But that is not assuring or legally binding.  Guidance can be changed or weakened at the agency's discretion without formal rulemaking procedures.  *See* 5 U.S.C. §§ 553(b)(A), 553(d)(2).  Indeed, guidance on critical subjects frequently changes from administration to administration.  *See, e.g.*, *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 863–64 (1984) ("An initial agency interpretation is not instantly carved in stone.  On the contrary, the agency . . . must consider varying interpretations and the wisdom of its policy on a continuing basis.").  A simple recitation in the agreement along with the provisions described below, would make the United States' stated intent an enforceable part of the agreement.

<u>Second</u>, the Court should require the United States to modify the standard language quoted above to acknowledge that Response Cost Payments will not be transferred to the general Superfund unless response actions at the Site have been completed.  For example, the language above could be modified as follows:

> EPA shall deposit the Response Cost Payments in the Site-wide Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or**, if all such actions have been completed,** to be transferred by EPA to the EPA Hazardous Substance Superfund.

The United States objects to this language, because its guidance would allow for the transfer of funds from the Site-wide Special Account into the general Superfund if the balance of the Special Account exceeds what is needed at the Site, even if Site work is not yet complete. Georgia-Pacific does not object to making some allowance for funds to be transferred under that circumstance, provided that EPA gives notice that it has made such a determination.  And these triggers should be specifically set forth in the Consent Decree, where they will remain subject to the Court's continuing jurisdiction.  *See United States v. Bd. of Cty. Commissioners of Hamilton Cty., Ohio*, 937 F.3d 679, 688 (6th Cir. 2019) ("[A] consent decree is a settlement agreement subject to continued judicial policing.").  Without enforceable commitments in the Consent Decree, non-settling PRPs and the public more broadly may not even know that EPA has made such transfers.

<u>Third</u>, we ask that the Court require EPA to specifically acknowledge that NCR's payments reduce the liability of other Site PRPs, even if EPA does not use those payments to fund Site response costs.  After each instance where EPA uses the language quoted above, it should add the following:

> EPA expressly acknowledges that Response Cost Payments reduce the potential liability of the other PRPs by the total amount of the Response Cost Payments, regardless of whether they are used to

25

> conduct or finance response actions at or in connection with the
> Site or are transferred by EPA to the EPA Hazardous Substance
> Superfund.

The United States objects to this language, because it says the language is unnecessary in light of

the protections specified in CERCLA section 113(f)(2).  Perhaps.  But if that is so, why not

include it and eliminate any ambiguity that future accounting practices or errors might create.

Fourth, the Court should require EPA to provide a regular accounting of money it holds

in the special account for the Site.  That transparency will allow the remaining PRPs to make

informed decisions regarding their own remaining liability and avoid future litigation.  At some

place in the agreement, EPA should include language substantially similar to the following:

> To ensure transparency regarding its use of the Response Cost
> Payments, EPA shall provide an annual report, documenting all
> funds received into or disbursed from the Site-wide Special
> Account, with the first such report to be submitted no later than
> January 31, 2021, and all subsequent reports due no later than
> January 31 of each subsequent year until response actions at the
> Site have been completed.

The Government objects to this, too.  It says that "those disclosures are most useful to the Parties

at times when they are discussing potential performance of additional work at the Site, not on an

arbitrary, annual deadline."  EPA Br. 27.  But requiring an annual accounting allows PRPs to

enter those discussions on an equal footing with the Government.  And requiring the accounting

on an annual basis should encourage the agency to present the information in a standard and

intelligible format that will benefit the public more broadly.

## IV.   The Court should reject NCR's invitation to address its unripe argument about Georgia-Pacific's continuing rights against NCR under CERCLA section 107.

NCR offers no defense of the fairness of the Consent Decree.  It instead asks the Court to

improve on the deal by granting NCR something the Government cannot—protection against

future section 107 claims.  *See* NCR Br. 2.  NCR specifically asks the Court to rule that the

Consent Decree forever precludes Georgia-Pacific, International Paper, and Weyerhaeuser from asserting section 107 claims against NCR. *See id.* at 2, 19. Indeed, NCR asserts that the Court has already more-or-less resolved the question.

