UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THE UNITED STATES OF AMERICA
and THE STATE OF MICHIGAN,

    Plaintiffs,

v.

NCR CORPORATION,

    Defendant, and

GEORGIA-PACIFIC LLC,
GEORGIA-PACIFIC CONSUMER
PRODUCTS LP, INTERNATIONAL
PAPER COMPANY, and
WEYERHAEUSER COMPANY,

    Intervenors.

_____/

CASE No. 1:19-CV-1041

HON. ROBERT J. JONKER

## ORDER ADOPTING CONSENT DECREE

Before the Court is a proposed Consent Decree between Plaintiffs and Defendant NCR Corporation. (ECF No. 2-1). The United States moves (ECF No. 10) for approval of the Consent Decree, which would resolve NCR's liability to Plaintiffs for costs of response actions taken or to be taken in connection with the release of polychlorinated biphenyls ("PCBs") at the Allied Paper / Portage Creek / Kalamazoo River Superfund Site ("Kalamazoo River Superfund Site" or "Site"). The Consent Decree would also provide protection to NCR against contribution claims from other PRPs at the Site. Intervenors are other PRPs at the Site, and they object to approval of the Consent Decree. After reviewing the proposed Consent Decree and all relevant matters of record, the Court finds that the proposed Consent Decree is fair, reasonable, consistent with the purposes of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42

U.S.C. §§ 9606, 9607, and in the public interest. Accordingly, the Court **GRANTS** the United States' Motion (ECF No. 10) and **APPROVES AND ADOPTS** the proposed Consent Decree (ECF No. 2-1).

### FACTUAL BACKGROUND

The United States' Motion and the proposed Consent Decree itself thoroughly detail the facts and issues relating to the Site. The parties here and this Court are thoroughly familiar with these issues and facts based on twenty-eight days of bench trial conducted in two phases. The trial resulted in a series of opinions from this Court, and an eventual judgment. The case is now pending in the Court of Appeals.[1]

The Court will not repeat all the details here, but will summarize highlights. The Kalamazoo River Superfund Site is located in Allegan and Kalamazoo Counties, Michigan and includes approximately eighty miles of the Kalamazoo River (from Morrow Dam to Lake Michigan) and roughly three miles of Portage Creek running up from its confluence with the Kalamazoo River past the Bryant and Monarch mills. The Site is contaminated with PCBs, a hazardous substance under CERCLA. It is contaminated because the paper mills in the Kalamazoo River Valley discharged PCBs as part of their waste streams in the mid to late 20th century. The PCBs were in the mills' waste streams because they recycled wastepaper as a source of pulp, and some of that wastepaper was NCR's Carbonless Copy Paper, which contained PCBs.

The Site has been studied by the State of Michigan and the federal government for decades. John Hesse, a researcher for the State of Michigan, testified at trial that during his surveys of

---

[1] *See Georgia-Pacific Consumer Prods, et al. v. NCR Corp, et al.,* Case No. 1:11-CV-483, ECF No. 432 (W.D. Mich. Sept. 26, 2013) (Phase I decision); *Georgia-Pacific Consumer Prods, et al. v. NCR Corp, et al.,* Case No. 1:11-CV-483, ECF No. 921 (W.D. Mich. Mar. 29, 2018) (Phase II decision); *Georgia-Pacific Consumer Prods, et al. v. NCR Corp, et al.,* Case No. 1:11-CV-483, ECF No. 925 (W.D. Mich. June 19, 2018) (Judgment); *Georgia-Pacific Consumer Prods, et al. v. NCR Corp, et al.*, Case Nos. 18-1805/18-1806/18-1818/18-1858 (6th Cir.) (appeals).

Portage Creek in the 1960s and '70s the creek appeared turbid, with discoloration extending from the creek well down the river. The consistency and color of the water reminded him of a blueberry milkshake. Studies of the area continued, and on May 5, 1989, the United States Environmental Protection Agency ("EPA") proposed that the Kalamazoo River Superfund Site be placed on the National Priorities List ("NPL"). The EPA then listed the Site on August 30, 1990. The Site has been divided into several current or former operable units ("OUs") for purposes of managing, studying, and cleaning up the Site. The river and creek itself is OU5 and is divided into seven separate work areas tied mostly to current or former dams.