The Court need not address that question here, because it is not ripe. And NCR is wrong in any event.

### A.     The viability of a claim by Georgia-Pacific against NCR is not ripe.

The Court need not address NCR's argument that Georgia-Pacific and the other non-settling PRPs have lost all section-107 cost-recovery rights against NCR, because those arguments are not ripe. They will not become ripe until one of those parties asserts a section 107 claim against NCR. Although International Paper has asserted such a claim against NCR to recover its costs associated with the Area 3 TCRA and the Area 1 remedial design, and Georgia-Pacific and Weyerhaeuser asserted section 107 cross-claims against NCR, that case is on hold pending NCR's appeal. Until that case is re-activated or another one is filed, the Court need not address this question.

And the Court should not address the question now. As NCR argued—and this Court agreed—future costs and the circumstances under which they might be incurred are uncertain, which counsels against making premature pronouncements about how those costs can be recovered or allocated. *See* Order, *Georgia Pacific Consumer Products, LP v. NCR Corp.*, No. 1:11-cv-483 (W.D. Mich. June 19, 2018) (ECF No. 924), at 6–7. "Future costs will certainly be incurred by one or more of the liable parties. But who incurs the costs; where the costs are incurred at the Site; what the costs are for; when the costs are incurred; and a host of other factors—many still unknown—will determine what liable party or parties is ultimately responsible to bear the costs." *Id.* at 6. That observation remains true today.

27

### B.    The Consent Decree cannot affect Georgia-Pacific's section-107 rights.

Whatever rights Georgia-Pacific retains under section 107 are not affected by the Consent

Decree.  As the Supreme Court announced 13 years ago, the contribution protection that section

113(f)(2) affords settling PRPs "does not by its terms protect against cost-recovery liability

under § 107(a)."  *United States v. Atl. Research Corp.*, 551 U.S. 128, 140 (2007).  This follows

directly from the Supreme Court's instruction that "§§ 107(a) and 113(f) provide two 'clearly

distinct' remedies."  *Id.* at 138 (quoting *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157,

163 n.3 (2004)); *see also Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*, 758 F.3d 757, 766 (6th Cir.

2014).  A section-113 contribution action, on the one hand, "is contingent upon an inequitable

distribution of common liability among liable parties."  *Atl. Research*, 551 U.S. at 139.  A

section-107 cost-recovery action, on the other hand, "permits recovery of cleanup costs but does

not create a right to contribution."  *Id.*  "Accordingly, the remedies available in §§ 107(a) and

113(f) complement each other by providing causes of action 'to persons in different procedural

circumstances.'"  *Id.* (quoting *Consol. Edison Co. of New York v. UGI Utilities, Inc.*, 423 F.3d

90, 99 (2d Cir. 2005)).  Simply put, because contribution and cost recovery constitute distinct

remedies, contribution protection cannot guard against cost-recovery claims.

Indeed, the *Atlantic Research* decision specifically rejected the precise concern that NCR

raises here about allowing section-107 claims to proceed against PRPs who have resolved their

liability to the United States or a State.  In response to the Government's arguments that allowing

private parties to sue under section 107 would deter settlements because contribution protection

would not guard against section-107 claims, the Supreme Court identified why that concern was

misplaced.  The Court specifically noted the settling PRP's ability to trigger equitable

apportionment in response to a section-107 claim via a section-113(f) counterclaim, the

"significant protection from contribution suits" by other PRPs, and the "inherent benefit of finally resolving liability as to the United States or a State." *Id.* at 140–41.

A settling PRP's residual exposure to section-107 claims is only meaningful where the settlement is unfair.  If the settlement is fair, the prospect of a section-113(f) counterclaim eliminates any incentive for non-settling PRPs to sue under section 107.  But if the settlement is unfair, the incentives change.  That NCR devotes an entire brief urging the Court to extinguish prematurely the section-107 rights of Georgia-Pacific, International Paper, and Weyerhaeuser shows what NCR thinks about the fairness of this deal.

### C.     This Court did not address the residual section-107 cost-recovery rights when it entered its order on the form of the judgment.