In the years since the Site's listing, various entities, including some of the successors of the paper mills that discharged NCR's PCBs into the Kalamazoo River, performed cleanup work at the Site. In 2010 one of those successors, Georgia-Pacific, sued NCR and two other potentially responsible parties ("PRPs")—International Paper and Weyerhaeuser—to establish liability under CERCLA for the PCB contamination of the Kalamazoo River, to determine the equitable shares of the costs of cleaning up the Kalamazoo River Superfund Site, and to require the defendants in that case to pay their portion of past and future cleanup costs. At the close of a lengthy two-phase trial, the Court found (in relevant part) that NCR was liable as an arranger under CERCLA and assigned it a 40% share of responsibility for past costs. The judgment required NCR to pay Georgia-Pacific $19,826,725.67 along with prejudgment and postjudgment interest. Liability extended to future costs, but the Court declined to make an allocation as to future costs in its Phase II decision. Appeals followed, and remain pending.

On December 11, 2019, Plaintiffs United States of America and the State of Michigan filed this action under Sections 106 and 107 of CERCLA seeking "to recover unreimbursed costs incurred for response activities undertaken in response to the release and threatened release of hazardous substances from facilities at and near the" Kalamazoo River Superfund Site. (Compl.

¶ 1, ECF No. 1, PageID.1).  The same day the United States filed the proposed Consent Decree with the Court and subsequently published it for public comment as required by law.  42 U.S.C. § 9622(d)(2)(B); 28 C.F.R. § 50.7, 84 Fed. Reg. 68,946 (Dec. 17, 2019).  Eleven sets of public comments were received, including those from the intervenors in this case, Georgia-Pacific, International Paper, and Weyerhaeuser.  The United States addresses the comments in its motion and states that, notwithstanding these comments, the Court should approve the Consent Decree.

As set out by the United States, the Consent Decree proposes resolving NCR's liability at the Superfund Site.  In exchange, NCR has agreed to (1) perform response cleanup work at certain areas of OU5 in the Site at an estimated cost of $135.7 million; (2) pay $76.5 million to the United States for past and future response costs at the Site; (3) pay $27 million for natural resource damages; and (4) pay $6 million to the State for the State's past and future response costs.  NCR also has agreed to withdraw its appeal from the judgment in the Georgia-Pacific litigation and pay the nearly $20 million to Georgia-Pacific as set out in that judgment.  Co-Plaintiff, the State of Michigan, has filed a statement in support of entry of the consent decree.  (ECF No. 12).  NCR has also filed a memorandum in support of the Consent Decree.  (ECF No. 26).  Georgia-Pacific, International Paper, and Weyerhaeuser have all intervened in this case, and have each filed objections to at least some aspect of the proposed Consent Decree.  (ECF Nos. 30, 31, and 32).  The United States and NCR have filed reply briefs (ECF Nos. 34 and 35).  The matter is ready for decision.

## LEGAL STANDARDS

Under CERCLA, a proposed consent decree must be lodged in the district court and approved to become enforceable. 42 U.S.C. § 9622(d)(1)(A).  "'The requirement of court approval is intended to help insure that the proposed settlement will serve the public interest by facilitating restoration of the environment and by adequately compensating the taxpayers for the cleanup costs

that will be incurred.'" *United States v. City of Grand Rapids*, 166 F. Supp. 2d 1213, 1218 (W.D. Mich. 2000) (Bell, J.) (quoting *United States v. Davis*, 11 F. Supp. 2d 183, 188 (D.R.I. 1998)). When deciding whether to approve and enter the proposed Consent Decree, the Court is required to consider "whether the decree is fair, adequate, and reasonable, as well as consistent with the public interest." *United States v. Lexington-Fayette Urban Cnty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010). The Sixth Circuit has interpreted this as a "three-part test of (1) fairness, (2) reasonableness, and (3) consistency with CERCLA's goals." *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1426 (6th Cir. 1991). "[F]airness in the CERCLA settlement context has both procedural and substantive components." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990); *see also United States v. BP Amoco Oil PLC*, 288 F.3d 1012, 1018 (8th Cir. 2002) (discussing both procedural and substantive fairness).