NCR suggests that this Court addressed and resolved the question of Georgia-Pacific's residual section-107 rights in its order on the form of the judgment in the cost-recovery action. NCR Br. 9.  Specifically, NCR asserts that under that ruling "any rights GP now has with respect to additional recovery against others related to the Site are rights under § 113, not § 107." *Id.* Not so.

As the Court will recall, the parties submitted a Joint Status Report noting their differences over the form of the judgment.  Among other things, they disagreed about the scope of the declaration of liability required by section 113(g)(2)(B).  *See* Proposed Final Judgment, *Georgia Pacific Consumer Products, LP v. NCR Corp.*, No. 1:11-cv-483 (W.D. Mich. May 31, 2018) (ECF No. 923-1), at 2–3.  Georgia-Pacific asked the Court to enter a declaration that would assign liability percentages to each party for all future costs.  *Id.*  NCR opposed that request, noting that the significant uncertainties over what might occur in the future counseled against assigning specific shares of liability for future categories of costs.  *Id.*  Ultimately, the Court agreed with NCR.  *See* Order, *Georgia Pacific Consumer Products, LP v. NCR Corp.*, No.

29

1:11-cv-483 (W.D. Mich. June 19, 2018) (ECF No. 924), at 6–7.  In doing so, the Court correctly

observed that the parties' rights vis-à-vis one another would be decided ultimately through one of

the allocation mechanisms in section 113.  *Id.* at 7.

But the Court said nothing about the procedural on-ramp that must be used to reach those

mechanisms.  It had no reason to do so—the issue was not ripe, so the parties did not brief it.

And having carefully avoided weighing in prematurely to consider future-cost questions it

thought not yet ripe for decision, *id.*, the Court would not have reached forward silently to

resolve the substantial question of whether Georgia-Pacific would need to travel in the 113 lane

or the 107 lane to recover any potential category of future costs.

NCR's reading of the Court's order on the form of the judgment is even more implausible

given that the Court rejected NCR's theory in denying NCR's motion for summary judgment.

*See Georgia-Pac. Consumer Prod. LP v. NCR Corp.*, No. 1:11-CV-0483, 2015 WL 11236845,

*5–6 (W.D. Mich. Aug. 12, 2015).  In that motion, NCR argued, as it does here, that the

adjudication of liability against Georgia-Pacific in previous litigation foreclosed it from

recovering future costs under section 107.  The Court declined to adopt that theory.  *Id.* at *5–6

("The Court disagrees that the ostensible section 107 counterclaims asserted by the defendants in

the KRSG litigation . . . obligated Georgia Pacific to assert section 113 contribution claims

against Defendants . . . for costs that Georgia Pacific incurred separate from those involved in

KRSG.").  If the Court changed its mind on that important question, it would have said so, and it

would have acknowledged the growing body of contrary authority discussed below.

> **D.     NCR's theory about the triggers for section 107 and section 113 claims is wrong.**

It is now settled that a PRP can only assert a claim for CERCLA contribution if it meets

one of section 113(f)'s statutory triggers; otherwise, it must proceed under section 107.  *See Atl.*

*Research*, 551 U.S. at 139.  And if a PRP meets one of the triggers for contribution, it must pursue the costs associated with that trigger under section 113(f).  *Hobart Corp.*, 758 F.3d at 767 ("PRPs must proceed under § 113(f) if they meet one of that section's statutory triggers.").  Those statutory triggers are: (1) the filing of a civil action under section 107; and (2) the resolution of liability to the government in "an administrative or judicially approved settlement." 42 U.S.C. §§ 9613(f)(1), (3)(B).

The Government and NCR attempt to extend this principle, arguing that once Georgia-Pacific has incurred liability for *some* costs at the Site, it must categorically proceed in contribution for *all* expenses it has incurred at the Site.  *See* EPA Br. 27–28; NCR Br. 8–9, 16–17.  But nothing in *Atlantic Research* suggests such a result, and every circuit to consider the argument has rejected it.  Those decisions teach that "even where one of the statutory triggers for a contribution claim has occurred for certain expenses at a site, a party may still bring a cost recovery action for its other expenses."  *Whittaker Corp. v. United States*, 825 F.3d 1002, 1009 (9th Cir. 2016).