In conducting this review, the court is tasked with determining whether a consent decree "is rational and not arbitrary or capricious." *Akzo*, 949 F.2d at 1435. The court "is not permitted to engage in a de novo review of the evidence." *City of Grand* Rapids, 166 F. Supp. 2d at 1218. Rather the Court generally affords deference to the government agency's judgment in entering into a consent decree. In evaluating consent decrees under CERCLA, the Sixth Circuit Court of Appeals has observed that reviewing courts "must give a proper degree of deference to the agency's expertise, yet also ensure that the agency has considered all of the relevant evidence in the record and has acted in the public interest." *Akzo*, 949 F.2d at 1426.

## DISCUSSION

After reviewing the record in this case, the Court concludes that the proposed Consent Decree appropriately resolves this matter and that it complies with all applicable standards, including the three part test of fairness, reasonableness and consistency with the purpose of CERCLA. The full contours of what the Consent Decree means going forward, including whether

the Consent Decree would extinguish International Paper's pending lawsuit against NCR[2]—as the United States says—or whether it bars subsequent lawsuits that Georgia-Pacific might file seeking to recover future costs from NCR—as NCR says—are not yet ripe for this Court to determine.

   1. *Procedural Fairness*

The Consent Decree is, first of all, procedurally fair. This element of the analysis requires courts to consider "the strength of plaintiff's case, the good faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in the litigation if the settlement is not approved." *Akzo Coatings*, 949 F.2d at 1435 (internal citations omitted). "The effect on non-settlers should be considered, but is not determinative in the court's evaluation." *Id.* In evaluating whether a Consent Decree is procedurally fair, "a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." *United States v. Cannons Engineering Corp.*, 899 F.2d 78, 86 (1st Cir. 1990). The Consent Decree in this case resulted from arms-length negotiations between the United States, the State of Michigan, and NCR. These negotiations took place over many months with capable and experienced counsel on all sides. The Consent Decree was lodged for public comment as required by law. Comments were received and considered, including those from the intervenors in this case. There is nothing

---

[2] *See International Paper Co. v. Georgia-Pacific Consumer Prods, et al*, Case No. 1:18-cv-1229 (W.D. Mich. filed Nov. 1, 2018). That lawsuit principally seeks response costs against NCR and the other defendants under CERCLA Section 107 (first cause of action) as well as contribution under CERCLA Section 113 (second cause of action). The Sixth Circuit Court of Appeals has remarked that "PRPs must proceed under § 113(f) if they meet one of that section's statutory triggers." *Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*, 758 F.3d 757, 767 (6th Cir. 2014); *see also Phase II Opinion & Order*, Case No. 1:11-cv-483, ECF No. 921, PageID.34655-34656 (W.D. Mich. Mar. 29, 2018) (citing *Hobart*); *see also* Order, Case No. 1:11-cv-483, ECF No. 924, PageID.34744 (W.D. Mich. June 19, 2018) (noting, "all parties are liable in the Court's view, and even though the liability is established and defined by CERCLA § 107, the ultimate responsibility is handled in contribution under CERCLA § 113(g)(3), not cost recovery under Section 107 and 113(g)(2)."). The place to decide whether there is any daylight for IP's claim is in that case, not here. Among other things, it is possible that the Court of Appeals' decision in IP's appeal from this Court's determination of its liability could have impact.

in the record to suggest bad faith or collusion. *See United States v. BP Expl. & Oil Co.*, 167 F. Supp. 2d 1045, 1051-52 (N.D. Ind. 2001) (noting, as part of a fairness evaluation, the absence of anything in the administrative record that would suggest the settlement negotiations were conducted in bad faith or that the consent decree was the product of collusion.). All this satisfies the Court that the Consent Decree is procedurally fair.