The distinction that *Atlantic Research* drew between contribution and cost recovery supports a PRP's ability to bring a section 107 cost-recovery action for certain site expenses even if it has a right to contribution for others.  *Atlantic Research* clarified that a PRP's right to pursue a contribution claim "is contingent upon an inequitable distribution of common liability among liable parties."  551 U.S. at 138–39.  Following that reasoning, where a non-settling PRP has not incurred liability for a specific cost, it has no choice but to recoup that expense through a cost recovery action.

Circuit courts considering this issue uniformly agree, holding that plaintiffs may appropriately bring cost recovery actions for expenses separate from those for which the

plaintiffs possess contribution rights.  For example, in *Whittaker*, the Ninth Circuit allowed a PRP to assert a cost recovery claim even though it previously resolved a portion of its liability in a settlement.  825 F.3d at 1013.  The *Whittaker* court reasoned that, "[f]ollowing the guidance of the Supreme Court and the other circuit courts," the plaintiff was not required to bring its claims under section 113 because it sought "reimbursement . . . for a different set of expenses, for which [the plaintiff] was not found liable" in the previous settlement.  *Id.* at 1011.[12]  Similarly, in *Bernstein v. Bankert*, the Seventh Circuit considered a PRP who incurred some cleanup costs at a site under a finalized settlement, and others pursuant to an unfinalized agreement.  733 F.3d 190, 202–03 (7th Cir. 2012).  The court held that "[t]o the extent [the plaintiff's] suit seeks to recover expenses arising out of their performance of the [unfinalized agreement], it is not a contribution action."  *Id.* at 207.  Finally, in *Agere Systems, Inc. v. Advanced Environmental Technology Corp*, the Third Circuit held that a plaintiff could bring a cost recovery claim for voluntary costs at one Operational Unit of a Superfund site even though it had incurred liability at a separate Operational Unit following an EPA section 107 suit.  603 F.3d 204, 212–13, 225 (3d Cir. 2010).

Cases considering CERCLA statutes of limitations questions also confirm that separate sets of expenses trigger separate claims under sections 107 and 113.  In *Am. Cyanamid Co. v. Capuano*, for example, the First Circuit rejected the argument that a 1988 judgment against the plaintiff for soil-cleanup costs triggered the limitations period for *any* contribution action the plaintiff might bring regarding the site.  381 F.3d 6, 13 (1st Cir. 2004).  The court held that "such costs or damages" in § 113(g)(3)(A) referred only to "the costs or damages contained in the

---

[12]The *Whittaker* decision reversed a district court decision that NCR relied on in its summary judgment briefing to support the same argument it presses here.  *See* Mem. in Support of Joint Mot. for Summ. J., *Georgia Pacific Consumer Products, LP v. NCR Corp.*, No. 1:11-cv-483 (W.D. Mich. March 15, 2015) (ECF No. 739), at 13, 19.

'judgment' mentioned" in that subparagraph, not to "any response costs or damages that could arise in the future."  381 F.3d at 13.  The Sixth Circuit in *RSR Corp. v. Commercial Metals Co.*, 496 F.3d 552, 557 (6th Cir. 2007), agreed with that holding.  It wrote that its conclusion followed the *American Cyanamid* approach "because we likewise construe 'such costs or damages' in § 113(g)(3)(B) to refer only to those 'costs or damages' imposed by the judicially approved settlement."  *Id.* at 559.  Thus, it is the mechanism by which a PRP incurs certain costs, rather than the status of the party seeking to recover those costs, that dictates whether a party seeking to recover expenses must sue under section 107 or section 113.

NCR argues that Georgia-Pacific cannot parse out liability "into contribution versus cost recovery by any subset of the Site or division of particular project costs."  NCR Br. 16.  But that is precisely what each of the forgoing cases does.  And such treatment seems especially appropriate at this Site, where the cleanup spans several geographic areas, dates back to the early 1990s, and stands to continue for many more years.  Indeed, the Court's previous decisions in the litigation between Georgia Pacific and NCR accords with this approach—separately analyzing different sources of liability under different agreements.  *See, e.g.*, *Georgia-Pac. Consumer Prod. LP v. NCR Corp.*, No. 1:11-CV-0483, 2015 WL 11236845, at *4 (W.D. Mich. Aug. 12, 2015).  Nor does the "slicing and dicing" language from *NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 692 (7th Cir. 2014), alter the conclusion that courts should separately analyze different sources of expenses.  That case cautioned against the "slicing and dicing of costs incurred under *the same* administrative order."  *Id.* (emphasis added).  The *NCR* court's own separate evaluation of three different sets of expenses under three different orders *actually supports* the proposition that courts should parse out different sources of liability.  *See id.* at 690–92.