2. *Substantive Fairness*

a. *Comparative Fault*

The Consent Decree also meets the substantive fairness prong. Here, reviewing courts begin with "comparative fault." *In re Tutu Water Wells CERCLA Litigation*, 326 F.3d 201, 207 (3d Cir. 2003). In other words, "a party should bear the cost of the harm for which it is legally responsible." *Cannons Engineering Corp.*, 899 F.2d at 87. However, "[t]here is no universally correct approach for measuring comparative fault." *City of Grand Rapids*, 166 F. Supp. 2d at 1222 (citing *Cannons*, 899 F.2d at 87). Rather, "whatever formula or scheme the EPA advances for measuring comparative fault and allocating liability should be upheld as long as the agency supplies a plausible explanation for it, welding some reasonable linkage between the factors it includes in its formula or scheme and the proportionate shares of the settlings PRPs." *Cannons*, 899 F.2d at 87. In this, "[t]he EPA must also be given considerable flexibility in negotiating and structuring settlements so that it may diverge from an apportionment formula in order to address special factors such as the uncertainly of future events and the timing of particular settlement decisions." *City of Grand Rapids*, 166 F. Supp. 2d at 1222 (citing *Cannons*, 899 F.2d at 87-88).

The Consent Decree reflects this Court's decision that NCR is liable as an arranger of PCBS at the Site. This Court obviously believes that was the correct decision, but the Court also recognizes that the Court of Appeals may not agree or may not agree with this Court's allocation of fault. The terms of the Consent Decree strike a reasonable balance. NCR will pay a significant

7

portion of costs at the Site under the Consent Decree. The United States values NCR's obligation under the Consent Decree at approximately $245 million and estimates the total Site costs at approximately $851 million. (ECF No. 11, PageID.275). The work that NCR will perform at the Site also includes a time-critical removal action ("TCRA") at the Trowbridge dam, which is currently at risk of failure. (ECF No. 2-6, PageID.215). Other work that NCR will undertake at the Site under the Consent Decree includes removal of the Otsego City Dam; realignment of the river channel; excavation of contaminated soils along the river banks floodplain; and Gun River; excavation of other areas with high concentrations of PCBs; caping anabranches; placing institutional controls; and the performance of long-term monitoring. The Court is satisfied NCR's contribution under the Consent Decree reasonably corresponds to the Court's Phase II contribution determination. Exact correspondence to the Court's allocation is not necessary or practical. The funds that NCR will spend to perform work at the Site, the cost reimbursement and natural resource damages it will pay and the particular environmental value of some of the work, fairly reflect NCR's comparative fault for the presence of PCBs at the Kalamazoo River Site, particularly considering ongoing litigation risk.

### b. *Intervenors' Objections*

There are two overarching sets of objections made by the intervenors. The first relates to whether NCR is paying its fair share for costs at the Site. The second relates to the effect of the Consent Decree's contribution protection provision on claims Georgia-Pacific might have in the future. Neither of these objections persuade the Court that the proposed Consent Decree is substantively unfair.

### i. *Fair Share*

Intervenor Georgia-Pacific contends that the Consent Decree is unfair to the non-settling PRPs because under the decree NCR will pay less than the share of liability the Court adjudicated

as part of the earlier litigation.  Its argument, in brief, is that future costs are still very much uncertain and that the United States' estimates with respect to those numbers are too low and were arbitrarily reached.  Even under the EPA's rosy numbers, Georgia-Pacific says, NCR will pay only 28.83% of the total OU5 costs, significantly less than its 40% share as allocated in this Court's Phase II decision. (ECF No. 32, PageID.490-491).  Moreover, there is no guarantee in the Consent Decree that the funds paid by NCR will even be used towards the Site (International Paper raises a similar argument).  Furthermore, by broadly defining "matters addressed," the Consent Decree at least facially provides a wide swath of contribution protection to NCR.  In order to ensure fairness, Georgia-Pacific asks that the Consent Decree be modified to limit the "matters addressed" in the decree to the next $609 million of work at OU5.