33

**E.**     **Georgia-Pacific can sue NCR (or any other PRP) to recover work performed pursuant to Unilateral Administrative Orders.**

NCR specifically asks the Court to rule that UAOs are civil actions within the meaning of section 113(f)(1).  The Court need not tackle that question now, but here, too, NCR is wrong.

UAOs are not "civil actions."  For one, UAOs fail to "resolve[] [the PRP's] liability to the United States or a State," which constitutes the defining feature of a contribution-triggering agreement.  *See Hobart Corp.*, 758 F.3d at 768 (quoting *ITT Indus., Inc. v. BorgWarner, Inc.*, 506 F.3d 452, 459 (6th Cir. 2007)).  Moreover, UAOs fall outside of the natural meaning of "civil action," which refers to "non-criminal judicial proceeding[s]."  *See Pharmacia Corp. v. Clayton Chem. Acquisition LLC*, 382 F. Supp. 2d 1079, 1087 (S.D. Ill. 2005).  And the text of section 106 itself distinguishes between the President initiating litigation in district court on the one hand and "take[ing] other action" (like initiating orders) on the other hand—suggesting that Congress viewed UAOs as separate from "civil action."  *See id.* at 1088–89.  So the majority of courts considering this issue agree that UAOs are not "civil actions" for the purposes of section 113(f).  *See Hobart Corp. v. Dayton Power & Light Co.*, 336 F. Supp. 3d 888, 896 (S.D. Ohio 2018) (citing *Diamond X Ranch, LLC v. Atl. Richfield Co.*, No. 3:13-cv-00570, 2016 WL 4498211, at **4–5, (D. Nev. Aug. 26, 2016); *Raytheon Aircraft Co. v. U.S.*, 435 F.Supp.2d 1136, 1142 (D. Kan. 2006); *Pharmacia Corp.*, 382 F. Supp. 2d at 1088–89; *Emhart Indus., Inc. v. New England Container Co.*, 478 F. Supp. 2d 199, 203 (D.R.I. 2007)).

NCR cites *Centerior Service Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344 (6th Cir. 1998), to support its argument to the contrary.  NCR Br. 13–14.  *Centerior*, which was decided before both *Cooper Industries* and *Atlantic Research*, held that "[c]laims by PRPs . . . seeking costs from other PRPs are necessarily actions for contribution."  *Centerior*, 153 F.3d at 350–51.  The Sixth Circuit did not need to reach the question of whether a UAO was a "civil

34

action" because the answer was immaterial under its rule of decision—the plaintiff's status as a

PRP meant any claim against another PRP was one for contribution.  The Supreme Court's

holdings in *Cooper Industries* and *Atlantic Research* overrule *Centerior*'s entire framework for

identifying the triggers for section 107 versus section 113 claims.  That decision is no longer

good law.

## **CONCLUSION**

The Court should deny entry of the proposed Consent Decree, and the Court should reject

NCR's invitation to have the Court address issues that are not ripe.

Respectfully submitted,

By:   /s/ George P. Sibley, III

Peter A. Smit
VARNUM LLP
Bridgewater Place
333 Bridge St., NW
P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000
pasmit@varnumlaw.com

Michael R. Shebelskie
Douglas M. Garrou
George P. Sibley, III
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
(804) 788-8200
gsibley@huntonak.com

*Counsel for Georgia-Pacific LLC and*
*Georgia-Pacific Consumer Products LP*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 14, 2020, I electronically filed this brief with the Clerk of this Court by using the CM/ECF system.  The participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ George P. Sibley, III
George P. Sibley, III

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.2(b), I certify that this brief does not exceed 10,800 words, all inclusive.

/s/ George P. Sibley, III
George P. Sibley, III

Dated:  July 14, 2020