The Court remains satisfied the Consent Decree is substantively fair as presented.

The Court's earlier allocation decision required NCR to pay approximately $20 million toward past costs, corresponding to the Court's decision finding NCR's share of response costs at the Site was 40%.  *Georgia-Pacific Consumer Prods, et al v. NCR Corp., et al*, Case No. 1:11-cv-483, ECF No. 921 PageID.34691 (W.D. Mich. Mar. 29, 2018).  NCR has that ruling on appeal now and, as always, there is litigation risk that the Court of Appeals will disagree with this Court's decision and side with NCR.  But as part of the Consent Decree, NCR is agreeing to drop its appeal and pay the Judgment without any discount.

The Court's Phase II decision expressly stated that the Court was not deciding future costs.  This was based on the inherent uncertainty of what was to come and on the possibility that comparative fault for certain future response costs might not be the same as the past cost allocation.  We are already seeing the uncertainty unfolding in a way that reduces expects costs.  The United States currently estimates that the cost to cleanup OU5 is $609 million (ECF No. 11, PageID.275), which is less than earlier estimates.  Some earlier estimates were much higher—approximately

$2.4 billion at one point—but even Georgia-Pacific does not believe the highest figure to be realistic now, given subsequent developments at the Site. (ECF No. 32, PageID.492). Yes, the number could increase, giving NCR a comparatively better deal. But it could also decrease further, particularly if the work NCR agrees to perform contributes to more rapid cleanup, giving NCR a comparatively greater share of the overall cost.[3]

The Court, furthermore, does not view the EPA's current estimate as arbitrary. The EPA's estimates are at least in the same ballpark as the $670 million Georgia-Pacific estimated during the Phase II trial with respect to future costs in OU5. (Fortenberry Test. 897:14-19, Oct. 6, 2015, *Georgia-Pacific Consumer Prods, et al v. NCR Corp., et al*, Case No. 1:11-cv-483, Trial Tr. Vol. V, ECF No. 838, PageID.28145) (W.D. Mich. filed Oct. 10, 2015). In a declaration James Saric, the EPA's Remedial Project Manager for the Site, stated that the EPA's current estimates of costs at OU5 were reached "using knowledge gained from removal actions that have been conducted at the Site, cost information from the removal actions, and remedial costs for selected remedies in River Areas 1 and 2 developed by Georgia-Pacific." (Saric Decl. ¶ I.3, ECF No. 33, PageID.582). This is not, then, a change without explanation; rather, as clearly laid out, the EPA's new estimates were formed by the years of experience working at the Site.

The Consent Decree further requires NCR to perform certain work, regardless of costs, at areas 2, 3, and 4 of OU5. The Consent Decree incorporates an opt out provision for this work, but only at a 150% premium. Either way, NCR is shouldering some risk of uncertainty too.

---

[3] To the extent the Intervenors object the Consent Decree does not ensure settlement funds will be applied to the Site, the Court is satisfied that existing EPA guidance adequately covers the matter. (*See* ECF No. 11-2). This is also what Mr. Saric declares the EPA plans to do here. (Saric Decl. ¶ 7, ECF No. 8, PageID.258). Additional language is not only unnecessary but would create a risk (however remote) that excess funds deposited in the special account will be encumbered contrary to EPA guidance.

All this satisfies the Court that the that the EPA has given a plausible explanation for its allocation, linking the fault of NCR for the presence of PCBs at the Site to the costs NCR is obligated to expend, and that NCR's share of the total cost is not so out of bounds to render the Consent Decree unfair.

    *ii.*    *Contribution Protection*

The second set of objections relates to what claims Georgia-Pacific may, or may not, have going forward given the contribution protection language as part of the consent decree. NCR claims that in approving the proposed Consent Decree, this Court also ought to "expressly confirm that [Georgia-Pacific] has no further right to seek future costs from NCR, under § 107 or otherwise, for any part of the Site." (ECF No. 26, PageID.439). The United States agrees that "Georgia-Pacific does not have a § 107 claim against NCR." (ECF No. 11, PageID.297). The intervenors other than GP ask this Court to refrain from addressing what they assert is an unripe issue. To render a decision now, they say, would be tantamount to an advisory opinion. The Court agrees.

NCR argues that the matter is ripe because Georgia-Pacific put the matter on the table in its public comments where it asked that the Consent Decree be modified to "expressly acknowledge that its contribution-protection provisions do not foreclose other PRPs from pursuing section-107 claims against NCR in the future." (ECF No. 11-1, PageID.328). The Court is not persuaded. The EPA did not modify the Consent Decree as Georgia-Pacific requested. It was satisfied that the decree as written was fair, reasonable, and consistent with CERCLA's goals and that is what is presently before the Court. Georgia-Pacific may believe that it has some available pathway notwithstanding the contribution protection provision and its failure to persuade the EPA to insert favorable language into the Consent Decree. But whether it can, or will be successful in this endeavor, does not bear on whether the Consent Decree is fair, reasonable, or consistent with CERCLA. The Court is satisfied the question of whether Georgia-Pacific can seek future costs

11

from NCR given the language of the Consent Decree must wait for another day: namely, the day—if it ever comes—that Georgia-Pacific actually tries to assert a claim.

   3.   *Reasonableness and Consistency With CERCLA's Goals.*

The Court finds the remaining two elements of the analysis are met as well: the Consent Decree is reasonable and it complies with the principal goals of CERCLA. Factors a reviewing court will consider with respect to reasonableness include the nature and extent of the hazard, the degree to which the remedy will address the hazard, possible alternatives, and the extent to which the decree furthers the goals of statute. *Akzo Coatings*, 949 F.2d at 1436. "The most important of these 'reasonableness' factors [is] the decree's likely effectiveness as a vehicle for cleansing" the Site. *Id.* at 1437. With respect to consistency with CERCLA's goals, courts consider the statutory purposes of ensuring prompt cleanup of hazardous sites, placing the costs of cleanup on PRPs, and encouraging settlement. *Best Foods v. Aerojet-General Corp.*, No. 1:89-cv-503, 2000 WL 1238910, at *12 (W.D. Mich. Aug. 24, 2000 (Hillman, J.) (citing § 9622(a) and *Akzo Coatings*, 949 F.2d at 1416-17). The same reasons for finding fairness also augur in favor of these other elements. Under the Consent Decree, NCR will not only reimburse significant costs, it will also perform new cleanup at the Site, including removal of sediment behind the failing Trowbridge Dam. In addition to paying the EPA $1.5 million for its past response costs, NCR will also pay $75 million to be deposited in a Special Account to fund further response actions at the Site. The settlement in this action also provides a significant contribution to compensation for natural resource damages. CERCLA's enforcement and settlement provisions are intended to hold liable parties accountable while remediating environmental contamination in an expeditious and efficient manner. *Akzo*, 949 F.2d at 1439; *City of Grand Rapids*, 166 F. Supp. 2d at 1226. The proposed Consent Decree achieves these goals.

## CONCLUSION

For the reasons stated above and outlined in the proposed Consent Decree itself, the Court concludes that the proposed Consent Decree is fair, reasonable, and consistent with the public interest. Therefore, the Court **GRANTS** the United States' Motion (ECF No. 10) and **APPROVES AND ADOPTS** the parties' Consent Decree (ECF No. 2-1). The Court will sign and enter the Consent Decree.

**IT IS SO ORDERED.**

Dated:   December 2, 2020              /s/ Robert J. Jonker
                                       ROBERT J. JONKER
                                       CHIEF UNITED STATES DISTRICT JUDGE